**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

GENERAL ELECTRIC COMPANY,

        *Plaintiff,*

    v.

MITSUBISHI HEAVY INDUSTRIES,
LTD., and MITSUBISHI POWER SYSTEMS
AMERICAS, INC.,

        *Defendants.*

CIVIL ACTION NO. 3:10-CV-276-F

**JURY TRIAL DEMANDED**

**APPENDIX TO MITSUBISHI'S OPPOSITION TO
GENERAL ELECTRIC'S MOTION *IN LIMINE***

    Defendants Mitsubishi Heavy Industries, Ltd. and Mitsubishi Power Systems Americas, Inc. (collectively, "MHI") respectfully submit this appendix, filed in conjunction with their opposition to General Electric's motion in limine.

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,633 | 05/24/2011 | 7,629,705 | 356282US20RX | 2639 |

45432          7590          07/27/2011
PATRICK W. RASCHE (22402)
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard
Suite 1800
St. Louis, MO 63105

| EXAMINER |
|---|
| NASSER, ROBERT L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 07/27/2011 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patents and Trademark Office
P.O.Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS
OBLON, SPIVAK, MCCLELLAND MAIER & NEUSTADT, LLP
1940 DUKE STREET
ALEXANDRIA, VA 22314

Date:

MAILED

JUL 2 7 2011

CENTRAL REEXAMINATION UNIT

**Transmittal of Communication to Third Party Requester**
**Inter Partes Reexamination**

REEXAMINATION CONTROL NO. : 95000633
PATENT NO. : 7629705
TECHNOLOGY CENTER : 3999
ART UNIT : 3992

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified Reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the inter partes reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it cannot be extended. See also 37 CFR 1.947.

If an ex parte reexamination has been merged with the inter partes reexamination, no responsive submission by any ex parte third party requester is permitted.

All correspondence relating to this inter partes reexamination proceeding should be directed to the Central Reexamination Unit at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070(Rev.07-04)

| INTER PARTES REEXAMINATION COMMUNICATION | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/000,633 | 7,629,705 |
| | Examiner | Art Unit | |
| | ROBERT NASSER | 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS ACTION IS SET TO EXPIRE
☒ <u>two</u> MONTH(S) ☐ THIRTY DAYS  FROM THE MAILING DATE OF THIS LETTER.
EXTENSIONS OF TIME FOR PATENT OWNER ARE GOVERNED BY 37 CFR 1.956.

Each time the patent owner responds to this Office action, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

| *OFFICE ACTION IN* **INTER PARTES** *REEXAMINATION* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/000,633 | 7,629,705 |
| | Examiner | Art Unit | |
| | ROBERT NASSER | 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on _____
Third Party(ies) on 24 May 2011

**RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:**

*For Patent Owner's Response:*
    2 MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response:*
    30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

**PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☒ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II. SUMMARY OF ACTION:**

1a. ☒ Claims <u>1-9,13 and 14</u> are subject to reexamination.
1b. ☒ Claims <u>10-12 and 15-17</u> are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable. [Amended or new claims]
5. ☒ Claims <u>1-9, 13, 14</u> are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____  ☐ are acceptable   ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:  ☐ approved.  ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
    ☐ been received.   ☐ not been received.   ☐ been filed in Application/Control No <u>95000633</u>.
10. ☐ Other _____

U.S. Patent and Trademark Office
PTOL-2064 (08/06)

Paper No. 20110713

Application/Control Number: 95/000,633                                    Page 2
Art Unit: 3992

# *Reexamination*

This action addresses claims 1-9, 13, and 14 of United States Patent Number 7,629,705,

for which a substantial new question of patentability has been deemed to be raised by the

Request for *Inter Partes* reexamination, which was filed 5/24/2011.

Since requester did not request reexamination of claims 10-12 and 15-17 and did not assert

the existence of a substantial new question of patentability (SNQ) for such claims (see 35 U.S.C.

§ 311(b)(2); see also 37 CFR 1.915b and 1.923), such claims will not be reexamined. This matter

was squarely addressed in *Sony Computer Entertainment America Inc., et al. v. Jon W. Dudas*,

Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy, 2006 WL 1472462. The

District Court upheld the Office's discretion to not reexamine claims in an *inter partes*

reexamination proceeding other than those claims for which reexamination had specifically been

requested. The Court stated:

> "To be sure, a party may seek, and the PTO may grant, <u>inter partes</u> review of each and every
> claim of a patent. Moreover, while the PTO in its discretion may review claims for which
> <u>inter partes</u> review was not requested, nothing in the statute compels it to do so. To ensure
> that the PTO considers a claim for <u>inter partes</u> review, <u>§ 311(b)(2)</u> requires that the party
> seeking reexamination demonstrate why the PTO should reexamine each and every claim for
> which it seeks review. Here, it is undisputed that **Sony** did not seek review of every claim
> under the '213 and '333 patents. Accordingly, **Sony** cannot now claim that the PTO wrongly
> failed to reexamine claims for which **Sony** never requested review, and its argument that
> AIPA compels a contrary result is unpersuasive."

## Information Disclosure Statement

Application/Control Number: 95/000,633                                    Page 3
Art Unit: 3992

Several items were lined through in the IDS of 5/24/2011, as the particular items while

pertinent to the case, are not prior art.


### Reference Cited In the Request

U.S. Patent Application  Publication No. 2005/0122083 to Erdman et al., entitled "Generator
with Utility Fault Ride-Through Capability," published June 9, 2005 ("Erdman").

U.S. Patent No. 6,784,565 to Wall et al, entitled "Turbogenerator with Electrical Brake," filed
February 15, 2002 and issued August 31, 2004 ("Wall").

US Patent 6,531,926 to Pate et al entitled "Dynamic Control of Phase-Locked Loop," filed
September 11, 2002 and issued March 11, 2003 ("Pate").

Kaura et al "Operation of a Phase Locked Loop System Under Distorted Utility Conditions,"
IEEE Transactions on Industry Applications, vol. 33, No. 1, pp. 58-63, published Jan./Feb.
1997 ("Kaura").

"A Novel Adaptive Gain-Scheduling Controller for Synchronous Generator," R. Mohammadi-
Milasi, et al., Proceedings of the 2004 IEEE International Conference on Control Applications,
Taipei, Taiwan, September 2-4, 2004 ("Milasi").

U.S. Patent Application Publication No. 2009/0079193 to Nielsen et al, entitled "Method of
Controlling a Wind Turbine Connected to an Electric Utility Grid," published March 26, 2009
and filed December 28, 2004 ("Nielsen")

International Publication WO 2004/008627 to Bucker entitled "Method for Operating a Wind
Power Plan and Method for Operating It," published on January 22, 2004 ("Bucker").

"E.ON I Netz Grid Code: High and extra high voltage," E.ON Netz GmbH, Bayreuth, Germany,
published August 2003 ("EON 2003")
102(b).

US Patent 7,607,896 to Leuthen et al, entitled  "Systems and Methods for Power Ride-Through
in Variable Speed Drives," filed August 10, 2006, issued October 27, 2009 ("Leuthen)

International Publication WO 2003/058789 to Feddersen et al,  entitled "Power Grid Connection
System for a Wind Turbine Generator," published July 17, 2003 ("Feddersen").

Application/Control Number: 95/000,633                                          Page 4
Art Unit: 3992

U.S. Patent 6,285,533 to Sakamoto entitled "Method and Apparatus for Controlling the
Operation of Variable Speed Gearing," issued September 4, 2001 ("Sakamoto").

U.S. Published Application 2004/0207206 to Wobben entitled "Method for Operating a Wind
Energy Plant," published October 21 (Wobben US '206).

"E.ON I Netz: Supplemental Network Connection Rules for Wind Energy Systems," E.ON Netz
GmbH, published December 1,2001 ("E.ON 2001")..

International Publication WO 2005/031941 to Wobben entitled "Method for Operating a Wind
Turbine During a Disturbance in the Grid," published April 7, 2005 ("Wobben WO '941). All
references to the Wobben WO '941 International Patent Publication are made by citation to a
certified English translation filed during prosecution of the corresponding U.S. national stage
patent, U.S. Patent No. 7,525,208.


### Rejections Proposed by the Requester

        Within the scope of reexamination, the requester proposes the following rejections:

1A.     The request proposes that claims 1 and 7 are rejected under 35 USC 102(b) as being
        anticipated by Erdman.

1B.     The request proposes that claims 2-5, 8, 9, 13, and 14 are rejected under 35 USC 103(a)
        as being unpatentable over Erdman in view of Pate.

1C.     The request proposes that claims 2-6, 9, 13, and 14 are rejected under 35 USC 103(a) as
        being unpatentable over Erdman in view of Pate and Kaura.

1D.     The request proposes that claim 8 is rejected under 35 USC 103(a) as being unpatentable
        over Erdman in view of Kaura.

1E.     The request proposes that claim 8 is rejected under 35 USC 103(a) as being unpatentable
        over Erdman in view of Milasi.

2A.     The request proposes that claims 1 and 7 are rejected under 35 USC 102(b) as being
        anticipated by Wall.

2B.     The request proposes that claims 2-5, 8, 9, 13, and 14 are rejected under 35 USC 103(a)
        as being unpatentable over Wall in view of Pate.

2C.     The request proposes that claims 2-6, 9, 13, and 14 are rejected under 35 USC 103(a) as
        being unpatentable over Wall in view of Pate and Kaura.

Application/Control Number: 95/000,633                                    Page 5
Art Unit: 3992

2D.  The request proposes that claim 8 is rejected under 35 USC 103(a) as being unpatentable over Wall in view of Kaura.

2E.  The request proposes that claim 8 is rejected under 35 USC 103(a) as being unpatentable over Wall in view of Milasi.

3A.  The request proposes that claims 1 and 7 are rejected under 35 USC 102(b) as being anticipated by Wobben WO '941.

4A.  The request proposes that claim 9 is rejected under 35 USC 102(b) as being anticipated by Leuthen.

4B.  The request proposes that claim 13 is rejected under 35 USC 103(a) as being unpatentable over Bucker in view of Leuthen.

5A.  The request proposes that claims 1 and 7 are rejected under 35 USC 103(a) as being unpatentable over Fedderson in view of EON 2003.


The proposed rejections identified in issues 1A, 1B, 1C, 1D, 1E, 2A, 2B, 2C, 2D, 2E, 3A, and 5A are **adopted** .

The proposed rejections identified in issues 4A and 4B are **not adopted**.


The examiner notes that the request proposed the following additional rejections:

1) the request proposes that claim 7 is rejected under 35 USC 102(b) as being anticipated by Bucker.

2) the request proposes that claims 1 and 7 are under 35 USC 103(a) as being unpatentable over Feddersen in view of EON 2001.

3) the request proposes that claims 1 and 7 are rejected under 35 USC 102(e) as being anticipated by Nielsen.

4) the request proposes that claims 7 is rejected under 35 USC 102(b) as being anticipated by Sakamoto.

5) the request proposes that claims 7 is rejected under 35 USC 102(b) as being anticipated by Wobben Us '206.

Application/Control Number: 95/000,633                                    Page 6
Art Unit: 3992

However, since the teachings of these references were deemed not to raise a substantial

new question of patentability, these additional rejections are outside the scope of reexamination.


## Relevant Statutes

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

(e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.


The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.


## Rejections

The examiner notes that the declaration of Mr. Harley, filed 5/24/2001 has been

considered in its entirety.


**1. Erdman**

Application/Control Number: 95/000,633                                    Page 7

Art Unit: 3992

**A. The request proposes that claims 1 and 7 are rejected under 35 USC 102(b) as**

**being anticipated by Erdman (adopted).**

This rejection was proposed by third party requester in the request for reexamination on

pages 92-100 (claim 1) and pages 133-139 (claim 7).  These rejections are **adopted** as proposed

in the request and are hereby incorporated by reference, with the following clarification by the

examiner.

Erdman teaches a method for operating a wind turbine, which is an electrical machine.

Erdman shows, in figure 1, a series of turbines 3, as part of a collection system 5, that are

connected to the utility grid 7.  In figure 2, Erdman shows a control system 24 connected to the

collection system 5 through transformer 27.  As such, the turbine is connected to the power grid.

Furthermore, in paragraph [0033] Erdman teaches that the system can operate on three phase or

one phase power, which is received from the grid.  Furthermore, as noted by the Harley

declaration, one skilled in the art would have understood that the turbine of Erdman received

power from the grid (see Harley declaration paragraphs 108-111).  Erdman further teaches in

paragraph [0038] that the system would stay connected to the grid, e.g. ride through, when a fault

condition occurs.  In paragraph [0037}, Erdman further teaches supplying current to the grid

before, during and after a fault, where a fault is defined as a significant reduction in voltage for a

short duration (see paragraph [0006]).  As such, it is clear that Erdman remains connected to the

grid during and subsequent to a reduction in voltage.  In addition, the control system 24 is

connected to the grid (power system) through transformer 27 and is connected to the turbine 17

(see for example, paragraph [0031]).  Both the machine and the control system remain connected

Application/Control Number: 95/000,633                                        Page 8
Art Unit: 3992

to the grid during a voltage fault, which includes a zero volt fault (see paragraph [0035]). As

such, the system is configured to ride through a zero volt fault condition and remain connected to

the power grid. Claim 7 is rejected for the same reasons given above, noting that Erdman

satisfies either alternative in the claim.


**B. The request proposes that claims 2-5, 8, 9, 13, and 14 are rejected under 35 USC**

**103(a) as being unpatentable over Erdman in view of Pate (adopted).**

The rejection of claim 2 is proposed by third party requester in the request for

reexamination on pages 100-107. The rejection of claim 3 is proposed by third party requester in

the request for reexamination on pages 110-114. The rejection of claim 4 is proposed by third

party requester in the request for reexamination on pages 120-122. The rejection of claim 5 is

proposed by third party requester in the request for reexamination on pages 124-125. The

rejection of claim 8 is proposed by third party requester in the request for reexamination on

pages 139-142. The rejection of claim 9 was proposed by third party requester in the request for

reexamination on pages 147-156. The rejection of claim 13 was proposed by third party

requester in the request for reexamination on pages 158-168. The rejection of claim 14 was

proposed by third party requester in the request for reexamination on pages 169-172.

These rejections are **adopted** as proposed in the request and hereby incorporated by

reference, with the following clarification.

As to claim 9, the multiplier 33 of Erdman outputs a signal that has a dc offset related to

the phase difference between the corrective signal and the input. As such, it detects the phase.

In addition, the filter 38 and P.I. combine to form a P.I. filter scheme.

Application/Control Number: 95/000,633                                          Page 9
Art Unit: 3992

**C. The request proposes that claims 2-6, 9, 13, and 14 are rejected under 35 USC 103(a) as being unpatentable over Erdman in view of Pate and Kaura (adopted).**

The rejection of claim 2 is proposed by third party requester in the request for reexamination on pages 107-110. The rejection of claim 3 is proposed by third party requester in the request for reexamination on pages 115-120. The rejection of claim 4 is proposed by third party requester in the request for reexamination on pages 122-123. The rejection of claim 5 is proposed by third party requester in the request for reexamination on pages 125-129. The rejection of claim 6 is proposed on pages 129-133. The rejection of claim 9 was proposed by third party requester in the request for reexamination on pages 157-158. The rejection of claim 13 was proposed by third party requester in the request for reexamination on pages 168-169. The rejection of claim 14 was proposed by third party requester in the request for reexamination on page 173.

These rejections are **adopted** as proposed in the request and hereby incorporated by reference, with the following clarification.

As to claim 9, the multiplier 33 of Erdman outputs a signal that has a dc offset related to the phase difference between the corrective signal and the input. As such, it detects the phase. In addition, the filter 38 and P.I. combine to form a P.I. filter scheme.

**D. The request proposes that claim 8 is rejected under 35 USC 103(a) as being unpatentable over Erdman in view of Kaura (adopted).**

Application/Control Number: 95/000,633                                      Page 10
Art Unit: 3992

The rejection is proposed on pages 143-145 of the request. The rejection is **adopted** as proposed in the request and is hereby incorporated by reference.

**E. The request proposes that claim 8 is rejected under 35 USC 103(a) as being unpatentable over Erdman in view of Milasi (adopted).**

The rejection is proposed on pages 145-147 of the request. The rejection is **adopted** as proposed in the request and is hereby incorporated by reference.

## 2. Wall

**A. The request proposes that claims 1 and 7 are rejected under 35 USC 102(b) as being anticipated by Wall (adopted).**

This rejection is proposed by third party requester in the request for reexamination on pages 174-184 (claim 1) and pages 217-224 (claim 7). These rejections are **adopted with additional clarification by the examiner.**

Wall shows an power supply, such as a wind turbine (column 3, lines 17-19), that is connected to the utility load 18 through power converters 14 and 16, where the utility load may be a utility grid (column 1, line 23). Further, Wall states that the turbine 12 receives power from the utility/load 18 through DC bus 24 (see column 4, lines 15-18). As such, the turbine is connected to the power grid and is configured to receive at least one phase pf electrical power from the grid. Wall further teaches that there is a power controller which includes a transient handling system 580. The transient handling system 580 is configured to ride through transients,

Application/Control Number: 95/000,633                               Page 11
Art Unit: 3992

e.g. stay connected to the gird, which include voltage sags (see column 23, lines 26-35).  A

voltage sag, as shown in figure 17, is a voltage event between 0 and 220 volts line to line RMS

for a duration of less than 400 ms.  As such, Wall teaches that both the turbine and the controller

remain connected to the grid during and subsequent to a voltage sag, which is a voltage outside

of a predetermined range, e.g. below 220 volts, for an undetermined period of time, e.g. up to

400 ms.  In order to configure the system to remain connected to the grid, Wall has the controller

620 which receives three phases of voltage from the grid (see figure 16) and communicates with

the turbine (see figure 18), and configuring the controller and turbine to remain connected to the

grid during and subsequent to a voltage sag below a predetermined range, e.g. 220 volts, where

the sag can include a zero-volt fault condition (see figure 17).


**B. The request proposes that claims 2-5, 8, 9, 13, and 14 are rejected under 35 USC
103(a) as being unpatentable over Wall in view of Pate (adopted).**

The rejection of claim 2 is proposed by third party requester in the request for

reexamination on pages 184-192.  The rejection of claim 3 is proposed by third party requester in

the request for reexamination on pages 195-198.  The rejection of claim 4 is proposed by third

party requester in the request for reexamination on pages 204-206.  The rejection of claim 5 is

proposed by third party requester in the request for reexamination on pages 207-209.  The

rejection of claim 8 is proposed by third party requester in the request for reexamination on

pages 224-227.  The rejection of claim 9 was proposed by third party requester in the request for

reexamination on pages 232-238.  The rejection of claim 13 was proposed by third party

Application/Control Number: 95/000,633                                      Page 12
Art Unit: 3992

requester in the request for reexamination on pages 240-247.  The rejection of claim 14 was

proposed by third party requester in the request for reexamination on page 248-251.

These rejections are **adopted** as proposed in the request and hereby incorporated by

reference.


**C. The request proposes that claims 2-6, 9, 13, and 14 are rejected under 35 USC**

**103(a) as being unpatentable over Wall in view of Pate and Kaura (adopted).**

The rejection of claim 2 is proposed by third party requester in the request for

reexamination on pages 192-195. The rejection of claim 3 is proposed by third party requester in

the request for reexamination on pages 198-203.  The rejection of claim 4 is proposed by third

party requester in the request for reexamination on pages 206-207.  The rejection of claim 5 is

proposed by third party requester in the request for reexamination on pages 209-213. The

rejection of claim 6 is proposed on pages 213-216.  The rejection of claim 8 is proposed by third

party requester in the request for reexamination on pages 227-229.  The rejection of claim 9 was

proposed by third party requester in the request for reexamination on pages 239.  The rejection

of claim 13 was proposed by third party requester in the request for reexamination on pages 247-

248. The rejection of claim 14 was proposed by third party requester in the request for

reexamination on pages 251-252.

These rejections are **adopted** as proposed in the request and hereby incorporated by

reference.

Application/Control Number: 95/000,633                                        Page 13
Art Unit: 3992

**D. The request proposes that claim 8 is rejected under 35 USC 103(a) as being**

**unpatentable over Wall in view of Kaura (adopted).**

The rejection is proposed on pages 227-229 of the request.  The rejection is **adopted** as

proposed in the request and is hereby incorporated by reference. .

**E. The request proposes that claim 8 is rejected under 35 USC 103(a) as being**

**unpatentable over Wall in view of Milasi (adopted).**

The rejection is proposed on pages 229-232 of the request.  The rejection is **adopted** as

proposed in the request and is hereby incorporated by reference.

**3. Wobben WO '941**

**A. The request proposes that claims 1 and 7 are rejected under 35 USC 102(b) as**

**being anticipated by Wobben WO '941 (adopted).**

This rejection is proposed by third party requester in the request for reexamination on

pages 252-266.  These rejections are **adopted** as proposed in the request and are hereby

incorporated by reference.

**4. Leuthen**

**A. The request proposes that claim 9 is rejected under 35 USC 102(b) as being**

**anticipated by Leuthen (not adopted).**

This rejection is proposed by third party requester in the request for reexamination on

pages 266-270.  This rejection is **not adopted.**

Application/Control Number: 95/000,633                                       Page 14
Art Unit: 3992

Claim 9 requires a phase locked loop (PLL) regulator that comprises a PLL that comprises at least one phase detection scheme and at least one proportional-integral (PI) filter scheme.   In other words, both the phase detection scheme and the PI filter scheme must be part of the PLL.   In Leuthen, the PI controller 340 is separate from the PLL 310. Also, it is unclear whether the PI regulator 340 is a filter.   As such, Leuthen is missing at least one feature of claim 9 and therefore the rejection is not adopted.

**B. The request proposes that claim 13 is rejected under 35 USC 103(a) as being unpatentable over Bucker in view of Leuthen (not adopted).**

This rejection is proposed by third party requester in the request for reexamination on pages 276-287.   This rejection is **not adopted.**

Claim 13 requires a phase locked loop (PLL) regulator that comprises a PLL that comprises at least one phase detection scheme and at least one proportional-integral (PI) filter scheme.   In other words, both the phase detection scheme and the PI filter scheme must be part of the PLL.   In Leuthen, the PI controller 340 is separate from the PLL 310. Also, it is unclear whether the PI regulator 340 is a filter.   Bucker does not show this feature.   As such, the combination is missing at least one feature of claim 13 and therefore the rejection is not adopted.

**5. Feddersen**

**A. The request proposes that claims 1 and 7 are rejected under 35 USC 103(a) as being unpatentable over Feddersen in view of EON 2003 (adopted).**

Application/Control Number: 95/000,633                                  Page 15
Art Unit: 3992

These rejections are proposed by third party requester in the request for reexamination on

pages 304-320.  These rejections are **adopted** as proposed in the request and hereby incorporated

by reference.

Application/Control Number: 95/000,633                                      Page 16
Art Unit: 3992

### *Amendment in Reexamination Proceedings*

Patent Owner is notified that any proposed amendment to the specification and/or claims

in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally

presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR

1.20(c).

In order to ensure full consideration of any amendments, affidavits or declarations, or

other documents as evidence of patentability, such documents must be submitted in response to

this Office action.  Submissions after the next Office action, which is intended to be an Action

Closing Prosecution (ACP), will be governed by 37 CFR 1.116(b) and (d), which will be strictly

enforced.


### *Service of Papers*

After filing of a request for inter partes reexamination by a third party requester,

any document filed by either the patent owner or the third party requester must be

served on every other party in the reexamination proceeding in the manner provided in

§ 1.248. Any document must reflect service or the document may be refused

consideration by the Office. The failure of the patent owner or the third party requester

to serve documents may result in their being refused consideration.  See 37 CFR 1.903

Application/Control Number: 95/000,633                                    Page 17
Art Unit: 3992

### Extensions of Time

Extensions of time under 37 CFR 1.136(a) will not be permitted in *inter partes* reexamination

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to

parties in a reexamination proceeding. Additionally, 35 U.S.C. 314(c) requires that *inter partes*

reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.937). Patent

owner extensions of time in *inter partes* reexamination proceedings are provided for in 37 CFR

1.956. Extensions of time are not available for third party requester comments, because a

comment period of 30 days from service of patent owner's response is set by statute. 35 USC

314(b)(3).

### Notification of Concurrent Proceedings

The patent owner is reminded of the continuing responsibility under 37 CFR 1.985 to apprise the

Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No.

7519327 throughout the course of this reexamination proceeding. The third party requester is

also reminded of the ability to similarly apprise the Office of any such activity or proceeding

throughout the course of this reexamination proceeding. See MPEP § 2686 and 2686.04.

Application/Control Number: 95/000,633                                    Page 18
Art Unit: 3992

**All** correspondence relating to this *inter partes* reexamination proceeding should be directed as
follows:

By **U.S. Postal Service Mail** to:

      Mail Stop *Inter Partes* Reexam
      ATTN:  Central Reexamination Unit
      Commissioner for Patents
      P.O. Box 1450
      Alexandria, VA  22313-1450

By FAX to:    (571) 273-9900
              Central Reexamination Unit

By hand to:    Customer Service Window
              Randolph Building
              401 Dulany St.
              Alexandria, VA  22314

By EFS:.     Registered users may submit via the electronic filing system EFS-Web, at
https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html.

For EFS-Web transmissions, 37 CFR 1.8(a)(1)(i) (C) and (ii) states that correspondence (except
for a request for reexamination and a corrected or replacement request for reexamination) will be
considered timely filed if (a) it is transmitted via the Office's electronic filing system in
accordance with 37 CFR 1.6(a)(4), and (b) includes a certificate of transmission for each piece of
correspondence stating the date of transmission, which is prior to the expiration of the set period
of time in the Office action.

Any inquiry concerning this communication or earlier communications from the Reexamination
Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the
Central Reexamination Unit at telephone number (571) 272-7705.

/Robert L. Nasser Jr/
Robert L. Nasser Jr.
CRU Examiner
AU 3992
(571) 272-4731

Conferee    _70†_____

Conferee   _ABC_____

71338   U.S. PTO

SHEET   1   OF   1

| | | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | ATTY DOCKET NO. 356282US20RX | | SERIAL NO.   71338   U.S. PTO New Reexamination Application |
|---|---|---|---|---|---|
| 05/24/11 | | | APPLICANT Sidney A. BARKER, et al. | | 95000633 |
| LIST OF REFERENCES CITED BY APPLICANT | | | FILING DATE Herewith | | GROUP |

**U.S. PATENT DOCUMENTS**

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | AA | 7,629,705 | 12/8/2009 | Sidney A. BARKER et al. | | | |
| | AB | 2005/0122083 | 06/09/2005 | William ERDMAN et al. | | | |
| | AC | 6,784,565 | 08/31/2004 | Simon WALL et al. | | | |
| | AD | 6,531,926 | 03/11/2003 | Prayson W. PATE et al. | | | |
| | AE | 2009/0079193 | 03/26/2009 | John G. NIELSEN et al. | | | |
| | AF | 2007/0132248 | 06/14/2007 | Haiqing WENG et al. | | | |
| | AG | 2004/0145188 | 07/29/2004 | Wilhelm JANSSEN et al. | | | |
| | AH | 5,239,251 | 08/24/1993 | Hian K. LAUW | | | |
| | AI | 7,607,896 | 10/27/2009 | John M. LEUTHEN et al. | | | |
| | AJ | 6,285,533 | 09/04/2001 | Shigeru SAKAMOTO | | | |
| | AK | 2004/0207206 | 10/21/2004 | Aloys WOBBEN | | | |

**FOREIGN PATENT DOCUMENTS**

| | | DOCUMENT NUMBER | DATE | COUNTRY | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|
| | AL | WO 2004/008627 | 01/22/2004 | WIPO | | |
| | AM | WO 03/058789 A1 | 07/17/2003 | WIPO | | |
| | AN | WO 2005/031941 A1 | 04/07/2005 | WIPO (Certified English translation attached as Exhibit AA) | X | |

**OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, etc.)**

| | | |
|---|---|---|
| | AO | Vikram KAURA, "Operation of a Phase Locked Loop System Under Distorted Utility Conditions" IEEE Transactions on Industry Applications, vol. 33, No. 1, pp. 58-63, published Jan./Feb. 1997. |
| | AP | R. MOHAMMADI-MILASI et al., "A Novel Adaptive Gain-Scheduling Controller for Synchronous Generator" Proceedings of the 2004 IEEE International Conference on Control Applications, Taipei, Taiwan, September 2-4, 2004. |
| | ~~AQ~~ | ~~DECLARATION OF DR. RONALD HARLEY UNDER 37 C.F.R. § 1132~~ |
| | AR | "E.ON"|Netz Grid Code: High and extra high voltage", E.ON Netz GmbH, Bayreuth, Germany, published August 2003. |
| | AS | "United States of America Federal Energy Regulatory Commission: Order No. 661-A", issued December 12, 2005. |
| | AT | "Wind Farm Integration in British Columbia - Stages 1 & 2: Planning and Interconnection Criteria", submitted by Electric System Consulting, ABB Inc., published March 28, 2005. |
| | AU | "Phase Locked-Loops: Design, Simulation, and Application" Best, Roland E., second edition, published 1993, incorporated by reference within "Erdman". |
| | AV | "Phase Locked-Loops: Design, Simulation, and Application" Best, Roland E., fourth edition, published 1999, incorporated by reference within "Pate". |
| | ~~AW~~ | ~~File History for the 11/551,430 patent application from PAIR.~~ |
| | ~~AX~~ | ~~USPTO Patent Assignment Details for the 7,629,705 patent.~~ |
| | ~~AY~~ | ~~Curriculum Vitae of Ronald G. HARLEY~~ |
| | AZ | "Supplemental Network Connection Rules for Wind Energy Systems", E.ON Netz GmbH, Status: December 1, 2001 |
| | AA | Certified English translation of WO 2005/031941 A1 obtained via PAIR IFW of corresponding U.S. Patent No. 7,525,208. □ Additional References sheet(s) attached |

| Examiner /Robert Nasser/ | | Date Considered   07/15/2011 |
|---|---|---|

*Examiner: Initial if reference is considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /B.N./

| *Reexamination* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 95000633 | 7,629,705 |
| | **Certificate Date** | **Certificate Number** |

| Requester Correspondence Address: | ☐ Patent Owner | ☒ Third Party |
|---|---|---|

Edward H. Kuesters and Zachary S. Stern
1940 Duke Street
Alexandria, VA 22314

| LITIGATION REVIEW ☒ | RLN (examiner initials) | 07/13/2011 (date) |
|---|---|---|
| Case Name | | Director Initials |
| General Electric Company v. Mitsubishi Heavy Industries, LTD et al, 3:10cv276, US District Court for the Northern District of Texas | | ARC for SY |
| | | |
| | | |
| | | |
| | | |

| COPENDING OFFICE PROCEEDINGS | |
|---|---|
| TYPE OF PROCEEDING | NUMBER |
| NoNE | |
| | |
| | |
| | |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office                                   DOC. CODE  RXFILJKT

MITSUBISHI APPENDIX                                                                23

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 95000633 | 7,629,705 |
| | Examiner | Art Unit |
| | ROBERT NASSER | 3992 |

## SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

## SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| reviewed prosecution history of us patent 7629705 | 7/6/2011 | nasser |

## INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office                    Part of Paper No. : 20110705

**American Bar Association**
**www.supremecourtpreview.org**

No. 10-290

IN THE

## Supreme Court of the United States

MICROSOFT CORPORATION,

*Petitioner,*

v.

I4I LIMITED PARTNERSHIP AND
INFRASTRUCTURE FOR INFORMATION, INC.,

*Respondents.*

On Writ Of Certiorari
To The United States Court Of Appeals
For The Federal Circuit

BRIEF OF *AMICUS CURIAE* INTERNATIONAL
BUSINESS MACHINES CORPORATION
IN SUPPORT OF NEITHER PARTY

RONALD A. LAUDERDALE
MANNY W. SCHECTER
MARIAN UNDERWEISER
MARC A. EHRLICH
IBM CORPORATION
One North Castle Drive
Armonk, NY 10504
(914) 765-4343

KENNETH R. ADAMO
*Counsel of Record*
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939
kradamo@jonesday.com

LAWRENCE D. ROSENBERG
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
(202) 879-3939

TRACI L. LOVITT
JONES DAY
175 Federal Street
Suite 501
Boston, MA 02110
(617) 342-8117

February 2, 2011

*Counsel for Amicus Curiae*

## QUESTION PRESENTED

The Patent Act provides that "[a] patent shall be presumed valid" and that "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. §282. The Federal Circuit held below that Microsoft was required to prove its defense of invalidity under 35 U.S.C. §l02(b) by clear and convincing evidence, even though Microsoft claimed that the prior art on which the invalidity defense rested was not considered by the Patent and Trademark Office prior to the issuance of the asserted patent.

The question presented is:  Whether the court of appeals correctly held that Microsoft's invalidity defense must be proved by clear and convincing evidence.

ii

# TABLE OF CONTENTS

Page

QUESTION PRESENTED ........................................ i

TABLE OF AUTHORITIES ..................................... iv

INTEREST OF *AMICUS CURIAE* ........................... 1

STATEMENT ............................................................ 3

SUMMARY OF THE ARGUMENT .......................... 4

ARGUMENT ............................................................ 7

I. THE CLEAR AND CONVINCING EVIDENCE STANDARD IS ESSENTIAL TO A WORKABLE PATENT SYSTEM AND SHOULD BE MAINTAINED. ............................................. 9

    A. The Clear And Convincing Evidence Standard Accords Appropriate Deference To The PTO's Expertise And Procedures. ........ 9

    B. The Clear And Convincing Evidence Standard Promotes Invention Creation, Disclosure, And Commercialization. ................... 14

II. A PREPONDERANCE OF THE EVIDENCE STANDARD OR DUAL STANDARD WOULD BE UNWORKABLE AND WOULD THWART INNOVATION. ........................... 16

    A. Lowering The Burden For All Validity Challenges Would

iii

TABLE OF CONTENTS
(continued)

Page

        Eviscerate The Deference Owed To The PTO. ....................................... 17

B.    Creating A Dual Standard Is Not The Answer. ...................................... 18

C.    Changing The Evidentiary Standard for Proving Patent Invalidity Would Inject Uncertainty And Upset The Balance In The Patent System. ........ 23

III.   TRIAL COURTS CAN USE APPROPRIATE JURY INSTRUCTIONS TO ENABLE A MORE COMPLETE AND PRECISE EVALUATION OF EVIDENCE PERTINENT TO INVALIDITY. .............................................. 24

A.    Jury Instructions Are Effective Tools For Managing The Jury's Use Of The Evidence Presented. ....... 25

B.    Appropriate Jury Instructions Are The Best Tools For Addressing Questions Regarding Consideration Of Prior Art. .............. 31

CONCLUSION ....................................................... 37

iv

# TABLE OF AUTHORITIES

Page

Cases

*Agfa Corp. v. Creo Products, Inc.,*
  451 F.3d 1366 (Fed. Cir. 2006) ........................ 11

*Am. Eagle Ins. Co. v. Thompson,*
  85 F.3d 327 (8th Cir. 1996) .............................. 29

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.,*
  725 F.2d 1350 (Fed. Cir. 1984) ........................ 32

*ATD Corp. v. Lydall, Inc.,*
  159 F.3d 534 (Fed. Cir. 1998) .................... 30, 31

*Bilski v. Kappos*
  130 S.Ct. 3218 (2010) ................................. 14, 23

*Bonito Boats, Inc. v. Thunder Craft Boats,*
  *Inc.,* 489 U.S. 141 (1989)..................................... 6

*Burke v. Spartanics, Ltd.,*
  252 F.3d 131 (2d Cir. 2001).............................. 29

*Bruno Indep. Living Aids, Inc. v. Acorn*
  *Mobility Servs., Ltd.,*
  394 F.3d 1348 (Fed. Cir. 2005) ........................ 22

*Cantrell v. Wallick,*
  117 U.S. 689 (1886) ........................................... 9

*Chiron Corp. v. Genentech, Inc.,*
  363 F.3d 1247 (Fed. Cir. 2004) .................. 29, 30

*Connell v. Sears, Roebuck & Co.,*
  722 F.2d 1542 (Fed. Cir. 1983) .......................... 9

*Comaper Corp. v. Antec, Inc.,*
  596 F.3d 1343 (Fed. Cir. 2010) ........................ 21

*Dawson Chem. Co. v. Rohm & Haas Co.,*
  448 U.S. 176 (1980) ........................................... 7

*Desmond v. Mukasey,*
  530 F.3d 944 (D.C. Cir. 2008) ......... 27, 33, 34, 37

*Faulkner v. Super Valu Stores, Inc.,*
  3 F.3d 1419 (10th Cir. 1993) ...................... 28, 36

v

TABLE OF AUTHORITIES

(continued)

Page

*Francis v. Franklin,*
    471 U.S. 307 (1985) .......................................... 25
*Greer v. Miller,*
    483 U.S. 756 (1987) .......................................... 25
*i4i Ltd. Partnership v. Microsoft Corp.,*
    598 F.3d 831 (Fed. Cir. 2010) ......................... 3, 4
*Kingsdown Medical Consultants, LTD. v.*
    *Hollister Inc.,* 863 F.2d 867(Fed Cir. 1988)...... 11
*KSR Int'l Co. v. Teleflex Inc.,*
    550 U.S. 398 (2007) .................................... 14, 23
*Lannom Mfg. Co, Inc. v. U.S. Int'l Trade*
    *Comm'n,*
    799 F.2d 1572 (Fed. Cir. 1986) ......................... 10
*Lutwak v. United States,*
    344 U.S. 604 (1953) .......................................... 26
*Marshall v. Lonberger,*
    459 U.S. 422 (1983) .......................................... 25
*McGrath v. Consol. Rail Corp.,*
    136 F.3d 838 (1st Cir. 1998)................. 28, 29, 35
*Medforms Inc. v. Healthcare Mgmt. Solutions,*
    *Inc.,* 290 F.3d 98 (2d Cir. 2002) ................ 13, 17
*Merrick v. Paul Revere Life Ins. Co.,*
    500 F.3d 1007 (9th Cir. 2007) .................... 29, 31
*Miranda v. Arizona,*
    384 U.S. 436 (1966) .......................................... 25
*Philip Morris USA v. Williams,*
    549 U.S. 346 (2007) .......................................... 26
*Radio Corp. of Am. v. Radio Eng'g*
    *Laboratories,*
    293 U.S. 1 (1934) ............................................. 4, 9

vi

TABLE OF AUTHORITIES
(continued)

Page

*Richardson v. Marsh,*
    481 U.S. 200 (1987) ...................................... 25, 26
*Smith v. Hall,*
    301 U.S. 216 (1937) ............................................. 9
*United States v. Heatley,*
    No. S2 96 Cr. 515 (SS), 1997 WL 12961
    (S.D.N.Y. Jan. 14, 1997)................................... 26
*United States v. Morgan,*
    313 U.S. 409 (1941) ............................................ 9
*United States v. The Spy Factory, Inc.,*
    960 F. Supp. 684 (S.D.N.Y. 1997) .................... 26
*W. Elec. Co. v. Piezo Tech., Inc.,*
    860 F.2d 428 (Fed. Cir. 1988) .............. 10, 13, 20
*Watkins v. Sowders,*
    449 U.S. 341 (1981) .......................................... 25
*Wipf v. Kowalski,*
    519 F.3d 380 (7th Cir. 2008) ............................ 29
*Wong Sun v. United States,*
    371 U.S. 471 (1963) .......................................... 26


Statutes, Codes & Rules

35 U.S.C. § 102(b) ................................................... 3
35 U.S.C. § 282 ............................................... 10, 17
37 C.F.R. § 1.56 ..................................................... 11
MPEP § 902.01 ...................................................... 11
MPEP § 902.02 ...................................................... 11
MPEP § 902.03 ...................................................... 11
MPEP § 904.02 ...................................................... 11
Supreme Court Rule 37.3 ....................................... 1
Supreme Court Rule 37.6 ....................................... 1

vii
## TABLE OF AUTHORITIES
(continued)

Page

Miscellaneous

Sara-Jayne Adams, *Quality Is The Key To A Bright Patent Future*, INTELLECTUAL ASSET MANAGEMENT, Apr./May 2008 .......................... 14

Am. Intellectual Prop. Law Ass'n, *AIPLA Response to the October 2003 Federal Trade Commission Report* (2004) ............... 16, 22

Biotechnology Industry Organization, *BIO Response to the Federal Trade Commission's Patent System Reform Recommendations* (2004) ........................... 16, 18

Etan S. Chatlynne, Note, *The Burden of Establishing Patent Invalidity: Maintaining a Heightened Evidentiary Standard Despite Increasing "Verbal Variances,"* 31 Cardozo L. Rev. 297 (2009) ...... 17

FISCAL YEAR 2010 USPTO WORKLOAD TABLES, *available at* http://www.uspto.gov/about/stratplan/ar/20 10/oai_06_wlt_00.html ....................................... 19

Marla Page Grossman, *Diversion of USPTO User Fees: A Tax on Innovation*, Issue Brief (Institute for Policy Innovation, Tex.), Apr. 27, 2009 ................................................... 7, 8

Richard S. Gruner, *Better Living Through Software: Promoting Information Processing Advances Through Patent Incentives*, 74 St. John's L. Rev. 977 (2000) .......................................................... 15, 24

Robert Hunt, *Patent Reform: A Mixed Blessing for the U.S. Economy?*, Business

viii
## TABLE OF AUTHORITIES
(continued)

Page

Review (Federal Reserve Bank of
Philadelphia), Nov./Dec. 1999 ............................ 8

Paul R. Michel, Former Chief Judge, United
States Court of Appeals for the Federal
Circuit, Address Prepared for the Global
Intellectual Property Center of the U.S.
Chamber of Commerce (July 21, 2010),
http://www.theglobalipcenter.com/sites/defa
ult/files/documents/CJ_Michel_Remarks_7.
21.2010.pdf ........................................................ 7

President Barack Obama, Remarks in State of
the Union Address (Jan. 25, 2011),
http://www.whitehouse.gov/the-press-
office/2011/01/25/remarks-president-state-
union-address .................................................... 7

Peer to Patent Steering Committee, *available
at http://peertopatent.tumblr.com/
steeringcommittee* ............................................ 14

Patently-O, *available at*
http://www.patentlyo.com/patent/2009/04/p
ercentage-of-patents-that-were-initially-
rejected.html ..................................................... 12

Press Release, IBM Shatters U.S. Patent
Record; Tops Patent List for 18th
Consecutive Year (Jan. 10, 2011) *available
at* http://www-03.ibm.com/press/us/en/
presskit/33325.wss ............................................ 2

PTO, PATENTING BY ORGANIZATIONS 2009 (Apr.
15, 2010), *available at*
http://www.uspto.gov/web/offices/ac/ido/oeip
/taf/topo_09.pdf ................................................ 1, 2

ix
## TABLE OF AUTHORITIES
(continued)

Page

Robert J. Shapiro & Kevin A. Hassett, *The Economic Value of Intellectual Property* (Oct. 2005), *available at* http://www.sonecon.com/docs/ studies/IntellectualPropertyReport- October2005.pdf .................................................. 8

Michael J. Shuster, *Altering Patent Suit Proof Burden Would Chill Innovation, Legal Backgrounder* (Washington Legal Foundation, Washington, D.C.), Apr. 16, 2004 .................................................................. 18

International Business Machines Corporation ("IBM") respectfully submits this brief pursuant to Supreme Court Rule 37.3 in support of neither party.[1]   IBM urges the Court to apply its longstanding precedents and hold that (i) the Court of Appeals for the Federal Circuit properly required Microsoft to prove its patent invalidity defense by clear and convincing evidence; and (ii) trial courts should use appropriate jury instructions to enable a more complete and precise evaluation of evidence pertinent to invalidity. IBM takes no position on the proper application of that standard of proof to the facts of this case.

## INTEREST OF *AMICUS CURIAE*

IBM has a strong interest in an evenhanded and fair interpretation of patent law, as it is both a patentee and a manufacturer. IBM is well known as a strong proponent of the U.S. patent system. It has received tens of thousands of patents and has been awarded more U.S. patents than any other assignee for eighteen consecutive years.[2]   IBM effectively

---

[1] Pursuant to Supreme Court Rule 37.6, IBM states that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission. In addition, all parties have consented to the filing of this *amicus* brief, and their consent letters are on file with the Clerk's Office.

[2] For example, the United States Patent and Trademark Office ("PTO") reported that in 2009, IBM received 4,887 patents, which is 1,295 more U.S. patents than any other company. *See* PTO, PATENTING BY ORGANIZATIONS 2009 (Apr. 15, 2010), *available      at*      http://www.uspto.gov/web/offices/ac/ido/

2

relies upon its intellectual property rights as an integral part of its business, generating about $1 billion every year from licensing its intellectual property portfolio and supporting about $100 billion in revenue from providing information technology equipment and services annually.

As one of the most successful licensors of technology in the world, IBM relies on its ability to enforce its patents to advance its business interests. IBM is also a large corporation offering innovative products and services in a broad range of fields; and, like many of the information technology company *amici*, IBM is frequently forced to defend against charges of infringement. Accordingly, IBM is unusually well-positioned to provide a balanced perspective on the appropriate burden of proof that should be applied to validity challenges to promote innovation and protect the public interest. IBM has no direct stake in this dispute and is not inclined to favor licensees and purchasers over patent owners, or vice versa.

IBM is also uniquely situated because its business spans a broad spectrum of different industries, all of which would be affected by changes to the burden for proving patent invalidity. IBM's business interests encompass a diverse range of industries and fields that enable, and are enabled by, information

---

oeip/taf/topo_09.pdf (last visited Jan. 12, 2011). IBM was awarded 5,896 U.S. patents in 2010, marking the 18th consecutive year it has topped the list of companies earning U.S. patents. *See* Press Release, IBM Shatters U.S. Patent Record; Tops Patent List for 18th Consecutive Year (Jan. 10, 2011) *available at* http://www-03.ibm.com/press/us/en/presskit/33325.wss (last visited Jan. 11, 2011).

3

technology, including software and computer technology, electrical engineering, life sciences, physical and organic chemistry, business consulting, computer services, engineering services, fundamental physics, microelectronics, and the mechanical arts.

Because IBM is an innovation company, it appreciates the critical significance of maintaining a fair and robust patent system and the importance of clear and evenhanded standards for evaluating patent validity.

## STATEMENT

1.   Respondent, i4i Limited Partnership ("i4i"), is the owner of U.S. Patent 5,787,449 ("the '449 patent"). The '449 patent claims an invention for editing custom XML, a computer language. *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 839 (Fed. Cir. 2010). i4i sued Petitioner, Microsoft Corporation ("Microsoft"), alleging that certain versions of Microsoft Word infringe the '449 patent. *Id.*

2.   After a jury trial, Microsoft was found liable for infringement, and the '449 patent was found to be not invalid. *Id.* The Federal Circuit affirmed the lower court's decisions on infringement and validity. *Id.*

Before the Federal Circuit, Microsoft argued that it had established anticipation by the sale of the prior art S4 software, which had not been considered by the PTO during examination of the '449 patent. *Id.* at 846. The Federal Circuit recognized that there was no dispute that the S4 software was prior art under 35 U.S.C. §102(b). Instead, the dispute centered upon whether Microsoft had proved that S4 practiced the "metacode map" limitation of the '449

4

patent. *Id.* Because the S4 source code had been destroyed years before the litigation began, the dispute turned largely on the credibility of S4's creators. *Id.* at 847.

At the close of the evidence, the trial court instructed the jury that it was Microsoft's burden to prove that the '449 patent was invalid by clear and convincing evidence.

3.  Microsoft contends that by imposing a clear and convincing evidence standard of proof when the PTO had not considered the S4 prior art during prosecution, the trial court erected an overly-high hurdle that was not warranted. Cert. Pet. at 12-13. Microsoft contends that the proper burden should be the preponderance of the evidence standard. *Id.*; Pet. Br. at 15-18.

## SUMMARY OF THE ARGUMENT

The strength of the U.S. patent system is critical to the continued vitality of the U.S. economy. Since at least this Court's ruling in *Radio Corp. of America v. Radio Engineering Laboratories, Inc.*, 293 U.S. 1, 2 (1934), defendants challenging the validity of a U.S. patent in infringement litigation have borne a high evidentiary burden for proving invalidity. This standard ensures that U.S. patents continue to provide strong protection and encouragement to create, disclose, and commercialize innovative discoveries.

The clear and convincing evidence standard is appropriate because it promotes the certainty needed to enable innovations that can best be protected by patents. The standard recognizes the PTO's expertise and extensive examination processes by according appropriate deference to PTO decisions and

5

by striking the proper balance between the role of the PTO and that of the courts in addressing patent validity. The standard protects patent rights, and ensures stability and predictability in the creation and enforcement of those rights, as well as a workable patent system.

Lowering the burden of proof to a preponderance standard would eviscerate the deference owed to the PTO's decision-making process, according it the same level of deference as registration systems and creating substantial uncertainty in the validity of patent rights.

Further, adopting a dual standard would elevate one factor—whether the examiner previously "considered" the prior art—above all others. It would divert attention from substantive aspects of review and would create uncertainty in the validity of patent rights. It would increase the complexity of patent litigation as parties dispute exactly which prior art was "considered" by the PTO, and force categorization of the prior art as considered/not considered before the jury evaluates validity. Such collateral disputes serve no constructive purpose, but instead disrupt meaningful judicial inquiry into the validity determination. Dual standards for proving invalidity would confuse jurors and create incentives for patent applicants to overwhelm the PTO with large quantities of prior art in anticipation of future litigation. Finally, changing the standard would reduce the predictability of the current system and inject uncertainty into patent-related business decisions.

A balanced patent system provides reasonable, comprehensive means to ensure that issued patents

6

are valid and challenges to validity are encouraged where appropriate. Just as strengthening and supporting the PTO is critical for ensuring issuance of high quality patents, providing fact-finders with the opportunity to consider all relevant evidence of invalidity is critical for ensuring that what is in the public domain properly remains there. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146 (1989) ("The Patent Clause itself reflects a balance between the need to encourage innovation and the avoidance of monopolies which stifle competition without any concomitant advance in the 'Progress of Science and useful Arts.'").

Changing the standard of proof is too blunt an instrument. An examiner's "consideration" of a particular piece of prior art is relevant to the weight that evidence should be given, but should not, as a threshold matter, dictate the evidentiary burden that must be met for proving invalidity. Validity challenges encompass a wide range of facts and circumstances. Relying on the standard of proof to address any such variations forces the court to make a stark and binary choice. A better and more nuanced approach preserves the current burden of proof, but requires trial courts to use tailored jury instructions to ensure that juries properly assess all the evidence presented in validity challenges, including evidence, if any, of the examiner's consideration of the prior art at issue. This approach would maintain the strength of patent rights by allowing meritorious challenges to be heard while empowering trial courts to tailor review of each patent's validity in light of the specific facts presented by each case.

7

## ARGUMENT

Strong and enforceable patent rights are essential to promoting innovation and technological advancement. Indeed, in his recent State of the Union address, President Obama linked this country's prosperous economy to innovation and emphasized that: "[n]o country has more successful companies, or grants more patents to inventors and entrepreneurs." *See* President Barack Obama, Remarks in State of the Union Address (Jan. 25, 2011), http://www.whitehouse.gov/the-press-office/2011/01/25/remarks-president-state-union-address.

Others have similarly commented on the link between innovation and patent protection:

> [H]ow do we incentivize increased private investment in innovation? The answer is simple: strengthen the intellectual property systems . . . especially patents. . . . [N]o one can be expected to invest without confidence in a return. Patents, and the protection of investment they afford, provide the only incentives strong enough to cause a big increase in private investment in innovation.

Paul R. Michel, Former Chief Judge, United States Court of Appeals for the Federal Circuit, Address Prepared for the Global Intellectual Property Center of the U.S. Chamber of Commerce (July 21, 2010), http://www.theglobalipcenter.com/sites/default/files/documents/CJ_Michel_Remarks_7.21.2010.pdf; *see also Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 221 (1980) (recognizing "the policy of stimulating invention that underlies the entire patent system"); Marla Page Grossman, *Diversion of USPTO User Fees: A Tax on Innovation,* Issue Brief

8

(Institute for Policy Innovation, Tex.), Apr. 27, 2009, at 1-2 ("Patents are absolutely crucial to fostering invention, innovation, and investments, all of which are essential to the core strength of our nation's competitiveness in the global economy. ... Our nation's economy depends on enforceable patents as effective mechanisms that protect new ideas and investments in innovation and creativity.").

Studies show that intellectual assets account for a significant portion of the U.S. economy. Robert J. Shapiro & Kevin A. Hassett, *The Economic Value of Intellectual Property* 3 (Oct. 2005), *available at* http://www.sonecon.com/docs/studies/IntellectualProp ertyReport-October2005.pdf. Weakening the patent system would undermine the significant investment in innovation that is fostered by intellectual property protection and reflected in these extensive intellectual property holdings.

To ensure the country's continued economic strength, it is critical that the patent system issues, and the courts enforce, patents consistently and predictably. Grossman, *supra*, at 1-2; *see also* Robert Hunt, *Patent Reform: A Mixed Blessing for the U.S. Economy?*, Business Review (Federal Reserve Bank of Philadelphia), Nov./Dec. 1999, at 21. Given the unquestioned importance of patents to our economy, any proposal that would undermine the predictability of patent rights in general raises serious concerns. Accordingly, this Court should adopt a measured approach for addressing patent validity challenges that is consistent with the purposes of the patent system.

9

I.    THE CLEAR AND CONVINCING EVIDENCE
      STANDARD IS ESSENTIAL TO A
      WORKABLE PATENT SYSTEM AND
      SHOULD BE MAINTAINED.

      A.    The Clear And Convincing Evidence
            Standard Accords Appropriate
            Deference To The PTO's Expertise And
            Procedures.

This Court has long-applied a heightened evidentiary burden of proof in patent invalidity cases. *Radio Corp.*, 293 U.S. at 2 ("[T]here is a presumption of validity, a presumption not to be overthrown except by clear and cogent evidence."); *see also Cantrell v. Wallick*, 117 U.S. 689, 696 (1886) (holding the burden of proving invalidity is "upon the party setting it up" and that "every reasonable doubt should be resolved against him"); *Smith v. Hall*, 301 U.S. 216, 233 (1937) (concluding that evidence regarding two prior art methods "support the heavy burden of persuasion which rests upon one who seeks to negative novelty in a patent by showing prior use").

The Federal Circuit has consistently supported the clear and convincing standard since the court was created over twenty-five years ago. *See, e.g., Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1549 (Fed. Cir. 1983) (concluding that evidence must defeat patent validity "clearly and convincingly," even if such evidence was not considered by the PTO).

Applying the clear and convincing standard to patent validity challenges properly takes into account the special expertise and procedures employed by the PTO. *United States v. Morgan,* 313 U.S. 409, 422 (1941) (noting that "the integrity of the

10

administrative process must be [as] equally respected" as the judicial process); *W. Elec. Co. v. Piezo Tech., Inc.*, 860 F.2d 428, 433 (Fed. Cir. 1988) ("[I]t is not the particular examiner's expertise that gives the decisions presumptive correctness but the authority duly vested in him by his appointment as a patent examiner."). To the extent that prior art was not before the patent examiner during prosecution, trial courts can assure appropriate deference to the PTO's expertise and process by applying the clear and convincing standard coupled with giving the jury carefully tailored limiting instructions. *See* Section III, *infra.*

The deference owed to the PTO stems from both the statutory presumption of validity and the presumption of correctness normally afforded agency decision making. *Lannom Mfg. Co. v. U.S. Int'l Trade Comm'n*, 799 F.2d 1572, 1575 (Fed. Cir. 1986) ("[The presumption of validity in 35 U.S.C.] Section 282 is based on the presumption of administrative correctness, a presumption derived from both public policy and pragmatic efficiency.").

The PTO is responsible for applying its particular expertise to achieve a goal designed by Congress. The PTO's purpose is to issue valid patents, and its practices and procedures are designed to do exactly that. Indeed, examiners are very effective in finding prior art and evaluating patent applications against that art.

Patent examiners with relevant technical expertise review every patent application. The examiner studies the application, searches internal and external databases for pertinent prior art, and

11

compares the subject matter claimed in the application with that taught in and by the prior art.[3]

During the examination process, the examiner and the applicant engage in a dialogue about the scope of the claims compared to the prior art. The examiner rejects claims that do not recite patentable subject matter, and the applicant proposes narrowing and clarifying amendments to overcome those rejections. As the following graph shows, claims in the vast majority of patent applications issued as patents between 2000 and 2006 were initially rejected by the PTO:

---

[3] Patent examiners have extensive tools at their disposal to assist their searches. *See generally* Manual of Patent Examining Procedure ("MPEP") at §902.01 et seq. The PTO utilizes a unique classification system for organizing prior art. MPEP §§902.01-902.02. The PTO has custom search tools for searching its prior art repositories and extensive, worldwide technology databases and information sources. MPEP §902.03. Using these specialized tools and his/her own knowledge and expertise, the patent examiner searches for the most pertinent prior art. MPEP §904.02.

The patent applicant has a duty to disclose all material prior art of which the applicant is aware. 37 C.F.R. §1.56 (imposing a duty of candor upon patent applicants and those associated with the application to be fully forthcoming about material prior art). If the duty is breached, the resulting patent, *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 877 (Fed Cir. 1988) (en banc), and related patents as well, *Agfa Corp. v. Creo Products, Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006), may be held unenforceable.

12



Patently-O (Apr. 3, 2009, 3:49 PM), *available at*
http://www.patentlyo.com/patent/2009/04/percentage-
of-patents-that-were-initially-rejected.html        (last
visited Jan. 15, 2011).[4]

The PTO will grant the patent if, and only if, all of
the examiner's objections have been satisfactorily
addressed.

An issued patent is the product of the PTO
performing its duty.   The deference applied to

---

[4] The categories along the y-axis identify groups of patents
classified by their respective art units.  The bars represent the
number of patents in each art unit that issued between 2000
and 2006 and that received at least one rejection before the
patent was issued.  These numbers are expressed in terms of
percentage of the total number of patents issued, as reflected in
the numbers along the x-axis.

13

validity challenges recognizes the expert *process* employed by the Agency, not the expertise applied in any particular instance. *W. Elec.*, 860 F.2d at 433. Indeed, while every patent application is different, the examination process is the same, designed to produce a substantively reliable intellectual property right.

It is useful to compare the level of deference accorded to issued patents and registered copyrights. Copyrights are subject to minimal examination upon registration, and while presumed valid, are accorded less deference if challenged in litigation. *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 114 (2d Cir. 2002) (holding that the district court did not err when instructing the jury that defendants could rebut the presumption of copyright validity by a preponderance of the evidence). In contrast, patents are rigorously examined by the PTO. The clear and convincing standard for validity challenges reflects this more rigorous process of agency review. Lowering the burden of proof would treat the patent examination system as if it were a registration system, similar to that in place for copyrights, and undercut the validity presumption that attaches to issued patents.

Some *amici* defend their position for changing the burden of proof, by arguing that the PTO issues a significant quantity of "bad" patents each year. But declaring the patent examination process a failure by lowering the burden of proof for all issued patents will do nothing to promote patent quality.

In its recent decisions, this Court has provided clear guidance to both the PTO and the lower courts for evaluating patentability through proper

14

examination standards. Indeed, the standards developed in the wake of this Court's decisions in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), and *Bilski v. Kappos,* 130 S. Ct. 3218 (2010), are reflected in the PTO's examiner guidelines for reviewing applications for non-obviousness and patentable subject matter.

In that same vein, innovation leaders have teamed with the PTO to address patent quality issues with efforts to improve patent review processes, such as making more and varied types of prior art readily available to patent examiners. For example, IBM, in cooperation with the PTO and other companies and academia, initiated the Open Source as Prior Art ("OSAPA") and Peer to Patent ("P2P")[5] projects. *See* Sara-Jayne Adams, *Quality Is The Key To A Bright Patent Future,* INTELLECTUAL ASSET MANAGEMENT, Apr./May 2008, at 65. The OSAPA project makes open source software more available to patent examiners as prior art, while the P2P project allows the public to submit prior art and commentary to the PTO that is directly pertinent to specific pending, published applications. *Id.*

B. **The Clear And Convincing Evidence Standard Promotes Invention Creation, Disclosure, And Commercialization.**

The deference afforded the patent examination process promotes the strength and vitality of the U.S. patent system, which in turn encourages the

---

[5] The P2P Steering Committee includes representatives from General Electric, Red Hat, Open Innovation Network, Article One Partners, Hewlett Packard, IBM, and Microsoft. *See* http://peertopatent.tumblr.com/steeringcommittee.

15

disclosure and commercialization of innovation. "Absent the guarantees of exclusive product marketing that flow from patent ownership, parties who are considering the commercialization of new products will hesitate to invest substantial engineering and marketing resources in producing and promoting products that other providers might then produce and market with lower costs." Richard S. Gruner, *Better Living Through Software: Promoting Information Processing Advances Through Patent Incentives*, 74 St. John's L. Rev. 977, 1012-13 (2000). In addition, if the strength of patent rights is diminished, some companies might try to keep valuable technological advancements hidden as trade secrets, rather than disclosing innovations to the public in issued patents and published patent applications. This practice would undermine the patent system's central purpose of promoting innovation by withholding information from follow-on innovators, discouraging collaboration, and impeding interoperability. *See id.* at 1009 (discussing disadvantages of secret commercialization, including inefficient use of technology and duplicative efforts to develop the same invention).

Courts have applied the clear and convincing evidence standard to prove invalidity for decades. Relying upon that standard and the resulting strength of patents issued by the PTO, companies have made strategic business decisions. They have negotiated patent licensing rates, and decided whether to bring, defer, pursue, or settle infringement lawsuits. Venture capitalists have invested in start-up companies. Patent attorneys issued legal opinions, which their clients relied upon in determining whether to launch new products. A

16

change in the standard of proof risks undermining the very foundation upon which each of these important decisions rest and would likely cause significant disruption to a large sector of the U.S. economy. *See, e.g.*, Am. Intellectual Prop. Law Ass'n, *AIPLA Response to the October 2003 Federal Trade Commission Report*, at 6 (2004); Biotechnology Industry Organization, *BIO Response to the Federal Trade Commission's Patent System Reform Recommendations*, at 4-5 (2004).

## II.   A PREPONDERANCE OF THE EVIDENCE STANDARD OR DUAL STANDARD WOULD BE UNWORKABLE AND WOULD THWART INNOVATION.

A preponderance of the evidence standard for proving invalidity would severely damage the patent system. Microsoft (as well as many *amici* who supported Microsoft's petition for *certiorari*)[6], advocates a change in the burden of proof to correct what it characterizes as flaws in the patent system. Microsoft's proposed solution, however, is too blunt an instrument to address such problems. Instead, this Court should craft a solution that takes into account the aspects of the patent system that are working well, maintains established standards to ensure consistency and reliability of the patent system, and focuses directly on the problem to be solved.

---

[6] *See* Amicus Br. of CTIA at 21; Amicus Br. of Yahoo at 10; Amicus Br. of Electronic Frontier Foundation et al. at 18; Amicus Br. of Google et al. at 2; Amicus Br. of Facebook et al. at 20.

17

### A.  Lowering The Burden For All Validity Challenges Would Eviscerate The Deference Owed To The PTO.

Lowering the burden of proof to preponderance of the evidence for all validity challenges, as Microsoft and some *amici* have advocated,[7] is an overly-broad solution.  Indeed, such a change is completely contrary to this Court's precedent and Federal Circuit precedent; it essentially vitiates the current standard; and it fails to recognize the presumption of validity codified in 35 U.S.C. §282.  The preponderance of the evidence standard applies by default in most civil cases. It acknowledges no deference for PTO regularity and expertise, and, if adopted, would eviscerate the deference that the PTO process should receive.

A preponderance burden is appropriate for a registration system, such as currently in place for copyrights, *Medforms*, 290 F.3d at 114, not a system characterized by highly expert, substantive agency review.  If patent validity were routinely overturned in the courts, there would be little incentive to improve the patent examination process, which would inevitably reduce overall patent quality, resulting in increased uncertainty in patent rights and increased litigation.  See Etan S. Chatlynne, Note, *The Burden of Establishing Patent Invalidity: Maintaining a Heightened Evidentiary Standard Despite Increasing "Verbal Variances,"* 31 Cardozo L. Rev. 297, 320 (2009) (stating that lowering the burden of proof for patent invalidity would weaken

---

[7] *See* footnote 6, *supra. See also* Pet. Br. at 15-18.

18

all patents and increase the number and cost of lawsuits).

In order for the PTO to properly serve the public interest, it must undertake rigorous patent examination. Applying a preponderance burden does nothing to support the PTO's efforts but instead undermines those efforts for all patents, regardless of the quality of the patent or its examination. And, if the burden of proof were lowered to preponderance of the evidence, the task of evaluating patentability would effectively shift totally to the courts, which would be a more expensive, time consuming, and less predictable evaluation, because the initial determination of the PTO would carry no weight. *BIO Response, supra*, at 4; Michael J. Shuster, *Altering Patent Suit Proof Burden Would Chill Innovation, Legal Backgrounder* (Washington Legal Foundation, Washington, D.C.), Apr. 16, 2004, at 4.

Given the significant and increasing economic importance of intellectual property rights as a driver for innovation, undermining the value of the entire corpus of issued patents is inconsistent with any reasonable economic policy.

### B.   Creating A Dual Standard Is Not The Answer.

Creating a dual standard—clear and convincing for prior art that was considered by the examiner during prosecution, and preponderance for prior art that was not—is also dangerous and problematic.

*First*, establishing what art was actually "considered" by the examiner during prosecution would be extremely difficult. Prior art references appear throughout the prosecution record. Some references appear on an applicant's Information

19

Disclosure Statement (PTO-1449).  These disclosure statements may contain many more references than the examiner may arguably be able to realistically review and "consider."  *See generally* FISCAL YEAR 2010 USPTO WORKLOAD TABLES, *available at* http://www.uspto.gov/about/stratplan/ar/2010/oai_06_ wlt_00.html (last visited Jan. 26, 2011) (providing statistics about examiner's workload).  The examiner also creates his own list of references for the record (Form 892).  References may be discussed at length in an Office Action and the applicant's Response to it, or they may be cited as the basis for a rejection with little commentary.  And, undoubtedly, aspects of the art are familiar to the examiner and play a role in the examination process or are dismissed as being not as pertinent as other prior art.  These teachings are "considered," but never cited or listed as prior art on any form.

Trying to establish the references "considered" by the examiner, and the extent to which they were considered, would create secondary litigation replete with difficult factual issues for a jury to resolve.  Just defining what is meant by "consider" is complicated.  Does it mean that the prior art was presented to the PTO, even if not cited for any purpose by the examiner?  Would a reference be "considered" if it is in a class or subclass searched by the examiner, but is not the basis for a rejection?  Would it be enough if it is listed on a Form 1449 along with 100 other references, but there is no evidence that the examiner actually focused on the reference?  Could one assume the examiner "considered" the reference if it is listed by the examiner on a Form 892?  There is no way to know from the public record how carefully an examiner read, digested, and evaluated a

20

reference that is of record, and no way to rule out whether an examiner "considered" a reference that is not of record. Plainly, there are no easy answers to these questions.

Not only is it problematic to define what it means to "consider" a particular reference, it is equally difficult to establish whether the examiner subjectively "considered" the substantive invalidity arguments raised by that reference. Some prior art identified in litigation may be cumulative or less relevant than the art the examiner cited or reviewed. The file history often does not tell the complete story. To fill gaps and clarify ambiguities in the written record, infringement defendants would routinely seek to depose examiners to determine what art he/she "considered" during prosecution. The effectiveness and completeness of such testimony is suspect. Rarely do patent challenges reach trial soon after the patent issues. More likely, by the time a patent comes to trial, years have passed since the application was prosecuted. Examiners may not be available or able to recall precisely which of the many references reviewed in connection with numerous applications on the examiner's docket were truly "considered" in connection with any one particular patent.

The practice of deposing patent examiners would be highly disruptive to the administration of the PTO. But, more troubling, it would allow investigation, through litigation, into areas that have long been off limits: "[A] patent examiner cannot be compelled to testify regarding his 'mental processes' in reaching a decision on a patent application." *W. Elec.*, 860 F.2d at 431.

21

*Second*, juries will likely be confused by the blurring and blending of the dual standards of proof. Patent cases are typically complex and difficult for juries. *See, e.g., Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1354-55 (Fed. Cir. 2010) (reversing lower court because jury verdict finding dependent claim invalid and independent claim not invalid was an irreconcilable inconsistency).   While it can be somewhat confusing for juries to separate the preponderance standard for infringement issues and the clear and convincing standard for validity and enforceability issues, that distinction can be understood because there is a clear separation between infringement and validity that juries are able to grasp and apply.   Indeed, it makes logical sense that infringement is subjected to a lower standard of proof because infringement issues are never considered by the PTO; whereas, the higher clear and convincing standard is applicable to validity issues because the PTO has reviewed the application and exercised its expertise and judgment in issuing the patent.

If dual standards are adopted on the validity/enforceability side of the equation, it will be much more difficult for juries to keep the standards straight and apply them properly.   If the jury is told to apply two standards to the validity issue, one of which is the preponderance standard, they may believe that no deference is due to the PTO's process. Indeed, the likely result is that the clear and convincing standard will become watered down or nullified, and a lower standard of proof would be applied to all prior art, whether "considered" or not, effectively eviscerating the presumption of validity.

22

*Third*, a dual standard would create new incentives for the patent applicant to "launder" as much prior art as possible by flooding the examiner during prosecution.   While the current system requires patent applicants to disclose material prior art to the PTO, it does not encourage flooding the PTO with prior art because the duty of candor does not create an affirmative duty to search for prior art; applicants are obligated to disclose only relevant prior art of which they are aware. *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.,* 394 F.3d 1348, 1351 n.4 (Fed. Cir. 2005) ("Because there is no general duty to conduct a prior art search, there is no duty to disclose art of which an applicant is unaware."). If a dual standard were implemented, however, applicants would be motivated to search for and incorporate into the record as much prior art as possible. The PTO's resources would be overwhelmed trying to manage this flood of additional, and mostly superfluous, material, and the careful balance the PTO and the courts seek for ensuring applicant's compliance with the duty of disclosure would be upset.

Finally, limiting application of the preponderance standard to instances where prior art was not "considered" by the PTO will be illusory, as there will likely always be an invalidity argument that a defendant can assert based on prior art of at least marginal relevance that was not "considered" by the examiner. *AIPLA Response, supra,* at 6.   While creating a dual standard may seem like a good compromise solution, it is not.  For all or nearly all cases, the standard actually applied would be preponderance of the evidence.

23

### C. Changing The Evidentiary Standard For Proving Patent Invalidity Would Inject Uncertainty And Upset The Balance In The Patent System.

Changing the evidentiary standard for proving invalidity would not simply weaken the patent system in an absolute sense, but would upset settled and reasonable expectations created by decades of application of the current standard and cause imbalance in the patent system.

The expense of this uncertainty would be far reaching. Companies who have relied on attorney opinions in making business decisions may have to revisit opinions to ensure that the conclusions remained valid. Licensees might balk at paying current licensing rates and seek to renegotiate agreements or sue to have the patents declared invalid.

Changing the standard for proving invalidity would have an impact different in kind from reforming substantive standards of patentability, such as nonobviousness (*KSR*) and patentable subject matter (*Bilski*). In those cases, the standard applies to the merits of the invention, and the changes effected by this Court apply to patents on a case-by-case basis. In contrast, a change to the burden for proving invalidity would apply to all inventions equally regardless of their merit or characteristics.

More importantly, if the standard of review were lowered, it would undermine the balance between patentees, licensees, and the public. Patentees and licensees alike would be less able (if not unable) to reach agreement on the value or need for a patent license. Uncertainty with respect to the validity of

24

patent rights would also make it difficult for competitors to weigh the merits of designing around an issued patent against challenging the patent's validity in court. And innovators facing uncertain and diminished patent protection would be disproportionately harmed, because they must bear the additional fixed costs of research and development. In contrast, patent speculators could adjust to this change because they would be able to pay less for patent assets they did not create in the first instance.

Further, while companies might be motivated to consider alternate vehicles for protecting innovations, such as trade secret protection, such options may be ineffective to protect the intellectual property. Gruner, *supra,* at 1009 (discussing disadvantages of secret commercialization, including inefficient use of technology and duplicative efforts of others to develop the same invention). For example, in the case of technology such as software that can be reverse engineered, trade secret protection is substantially ineffective. Once the technology is made public, the innovator cannot exclude others from practicing the invention if they have legitimately reverse engineered the technology—and this, in turn, may inhibit the innovation in the first place.

III. TRIAL COURTS CAN USE APPROPRIATE JURY INSTRUCTIONS TO ENABLE A MORE COMPLETE AND PRECISE EVALUATION OF EVIDENCE PERTINENT TO INVALIDITY.

Whether prior art was not before the PTO or was not "considered" by the examiner may be relevant to the fact-finder's validity determination. But rather

25

than throw out the clear and convincing evidence standard, the better solution is to use appropriate jury instructions to precisely calibrate the weight to be given such evidence while giving appropriate deference to the PTO's initial judgment in light of the specific facts of a given case.

A.   Jury Instructions Are Effective Tools For Managing The Jury's Use Of The Evidence Presented.

"[T]he crucial assumption underlying our constitutional system of trial by jury [is] that jurors carefully follow instructions." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985); *accord, e.g., Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983). Indeed, "we must assume that juries for the most part understand and faithfully follow instructions." *Francis*, 471 U.S. at 324 n.9 (alteration and internal quotation marks omitted). This bedrock principle is "almost invariable," even though "it may not always be simple for the members of a jury to obey [an] instruction." *Richardson v. Marsh*, 481 U.S. 200, 206, 208 (1987). Only when there is an "overwhelming probability" of the jury's "inability" to follow specific instructions, *id.* at 208, has this Court found "the instructions of the trial judge" inadequate to ensure "the proper evaluation of [the] evidence," *Watkins v. Sowders*, 449 U.S. 341, 347 (1981). *See also Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987).

This Court's strong confidence in a jury's ability to follow instructions is evident across "many varying contexts." *Richardson*, 481 U.S. at 206. In criminal cases, for example, this Court has allowed statements elicited from a defendant in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), to be used to impeach

26

the defendant's credibility, and evidence of a defendant's prior criminal convictions to be used to enhance the defendant's sentence—as long as the jury is instructed to use the evidence only for that limited purpose, not to establish the defendant's guilt. *See Richardson*, 481 U.S. at 206-07 (collecting cases); *see also Wong Sun v. United States*, 371 U.S. 471, 490 (1963) (conspirator's statements not made in furtherance of the conspiracy admissible only against declarant); *Lutwak v. United States*, 344 U.S. 604, 618-19 (1953) (same).[8]

Similarly, in the civil context, this Court has found it "constitutionally important for a court to provide assurance that the jury will ask the right question, not the wrong one" when instructing a jury on the assessment of punitive damages; a careful instruction should be given so that the jury can consider nonparties' injuries in order "to determine reprehensibility," but not "to punish for harm caused strangers." *Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007).

Indeed, trial judges are very good at crafting appropriate instructions to ensure that juries properly evaluate the evidence. Many examples of

---

[8] Justice Sotomayor recognized the effectiveness of issuing limiting jury instructions when serving as a trial judge. For example, in *United States v. The Spy Factory, Inc.*, 960 F. Supp. 684, 688-89 (S.D.N.Y. 1997), and *United States v. Heatley*, No. S2 96 Cr. 515 (SS), 1997 WL 12961, at *3 (S.D.N.Y. Jan. 14, 1997), then-Judge Sotomayor declined to sever the criminal trials of co-defendants, following the preferred practice in the federal system of trying defendants together who were indicted together, and using proper limiting jury instructions to avoid the risk of prejudice from the joint trial.

27

effective limiting instructions can be found in a variety of contexts.

For example, the D.C. Circuit commended the district court's use of jury instructions in *Desmond v. Mukasey*, 530 F.3d 944, 966 (D.C. Cir. 2008), an employment discrimination case. Desmond claimed that he was the victim of unlawful discrimination when he was dismissed from the FBI Academy, while the FBI contended that his dismissal was performance-related. At trial, the district court admitted a lengthy report "chronicling Desmond's alleged failures, infractions, and indiscretions at the Academy." *Id.* at 965. The district court, however, recognized the risk of unfair prejudice that was "inherent in presenting the jury with a wide-ranging compilation of Desmond's foibles at the Academy," and instructed the jury accordingly: "You're not to speculate about whether the report is true or not. You should consider the report ... only for the fact that [Desmond's supervisor] received it and relied on it in drafting his own report which he sent forward to headquarters." *Id.* at 965-66.

The D.C. Circuit affirmed the report's admission, and commended the district court for "carefully structur[ing] the report's admission to minimize any risks" of unfair prejudice. In praising "the district court's attentiveness to the context in which it admitted the [report]," the D.C. Circuit noted that the district court "repeatedly admonished the jury to consider the report solely for the limited purpose of showing [the supervisor's] reliance" on it. *Id.* (internal quotation marks omitted). The court indicated that "a proper limiting instruction" was important to the report's admissibility. *Id.* at 966.

28

In *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434-35 (10th Cir. 1993), the Tenth Circuit similarly endorsed the use of limiting instructions. There, Super Valu purchased a warehouse from Associated Grocers ("AG") but, when staffing the facility, declined to consider hiring AG's ex-warehousemen. Some former AG employees sued for age discrimination. In response, Super Valu explained that it feared that AG's ex-employees might have disrupted or sabotaged its business. The district court admitted evidence of the ex-employees' participation in "union picket lines," which "focused on statements shouted by participants at Super Valu and picket signs blaming Super Value for lost jobs." *Id.* at 1433 & n.15. On appeal, the plaintiffs challenged the relevancy of "lawful union activity" to Super Valu's alleged discrimination. But the Tenth Circuit affirmed the district court's handling of the evidence, emphasizing that "[t]he trial court instructed the jury that picket line activity was acceptable and further stated that any evidence pertaining merely to legitimate, legal union activities was irrelevant." *Id.* at 1433; *see also id.* at 1435.

In numerous examples, federal appellate courts have endorsed using limiting instructions to manage the evidence presented, rather than taking a more drastic step such as exclusion. *See, e.g., McGrath v. Consol. Rail Corp.*, 136 F.3d 838, 841 (1st Cir. 1998) (finding that a *per se* bar excluding evidence of collateral sources of income in personal injury suit was too broad when evidence was probative of the issue of malingering and when a limiting instruction directing the proper use of the evidence—"any references in there to [collateral] sources of income are not to reduce any compensation he may receive

29

here or to increase it, but only on the issue of his motivation to go back to work"—could be used instead); *Wipf v. Kowalski*, 519 F.3d 380, 387 (7th Cir. 2008) (finding that demonstrative video in medical malpractice suit was probative of multiple issues and that the district court properly admitted the evidence with a cautionary instruction "clarifying the limited purpose of the video and dispelling any potential impression that the video showed or simulated the actual events of Wipf's procedure"); *Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1017 (9th Cir. 2007) (finding that the district court erred in refusing to issue a limiting instruction that would have clarified for the jury the proper and improper uses of the plaintiff's evidence for awarding punitive damages); *Burke v. Spartanics, Ltd.*, 252 F.3d 131, 135 (2d Cir. 2001) (when plaintiff's expert opened the door to evidence of plaintiff's drug use in product liability suit, the district court properly permitted additional testimony on the subject because it gave appropriate limiting instructions after the testimony and before deliberations "that [the jury] could consider the testimony on alcohol and drug use only with respect to its evaluation of damages"); *Am. Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 332 n.5 (8th Cir. 1996) (concluding that district court properly admitted hearsay as evidence of witness's understanding because it also instructed the jury that the witness's statements "could only be considered for the limited purpose of showing his state of mind").

Unsurprisingly, limiting instructions have long been used in patent cases to allow juries to consider evidence for specific purposes. For example, in *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1260

30

(Fed. Cir. 2004), the patentee argued that the trial court erred by allowing evidence to be introduced regarding the patentee's failure to make a commercial embodiment of the accused drug Herceptin. The Federal Circuit rejected this argument because the evidence related to the accused infringer's defenses and because the district court issued an instruction that the evidence could be considered only for the limited purpose of "deciding whether the [patent] application meets the enablement and written description requirements." *Id.* at 1261.

In *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 550 (Fed. Cir. 1998), the patentee argued that the district court erred when it admitted evidence of the accused infringer's own patent because the jury could have thought that defendant's patent gave the defendant rights to sell the accused product. The district court allowed the evidence to show that the defendant's products were substantially different from and superior to the products covered by the patentee's patents. Because of the potential for jury confusion, however, the district court issued a limiting instruction that gave the jury clear direction on the proper use of the Lydall patent evidence:

> Where there is an issued patent, the later issuance of a patent for a device or method raises no presumption of noninfringement of the previously issued patent. You may consider the later issued Lydall patent in your decision and give it the appropriate weight, but you must keep in mind that even where improvements and modifications are separately patentable, the

31

improved device or method may still infringe the previously issued ATD patents.

*Id.* Given the district court's limiting instruction, the Federal Circuit concluded that the district court had not erred by admitting evidence of the Lydall patent. *Id.*

B. **Appropriate Jury Instructions Are The Best Tools For Addressing Questions Regarding Consideration Of Prior Art.**

Tailored jury instructions (and a clear verdict form) can maintain a vibrant patent system and the presumption of validity while permitting trial judges the flexibility to address particular, case-specific circumstances. This approach is consistent with trial court practice and, if properly and consistently applied, would enable juries to give appropriate consideration to the broad and diverse range of evidence of invalidity. Appropriate instructions shield juries from the confusion and inaccuracy that a dual standard for invalidity would necessarily impose, and they avoid creating incentives to flood the PTO with prior art regardless of its relevance. Further, because jury instructions are subject to meaningful review on appeal, litigants have recourse if the clear and convincing standard were improperly applied. *See, e.g., Merrick,* 500 F.3d at 1017 (finding error when "the instructions given did not provide the jury with clear direction" regarding the relevant law).

Indeed, using jury instructions in these circumstances would continue along a well-established path in patent cases addressing validity. The Federal Circuit has indicated that jury instructions can be used to give proper weight to

32

prior art evidence that was not considered by the PTO *without* changing the burden of proof. *See, e.g., Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358 (Fed. Cir. 1984) (finding jury instruction that offered a dual standard of proof erroneous). The Federal Circuit explained the effect upon the defendant's case when the prior art offered was not considered by the PTO:

> Neither does the *standard* of proof change; it must be by clear and convincing evidence or its equivalent[.] ... What the production of new prior art or other invalidating evidence not before the PTO does is to eliminate, or at least reduce, the element of deference due the PTO, thereby partially, if not wholly, *discharging* the attacker's burden, but neither shifting nor lightening it or changing the standard of proof. When an attacker simply goes over the same ground traveled by the PTO, part of the *burden* is to show that the PTO was wrong in its decision to grant the patent. When new evidence touching validity of the patent not considered by the PTO is relied on, the tribunal considering it is not faced with having to *disagree* with the PTO or with *deferring* to its judgment or with taking its expertise into account. The evidence may, therefore, carry more weight and go further toward sustaining the attacker's unchanging burden.

*Id.* at 1360.

Several examples illustrate how well-calibrated limiting instructions can be used in this context.

With respect to this case, Microsoft sought to rely on prior art for which evidence establishing the

33

salient details (the source code) had disappeared with the passage of time. In this situation, there is no need to change the standard of proof.

Instead, the trial court can give general jury instructions explaining the presumption of validity, the clear and convincing standard of proof, and the prior art offered by the defendant. Then, the trial court can give a tailored, limiting instruction to guide the jury in evaluating the prior art evidence offered in the context of the specific facts and circumstances presented in that case. For example, in the Microsoft situation, the court could give the following limiting instruction:

> In your deliberations, you are instructed to keep in mind that the evidence presented here about the prior art S4 software was never presented to the PTO during patent examination. Generally, the PTO applies its expertise to evaluate prior art during prosecution in order to decide whether to grant a patent, but it cannot do that if the prior art was never presented by the applicant or located by the examiner's own searches. In determining if the defendant has carried its burden of proving the patent invalid by clear and convincing evidence, you should consider that the PTO did not evaluate the S4 prior art when deciding to grant the patent.

Like the instruction given in *Desmond*, this limiting instruction strikes a balance between, on the one hand, recognizing the statutory presumption of validity, and on the other, providing a full and fair opportunity to present evidence of invalidity by protecting the accused infringer from the risk of unfair prejudice that could result if the jury is

34

instructed about the clear and convincing evidence burden without any additional guidance as to how to apply it in that particular situation. 530 F.3d at 966. In contrast, Microsoft's proposed solution of lowering the burden to a preponderance of the evidence standard risks finding a patent invalid notwithstanding the existence of significant evidence to the contrary, such as the consideration by the PTO of art more relevant to patentability than that not considered.

Another situation arises when the record shows that the examiner was aware generally of the prior art at issue, but did not document consideration of that art. For example, the examiner might find a website containing a general description of the prior art technology and put a printout of the webpage into the file history. During litigation, however, the accused infringer is able to obtain additional information about the prior art technology and offers detailed specifications, source code, documents, and/or testimony about other web pages, linked to the page considered by the examiner, but undocumented in the prosecution history.

Again, changing the burden of proof is not the answer; using an appropriate limiting instruction avoids the risk of undue prejudice:

> In your deliberations, you are instructed to keep in mind that some, but not all, of the evidence presented here about the prior art was presented to the PTO. Generally, the PTO applies its expertise to evaluate prior art during prosecution in order to decide whether to grant a patent, but it cannot do that if the prior art was never presented by the applicant or located by

35

the examiner's own searches. In determining if the defendant has carried its burden of proving the patent invalid by clear and convincing evidence, you should consider, that in deciding to grant the patent the PTO did not have the additional prior art evidence that was presented in court.

Just as the First Circuit concluded in *McGrath*, it is better to give a carefully tailored instruction that informs the jury how to use the evidence in its deliberations, rather than to apply a *per se* rule that ignores the realities presented in a specific case. 136 F.3d at 841.

Also, sometimes the proffered invalidating prior art is not explicitly recited in the file history of the patent-in-suit, but there is evidence in another file history that indicates the examiner was contemporaneously aware of the prior art being offered. In this situation, the trial court could issue a limiting instruction such as:

> In your deliberations, you are instructed to keep in mind that some of the evidence presented here about the prior art may not have been noted in the PTO file, but may have been noted in other PTO files of which the examiner of the patent-in-suit was contemporaneously aware. Generally, the examiner evaluates prior art known to him/her during prosecution in order to decide whether to grant a patent. In determining if the defendant has carried its burden of proving the patent invalid by clear and convincing evidence, you should consider whether the examiner of the patent-in-suit was

36

aware of and evaluated this prior art when deciding to grant the patent.

Just like the Tenth Circuit found in *Faulkner*, a limiting instruction that instructs the jury on the proper way to analyze the evidence is how to handle complicated issues. 3 F.3d at 1434-35. Just as the *Faulkner* court did not impose a blanket exclusion of evidence when the issues became complicated, this Court should not impose a blanket change to the burden of proof when complicated validity issues can be handled more effectively and precisely with tailored jury instructions.

Finally, another common situation arises when PTO reexamination proceedings and federal court infringement litigation are pending simultaneously. Even though the patent-in-suit was previously issued by the PTO, the examiner in reexamination may reject some or all of the issued claims. When the reexamination proceedings have not yet concluded, the pending rejections raise the specter that the original patent grant is suspect, but the findings are not yet conclusive. In these circumstances, an appropriate limiting instruction might be:

> In your deliberations, you are instructed to keep in mind that the patent-in-suit is currently undergoing reexamination at the PTO. Because those proceedings are not yet complete, you may take into account the examiner's rejections in your analysis, but you should not feel bound to them in any way. Instead, you should evaluate the prior art evidence for yourself in determining if the defendant has carried its burden of proving, by clear and convincing evidence, that

37

the prior art contained all of the limitations recited in the claims of the patent-in-suit.

As in *Desmond*, a specific limiting instruction can balance the need to provide the jury with evidence from the pending reexamination proceedings without allowing the jury to be unduly swayed by the examiner's interim observations.   530 F.3d at 966.

## CONCLUSION

This Court should reaffirm the clear and convincing burden of proof as the proper standard for proving patent invalidity and instruct trial courts to use appropriate instructions to avoid any undue prejudice to those who would challenge a patent's validity.

Respectfully submitted,

RONALD A. LAUDERDALE
MANNY W. SCHECTER
MARIAN UNDERWEISER
MARC A. EHRLICH
IBM CORPORATION
One North Castle Drive
Armonk, NY  10504
(914) 765-4343

KENNETH R. ADAMO
  *Counsel of Record*
JONES DAY
North Point, 901 Lakeside Avenue
Cleveland, OH  44114
(216) 586-3939
kradamo@jonesday.com

LAWRENCE D. ROSENBERG
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001-2113
(202) 879-3939

TRACI L. LOVITT
JONES DAY
175 Federal Street, Suite 501
Boston, MA  02110
(617) 342-8117

February 2, 2011

*Counsel for Amicus Curiae*

Dated: February 10, 2012          Respectfully submitted,


                                  By:   _/s/Lane Fletcher_____
                                  Vic H. Henry
                                  Texas Bar # 09484250
                                  vhhenry@hoaf.com
                                  Lane Fletcher
                                  Texas Bar # 07139300
                                  lanefletcher@hoaf.com
                                  HENRY ODDO AUSTIN & FLETCHER
                                  a Professional Corporation
                                  1700 Pacific Avenue, Suite 2700
                                  Dallas, Texas 75201
                                  Telephone: (214) 658-1900
                                  Facsimile: (214) 658-1919

                                  Roger D. Taylor (admitted *pro hac vice*)
                                  Cortney Alexander (admitted *pro hac vice*)
                                  Virginia L. Carron (admitted *pro hac vice*)
                                  FINNEGAN, HENDERSON, FARABOW,
                                  GARRETT & DUNNER, L.L.P.
                                  3500 SunTrust Plaza
                                  303 Peachtree Street, N.E.
                                  Atlanta, GA 30308-3263
                                  Phone: (404) 653-6400
                                  Facsimile: (404) 653-6444

                                  Thomas W. Winland (admitted *pro hac vice*)
                                  Naoki Yoshida (admitted *pro hac vice*)
                                  Jeffrey C. Totten (admitted *pro hac vice*)
                                  Tyler M. Akagi (admitted *pro hac vice*)
                                  FINNEGAN, HENDERSON, FARABOW,
                                  GARRETT & DUNNER, L.L.P.
                                  901 New York Avenue, N.W.
                                  Washington, D.C. 20001
                                  Phone: (202) 408-4000
                                  Facsimile: (202) 408-4400


                                  **ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing instrument has been served via the Court's ECF system on all known counsel of record in accordance with the Federal Rules of Civil Procedure on this the 10th day of February 2012.


_/s/Lane Fletcher_____ _