# TAB   1
# (part 1)

Execution Copy

## WIND TURBINE GENERATOR

### SUPPLY AGREEMENT

### By and Between

### MITSUBISHI POWER SYSTEMS AMERICAS, INC.,

### a Delaware corporation ("Seller"),

### and

### BABCOCK & BROWN INFRASTRUCTURE GROUP US LLC,

### a Delaware limited liability company ("Owner")

### Dated as of June 5, 2007

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000668

00001

## TABLE OF CONTENTS

|  | | Page |
|---|---|---|
| Article 1 Definitions | | 2 |
| 1.1 | Defined Terms | 2 |
| Article 2 Interpretation | | 2 |
| 2.1 | Sections, Articles, Appendices and Exhibits | 2 |
| 2.2 | Headings | 2 |
| 2.3 | Gender | 3 |
| 2.4 | Successors and Assigns | 3 |
| 2.5 | Miscellaneous | 3 |
| Article 3 Sale and Purchase of Wind Turbines | | 3 |
| 3.1 | Sale of Wind Turbines | 3 |
| 3.2 | Duties and Obligations of Seller Related to Wind Turbines | 3 |
| 3.3 | Standard of Performance | 5 |
| 3.4 | Cooperation and Non-interference | 6 |
| 3.5 | Liens | 6 |
| 3.6 | Escrow | 7 |
| Article 4 Purchase Price And Payment | | 8 |
| 4.1 | Unit Price; Purchase Price | 8 |
| 4.2 | Payment Schedule and Method | 12 |
| 4.3 | Notice to Proceed | 16 |
| 4.4 | Seller's Payment Security | 17 |
| Article 5 Notice to Proceed; Deliveries of Wind Turbines | | 18 |
| 5.1 | Delivery of Notice to Proceed | 18 |
| 5.2 | Intentionally Omitted | 18 |
| 5.3 | Delivery of Wind Turbines; Guaranteed Delivery Schedule | 18 |
| 5.4 | Delay of Deliveries to the Site | 20 |
| 5.5 | Site Storage of Wind Turbine Spares, Consumables and Other on Site Facilities | 21 |
| 5.6 | Packing of Wind Turbines | 21 |
| 5.7 | Transfer of Title; Risk of Loss | 21 |
| 5.8 | Execution and Delivery of the Warranty Agreement, Service Agreement, and MHI Guaranty Agreement | 21 |
| 5.9 | Coordination with SCADA Contractor | 21 |
| 5.10 | Project Acceptance Test | 22 |
| Article 6 Design; Issuance of Design Certificate | | 22 |
| 6.1 | Design | 22 |
| 6.2 | Certificate of Design Approval | 23 |
| 6.3 | Tower Load Data | 23 |
| Article 7 Insurance | | 23 |
| 7.1 | Insurance | 23 |

-i-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000669

00002

Article 8 Owner's Work, Seller's Technical Assistance and Variation........................ 23
   8.1    Owner's Work ................................................................................... 23
   8.2    Technical Assistance ......................................................................... 23
   8.3    Right of Access ................................................................................. 25
   8.4    Seller's Representative ...................................................................... 25
   8.5    Owner's Representative .................................................................... 25
   8.6    Variation and Adjustment ................................................................. 25

Article 9 Mechanical Completion, Commissioning, Substantial Completion and Final
Completion ................................................................................................................. 26
   9.1    Mechanical Completion .................................................................... 26
   9.2    Commissioning................................................................................. 27
   9.3    Substantial Completion .................................................................... 30
   9.4    Final Completion .............................................................................. 32
   9.5    Suspension........................................................................................ 34
   9.6    Change Order ................................................................................... 36
   9.7    Cancellation...................................................................................... 37

Article 10 Representations And Warranties of Seller ................................................. 38
   10.1   Due Organization; Good Standing .................................................... 38
   10.2   Due Authorization ............................................................................ 38
   10.3   Execution and Delivery .................................................................... 38
   10.4   Governmental Approvals .................................................................. 38
   10.5   Title to Wind Turbines ..................................................................... 38
   10.6   Documents........................................................................................ 38

Article 11 Indemnification ........................................................................................ 39
   11.1   General Indemnity ............................................................................ 39
   11.2   Indemnity Against Infringement ...................................................... 40
   11.3   Treatment of Infringing Equipment ................................................. 40

Article 12 Representations and Warranties of Owner ............................................... 41
   12.1   Due Organization; Good Standing .................................................... 41
   12.2   Due Authorization ............................................................................ 41
   12.3   Execution and Delivery .................................................................... 41
   12.4   Governmental Approvals .................................................................. 41
   12.5   Site Access ....................................................................................... 41

Article 13 Excusable Delay; Default; Cure .............................................................. 41
   13.1   Excusable Delay ............................................................................... 41
   13.2   Default ............................................................................................. 42

Article 14 Dispute Resolution................................................................................... 43
   14.1   Senior Representatives Discussion.................................................... 44
   14.2   Disputes Subject to Engineering Arbitration.................................... 44
   14.3   Disputes Subject to Litigation .......................................................... 45
   14.4   Specific Performance ....................................................................... 45

-ii-

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F**

MPSANDTX0000670

00003

Article 15 General Provisions ................................................................................. 45
   15.1   Waiver ............................................................................................... 45
   15.2   Successors and Assigns ..................................................................... 45
   15.3   Notices .............................................................................................. 47
   15.4   Consent to Jurisdiction .................................................................... 48
   15.5   Governing Law .................................................................................. 49
   15.6   Amendments ..................................................................................... 49
   15.7   Attachments Incorporated ................................................................ 49
   15.8   Entire Agreement ............................................................................. 49
   15.9   Survival ............................................................................................. 49
  15.10  Attorneys' Fees ................................................................................. 50
  15.11  Site Regulations ................................................................................ 50
  15.12  Confidentiality .................................................................................. 50
  15.13  Wind Speed Projections ................................................................... 51
  15.14  Intellectual Property ........................................................................ 51
  15.15  Counterparts ..................................................................................... 51
  15.16  No Implied Warranties ...................................................................... 51
  15.17  Limitation of Liability ...................................................................... 52
  15.18  Time for Claims ................................................................................ 53
  15.19  Late Payments ................................................................................... 53

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F**

MPSANDTX0000671

00004

**LIST OF APPENDICES**

APPENDIX I  Definitions

**LIST OF EXHIBITS\***

| | |
|---|---|
| EXHIBIT A | Technical Specifications for Wind Turbines |
| | A-1 Technical Specifications for MWT95/2.4 with 80m Hub Height |
| | A-2 Cold Weather Package |
| | A-3 Power Curve and Thrust Curves |
| | A-4 Power Curve Correction for Air Density |
| | A-5 Columnar Control Strategy (Deliverable)* |
| EXHIBIT B | B-1 Site Conditions* |
| | B-2 Site Plan (Layout)* |
| EXHIBIT C | Form of Guaranty Agreement and Payment Letter of Credit |
| | C-1 MHI Guaranty Agreement |
| | C-2 [provided concurrently] |
| | C-3 Form of Payment Letter of Credit |
| EXHIBIT D | Delivery Schedule* |
| EXHIBIT E | E-1 Requirement to Seller under Permit* |
| | E-2 Requirement to Seller under Power Purchase Agreement and Interconnection Agreement* |
| EXHIBIT F | Pricing for Optional Items |
| EXHIBIT G | Road Requirements for WTG Delivery*[Asteristk to be confirmed] |
| EXHIBIT H | Insurance |
| EXHIBIT I | Description of Owner's Work |
| EXHIBIT J | J-1 Form of Mechanical Completion Certificate |
| | J-2 Mechanical Completion Check List |
| EXHIBIT K | Form of Certificate of Commissioning |
| EXHIBIT L | Form of Certificate of Substantial Completion |
| EXHIBIT M | Commissioning Procedures and Check Sheet |
| EXHIBIT N | Form of Certificate of Final Completion |
| EXHIBIT O | Technical Advisory Fees Schedule |
| EXHIBIT P | P-1 Form of Escrow Agreement |
| | P-2 Escrow Items |
| EXHIBIT Q | Form of Certificate of Design Approval |
| EXHIBIT R | Cancellation Table |
| EXHIBIT S | [Reserved] |
| EXHIBIT T | T-1 Project Acceptance Test Procedure |

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F**

MPSANDTX0000672

|                | T-2 Form of Project Acceptance Test Certificate |
|----------------|-------------------------------------------------|
| EXHIBIT U      | U-1 Partial Lien Waiver Form                    |
|                | U-2 Final Lien Waiver Form                      |

\*        Exhibits marked with "\*" shall be updated in connection with designation of a particular Site for a particular Project in accordance with Section 15.2(d).

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F**

**MPSANDTX0000673**

00006

## Wind Turbine Generator Supply Agreement

THIS WIND TURBINE GENERATOR SUPPLY AGREEMENT (the "Agreement" or "Supply Agreement"), dated as of June 5, 2007("Effective Date"), is made and entered into by and between BABCOCK & BROWN INFRASTRUCTURE GROUP US LLC, a Delaware limited liability company ("Owner"), and MITSUBISHI POWER SYSTEMS AMERICAS, INC., a Delaware corporation ("Seller").

### Recitals:

A.   Seller sells and Owner wishes to buy MHI MWT95/2.4 wind turbine generators, together with the Towers, as more particularly described in Exhibits A-1, A-3, A4 and A-5 attached hereto and made a part hereof, as the same may be modified from time to time by Seller pursuant to the terms of this Agreement.

B.   Seller and Owner wish to enter into an agreement pursuant to which Owner agrees to purchase and order from Seller and pay for two hundred six (206) MHI MWT95 wind turbine generators (the "Wind Turbines" or "WTGs"), together with Towers, certain ancillary equipment, documentation, and Special Tools for such Wind Turbines, and manuals for the operation and maintenance of the Wind Turbines and other necessary documentation, all as more particularly set out in the Wind Turbine specifications attached hereto as Exhibits A-1, A-3, and A-4 and A-5 (the "Specifications") and as specifically described in this Agreement.

C.   Owner affirms to Seller that the Wind Turbines to be purchased by Owner will be used for the purpose of developing, constructing, building and installing wind energy projects at various project sites designated pursuant to Section 15.2(d), currently contemplated to be located in, but not limited to California, Illinois and Pennsylvania (each, a "Site").

D.   Seller desires to procure components for, supply, delivery to each pad at the Site, Commissioning, and sale of Wind Turbines for the Project (as defined below).

E.   Owner will be responsible for purchasing said WTGs and for erecting, installing and operating, according to the Seller's Specifications, the Wind Turbines at the Site. Seller acknowledges that, concurrent with the Seller's performance of the Wind Turbine Work under this Agreement, Owner may subcontract with one or more contractors (collectively, the "BOP Contractor") for (i) designing, engineering, procuring, supplying, installing, constructing and commissioning the Balance of Plant for the Project and (ii) unloading, stacking of Seller's trailers, assembling, erecting and installing the Wind Turbines, pursuant to one or more agreements between BOP Contractor and Owner (the "BOP Contract").

F.   As a part of this Agreement, Seller and Owner are contemporaneously also entering into that certain Warranty, Performance Test and Availability Guaranty Agreement, dated as of the same date hereof (the "Warranty Agreement"), pursuant to which Seller makes certain warranties and guarantees to Owner with respect to the Wind Turbines sold to Owner pursuant to this Agreement.

-1-

HOU:2500806.2

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

G.    As a part of this Agreement, Owner and Seller (in its capacity as Servicer, the "Servicer") are contemporaneously entering into that certain Wind Turbine Maintenance and Service Agreement, dated as of the same date hereof (the "Service Agreement"), pursuant to which Servicer will maintain, service and repair the Wind Turbines subject to the terms thereof.

H.    Seller is concurrently herewith delivering to Owner that certain guaranty agreement executed by MHI in the form attached hereto as Exhibit C-1 (the "MHI Guaranty Agreement"), pursuant to which MHI will guarantee Seller's performance and payment obligations under this Agreement, and the Warranty Agreement.  Seller (in its capacity as Servicer) is also, concurrent with the execution of the Service Agreement, delivering to Owner certain guaranty agreement executed by MHI in the form attached to the Service Agreement (the "MHI Guaranty Agreement (Service)"), pursuant to which MHI will guarantee Servicer's performance and payment obligations under the Service Agreement.

I.    Within five (5) Business Days following the issuance of the applicable Notice to Proceed delivered pursuant to Section 5.1 below, Owner will either (A) cause Babcock & Brown International Pty Ltd (ACN 108 617 483) a company incorporated under the laws of the State of Victoria, Australia ("Owner's Parent") to deliver to Seller that certain guaranty agreement in the form attached hereto as Exhibit C-2 (the "Babcock Guaranty Agreement"), pursuant to which Owner's Parent will guarantee Owner's payment obligations under this Agreement until such time as Owner provides the Payment Letter of Credit or (B) cause to be issued to Seller the Payment Letter of Credit by such date, in each case with respect to the applicable WTGs.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Owner agree as follows intending to be legally bound:

## Article 1
### Definitions

1.1    Defined Terms.  For purposes of this Agreement, capitalized terms used herein and not otherwise defined herein shall have the meaning assigned to such terms in Appendix I.

## Article 2
### Interpretation

2.1    Sections, Articles, Appendices and Exhibits.  References to Sections, Articles, Appendices and Exhibits are, unless otherwise indicated, made to Sections of, Articles of, Appendices to and Exhibits to this Agreement.  The parties acknowledge that the Recitals, Appendices and Exhibits hereto form an integral part hereof.

2.2    Headings.  The headings to Sections and Articles of this Agreement are for ease of reference only and do not form part of this Agreement and shall not in any way affect its construction or interpretation.

2.3    Gender.  The masculine gender shall include the feminine and neuter and the singular number shall include the plural and vice versa, and references to persons shall include individuals, bodies corporate, unincorporated associations and partnerships.

-2-

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F**

2.4 <u>Successors and Assigns</u>. References to parties in this Agreement shall be deemed to include references to their successors and permitted assigns.

2.5 <u>Miscellaneous</u>. The words "herein," "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular article, section or subsection of this Agreement. All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles in the United States of America, consistently applied. References to this Agreement shall include a reference to all Exhibits hereto, as the same may be amended, modified, supplemented or replaced from time to time based on mutual agreement. References to any agreement, document or instrument shall mean a reference to such agreement, document or instrument as the same may be amended, modified, supplemented or replaced from time to time based on mutual agreement. The use of the word "including" in this Agreement to refer to specific examples shall be construed to mean "including, without limitation" or "including but not limited to" and shall not be construed to mean that the examples given are an exclusive list of the topics covered. The word "day" shall constitute a calendar day of twenty-four (24) hours measured from midnight to the next midnight.

**Article 3**
**Sale and Purchase of Wind Turbines**

3.1 <u>Sale of Wind Turbines</u>. Upon the terms and subject to the conditions of this Agreement, Seller hereby agrees to (i) sell and deliver the WTGs to Owner, and observe, monitor and provide all such technical assistance pursuant to Section 8.2, during the assembly, installation and erection of, and Owner hereby agrees to purchase, pay for and accept from Seller, the Wind Turbines, including documentation and Special Tools as described in the Specifications, and (ii) perform the Wind Turbine Work under this Agreement. Seller agrees to furnish at its own cost and expense all labor, materials, services, and other things necessary to perform Seller's obligations in accordance with this Agreement and the other Contract Documents, as amended from time to time in accordance with the provisions hereof.

3.2 <u>Duties and Obligations of Seller Related to Wind Turbines</u>. As adjusted pursuant to Section 15.2(d), Seller shall have the following duties and responsibilities under and pursuant to this Agreement related to the Wind Turbine Work:

3.2.1 <u>Design, Manufacture, Delivery and Commissioning of Wind Turbines</u>. Seller shall (a) procure the Wind Turbines from MHI, (b) transport, supply and deliver the Wind Turbines to each pad at the Site on a level and continuous basis in accordance with Section 5.4(D), in accordance with the Delivery Schedule attached hereto as <u>Exhibit D</u> and Sections 5.3 and 5.4, (c) supply, transport and deliver the Special Tools, each as identified in the Turbine Installation and Erection Manual, to the Site on or before the first shipment of Wind Turbines to the Site, (d) observe, monitor and provide technical assistance at the Site during assembly, installation and erection of the Wind Turbines all pursuant to Section 8.2, (e) Commission all of the Wind Turbines, (f) perform the Project Acceptance Tests, (g) deliver the Instruction Manuals and other documentation herein required, and (h) <u>supply one (1) WTG miniature model as agreed by Seller and Owner (i)</u> perform any other obligation requested under the Agreement (collectively, the "<u>Wind Turbine Work</u>").

-3-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000676

00009

3.2.2  Documents to be Delivered. Seller shall deliver the following documents to Owner on or before the dates indicated herein; provided, however, in the event of any CWP or 4.5m Tower elections by Owner in accordance with Section 4.1.3 or Section 4.1, respectively, then any deadline below based on the NTP date shall instead be based on the date(s) of Owner's applicable election:

(a)  The preliminary Tower load data based on IEC Standard (the "Tower Load Data") shall be submitted to Owner within twenty (20) days following the applicable NTP date. Final Tower Load Data shall be submitted to Owner twenty (20) days after Seller receives the Site Conditions and the Site Plan from Owner.

(b)  Tower base flange drawing (the "Tower Base Flange Drawing") stamped "For Construction" shall be submitted to Owner within twenty (20) days following the applicable NTP date.

(c)  The Tower assembly drawing (the "Tower Assembly Drawing") indicating the dimensions and weights of each Tower section shall be submitted to Owner within twenty (20) days following the applicable NTP date.

(d)  [reserved]

(e)  The communications protocol document, which will include the connection detail needed to design the interface with the electrical and communications system (the "Communications Protocol") shall be submitted to Owner  within twenty (20) days following the applicable NTP date.

(f)  Three (3) sets of the manuals describing the installation and erection of the Wind Turbines and providing mounting details for the down tower electrical (all such manuals, collectively, the "Turbine Installation and Erection Manual") which describe the mechanical and electrical components to be utilized at the Site shall be submitted to Owner within twenty (20) days following the applicable NTP date.

(g)  Uncompleted copy of the form which will be utilized by Seller to report the results of the Initial Performance Test shall be submitted to Owner within twenty (20) days following the applicable NTP. The results thereof, which shall be conducted at the factory, shall be reported on such form and submitted to Owner not later than the date of delivery of the applicable WTG to the applicable pad at the Site.

(h)  Five (5) copies of the Instruction Manual shall be submitted to Owner within sixty (60) days prior to delivery of the first Unit to the applicable pad at the Site.

(i)  A proposed schedule of Scheduled Maintenance for the Project covering the Initial Warranty Period shall be submitted to Owner within twenty (20) days following the applicable NTP.

(j)  Columnar Control Strategy for Wind Turbines shall be submitted to Owner within as soon as possible, but not later than fifty (50) days from Seller's receipt of final applicable Site Conditions (including but not limited to basic Site data, Site wind

-4-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000677

00010

conditions, and seismic conditions), and the Site Plan from Owner, Seller shall confirm in writing to Owner that either (i) no such Columnar Control Strategy is required or (ii) that the Columnar Control Strategy is required to prevent the loads on the Wind Turbine, under the given Site Conditions and Site Plan, from exceeding the loads which the Seller assumed as the design basis for the Wind Turbines. Owner shall deliver the Site Conditions and Site Plan to Seller with respect to a particular Site as soon as practicable following the designation of such Site pursuant to Section 15.2(d).

(k) A preliminary spare parts list which identifies the spare parts, the quantities to be stored at the Site during the Warranty Period, and the unit prices for such parts (subject to escalation as provided in Section 5.14.2 of the Warranty Agreement) shall be submitted to Owner within thirty (30) days following the applicable NTP, and both parties shall mutually agree upon  the firm spare parts list (the "Spare Parts List") within sixty (60) days following the applicable NTP.

Following delivery of any of the items in this Section 3.2.2, any change of such items in a manner that materially impacts Owner shall entitle Owner to an equitable adjustment in the terms of this Agreement to compensate for the change.

3.2.3   Calibration.   Seller shall cause each turbine controller and each Wind Turbine Anemometer to be checked and tested at the factory in accordance with the manufacturers' standards.

3.2.4   Permits.   Seller shall obtain any and all Permits for the importation, transportation and delivery of the Wind Turbines to the pads at the Sites, and any other Permit required to be obtained by Seller or any of its subcontractors by Applicable Law in order to provide the Wind Turbines or to perform the Wind Turbine Work.

3.2.5   Consumable Parts.   Seller shall provide, prior to the achievement of Commissioning, all consumable Parts necessary or appropriate to achieve Substantial Completion, including consumable supplies such as the initial fill of lubricating oil, silicon seals, rods, bolts, nuts and washers (other than bolts, nuts and washers for the foundation anchors), bushings, gaskets, filters, lubricants, and other items normally consumed in the assembly, installation, erection and Commissioning of the Wind Turbines.

3.2.6   Special Tools.   Within 20 days after delivery of the Notice to Proceed, Seller shall provide Owner with a list of all Special Tools. Seller shall deliver and make available the number of sets of the Special Tools to the Site based on the number of WTGs being installed at the Site in the following manner: approximately one (1) set of tools for each fifty (50) WTGs, but no less than one (1) set per Site (so long as such Site includes at least twenty-five (25) WTGs) and, each time the WTGs exceed a multiple of 50 by more than twenty-five (25), Seller shall supply an additional set, for each Project on or before the first shipment of Wind Turbines to the applicable Site. Seller warrants that the Special Tools will function properly, and agrees to replace promptly any Special Tools that fail to function properly.

-5-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000678

00011

3.2.7   Technical Assistance.  Seller shall provide technical assistance at the Site during assembly, installation and erection of the Wind Turbines, pursuant to Section 8.2.

3.2.8   Inspection by Owner.  Owner upon reasonable prior notice to Seller may visit and inspect Seller's manufacturing facilities in Japan, to observe, witness and inspect performance testing, manufacturing and assembly thereof

3.2.9   Periodic Reports.  At Owner's request, Seller shall provide (no more often than monthly) periodic reports of its progress with respect to the Work, including as to performance testing and design approval.

3.3      Standard of Performance.  Seller covenants to Owner that all of the Wind Turbine Work shall conform to and will be carried out in accordance with the Specifications, Applicable Laws, the specific items set forth in Exhibit E-1, attached hereto, which are based upon requirements in Owner's Permits that are applicable to the Wind Turbines or the Wind Turbine Work, or such specific items which are based on requirements in Owner's Permits that are applicable to the Wind Turbines or the Wind Turbine Work as Owner may request to be added to Exhibit E-1 after the date hereof subject to (i) the prior approval of Seller (such approval not to be unreasonably withheld or delayed, but it shall be deemed reasonable for Seller to withhold approval of any provision that has the potential to expose Seller or its subcontractors or vendors to increased or additional risk or liability) and (ii) the provisions of Section 9.6, Permits described in Section 3.2.4, Prudent Wind Industry Practices, the Instruction Manual (each such manual as modified by Seller from time to time; provided, that the manuals in effect at a given time shall govern the work performed at such time and any later modifications to any manual shall not render the work so performed inconsistent with the Requirements), the specific items set forth in Exhibit E-2, attached hereto, which are based upon requirements in the Power Purchase Agreement or Interconnection Agreement that are applicable to the Wind Turbines or the Wind Turbine Work, or such specific items which are based on requirements in the Power Purchase Agreement or Interconnection Agreement that are applicable to the Wind Turbines or the Wind Turbine Work as Owner may request to be added to Exhibit E-2 after the date hereof subject to (a) the prior approval of Seller (such approval not to be unreasonably withheld or delayed, but it shall be deemed reasonable for Seller to withhold approval of any provision that has the potential to expose Seller or its subcontractors or vendors to increased or additional risk or liability) and (b) the provisions of Section 9.6, and the other requirements of this Agreement (collectively, the "Requirements"), all as more particularly described herein and in the Exhibits. The standard of performance set forth in this Section 3.3 shall apply to all aspects of the Wind Turbine Work.

3.4      Cooperation and Non-interference.  Seller acknowledges that, concurrently with the performance of the Wind Turbine Work under this Agreement, BOP Contractor will be erecting the WTGs (and potentially, the wind turbines of another manufacturer) and supplying, constructing, installing, and testing the balance of plant on behalf of Owner pursuant to the BOP Contract.  Seller agrees to use commercially reasonable efforts not to interfere with the work of Owner and the BOP Contractor and Owner's other wind turbine vendors supplying wind turbines and wind turbine generators that may be operating within the construction area of the Project and/or proximate to the Project.  Owner reserves the right to advise Seller at any time of actual or potential interference.  Seller agrees to use commercially reasonable efforts to cooperate with

-6-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000679

00012

Owner and BOP Contractor and to coordinate Seller's performance of the Wind Turbine Work with such other persons so that all work performed at the Site may be completed in a timely and efficient manner. In addition, Seller will attend all coordination meetings at the Site. Seller shall reasonably cooperate with Owner, at Owner's expense, in connection with Owner's efforts to obtain approvals, certificates, and Permits required to complete the Project.

Owner agrees to use commercially reasonable efforts not to interfere with the Wind Turbine work and shall cause the BOP Contractor and Owner's other wind turbine vendors supplying wind turbines to use commercially reasonable efforts not to interfere with Seller's Wind Turbine work. Seller reserves the right to advise Owner at any time of actual or potential interference.

3.5 Liens. Seller shall not directly or indirectly create, incur, assume or suffer to be created by any of its subcontractors, employees, laborers, mechanics or materialmen of goods or services, any lien, security interest or encumbrance on the Site, the Project, the Wind Turbines or any part of, or interest in, any thereof which is not extinguished or released within ten (10) days of its attachment, except Permitted Liens. As used herein, "Permitted Liens" shall mean carrier's, warehousemen's, mechanics', materialmen's, repairmen's and other like statutory liens (but excluding any consensual liens granted by Seller, such as security agreements) available under Applicable Law and securing obligations that are not overdue, or obligations that are overdue as a result of Owner's failure to pay Seller hereunder. Upon the payment by Seller to any of its subcontractors or materialmen for any portion of the Wind Turbine Work, Seller shall obtain unconditional, final payment or conditional, progress payment, as the case may be, waivers of mechanics' and materialmen's liens, security interests or encumbrances from all such persons for the Wind Turbine Work and shall provide such waivers to Owner at such time and to the extent that payment is received by Seller for such work performed and goods furnished. Seller shall as soon as practicable pay or discharge, and discharge of record, any such lien, security interest or encumbrance (other than Permitted Liens) for labor, materials, supplies or other charges which, if unpaid, might be or become a lien, security interest or encumbrance upon the Site, the Project, the Wind Turbines or any part or component thereof. Seller shall notify Owner of the assertion of any lien, security interest or encumbrance against the Site, the Project, the Wind Turbines or any part or component thereof (excluding Permitted Liens) promptly upon learning of such lien, security interest or encumbrance, and shall notify Owner whether it intends to pay the amounts asserted in the lien or otherwise obtain its discharge, or to obtain a bond or security for such lien that effectively removes such lien from the Project and the Project site. Upon the failure of Seller promptly to pay, discharge or bond against any lien, security interest or encumbrance as required hereby within thirty (30) days of notice of the existence thereof from any source and to provide written evidence of such action to Owner prior to the applicable subcontractor or vendor of Seller taking any action against the Project, Owner may, but shall not be obligated to pay, discharge or obtain a bond or security for such lien, security interest or encumbrance and, upon such payment, discharge or posting of security therefor, shall be entitled immediately to recover from Seller the amount thereof, together with all expenses incurred by Owner in connection with such payment or discharge or posting of security, or to set off all such amounts against any sums owed by Owner to Seller under the Contract Documents. Notwithstanding anything to the contrary, Seller shall have no obligation to discharge, release or satisfy any such liens in respect of amounts due hereunder and unpaid by Owner.

-7-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000680

00013

3.6   Escrow.

3.6.1   Not later than the Scheduled Substantial Completion Date, Seller and Owner shall enter into a mutually acceptable escrow agreement (the "Escrow Agreement") with a mutually agreeable escrow agent (the "Escrow Agent") for the benefit of Owner and any subsequent owner of the Project pursuant to which Seller shall deposit the Escrow Items with Escrow Agent on the Scheduled Substantial Completion Date. Seller warrants that the Escrow Items, when provided to qualified personnel, are adequate to enable the manufacture of replacement parts for the entire WTG. The Escrow Items are placed in escrow solely for the purpose of completing construction of, operating, maintaining, rebuilding and expanding the Project if Seller is unable or refuses to perform such work. The Escrow Agreement shall provide for the release of the Escrow Items by Escrow Agent to Owner upon written certification by Owner that one (1) of the following has occurred:

(a)   the institution of bankruptcy or insolvency proceedings by or against Seller as debtor not dismissed within ninety (90) days of filing;

(b)   the inability or unwillingness of Seller to supply Spare Parts for any WTG upon commercially reasonable terms and conditions.

3.6.2   The Escrow Agreement shall also contain such provisions as may be reasonably requested by Owner to ensure Owner's ability to obtain the Escrow Items from Escrow Agent despite the pendency of any bankruptcy or insolvency proceeding involving Seller as a debtor, including, but not limited to, the transfer by Seller of legal title to the copy of the source code deposited with Escrow Agent; provided, that nothing herein shall require Seller to transfer any patent, trademark or other intellectual property rights to Owner, except as expressly provided herein. Any rights of Owner to use the source code if released by Escrow Agent shall be in the nature of a nonexclusive royalty-free license to use the source code solely in connection with the operation and maintenance of the Project. Owner agrees not to disclose the source code to any third party except as may be necessary for the operation and maintenance of the Project and shall limit the use of such source code by any such third party to what may be necessary for the operation and maintenance of the Project and shall require any such third party otherwise not to (i) use the source code except as otherwise provided in this Section 3.6.2, nor (ii) disclose the source code to others.

3.6.3   The Escrow Agreement shall provide that, as and when the WTGs are modified or altered, Seller shall update the software, specifications, drawings and other documents which require updating in order for them not to be inaccurate in any respect in their description of the WTGs as so modified or altered, and to deposit such updated software, specifications, drawings and documents with Escrow Agent for safekeeping for the benefit of Owner.

**Article 4**
**Purchase Price And Payment**

-8-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

    4.1    <u>Unit Price; Purchase Price</u>. As full and complete payment for all of the two hundred six (206) Wind Turbines delivered to each pad at the Sites in accordance with the provisions of this Agreement, the performance of the Wind Turbine Work and Seller's other obligations under this Agreement with respect thereto, Owner shall pay to Seller in the manner and at the time specified in Section 4.2 below, and Seller shall accept as payment in full by Owner of the Contract Price. As used herein, "Contract Price" with respect to a particular Project shall equal the product of the number of WTGs designated to such Project multiplied by the Unit Prices contained in the table below, subject to adjustments as described in this Agreement. Exhibit F hereto sets forth pricing for certain optional items which Owner may select in accordance with the terms thereof. As and when selected, the Contract Price shall be adjusted accordingly.

**Unit Price Table**

| Number of Units | Yen Price Per Unit | US Dollar Price per Unit | Yen Hedge |
|---|---|---|---|
| 1) 44 WTGs | ¥213,000,000 ("Base Yen Price") | $1,120,120 (4.8m* tower) ("Base Dollar Price")<br><br>$1,144,120 (4.5m* tower) | For 35 WTGs, Seller bears first 5 Yen per US$ and Seller and Owner split excess 50-50. For 9 WTGs, as per Section 4.1.1(b) |
| 2) 162 WTGs | Base Yen Price x 105% =<br><br>¥223,650,000 | Base Dollar Price x 105% =<br><br>$1,176,126 (4.8m)*<br><br>$1,201,326 (4.5m)* | As per Section 4.1.1(b) |

\*    Owner will designate, for each Project, either 4.8m Towers or 4.5m Towers at least sixteen (16) months prior to shipment of the first WTG for that Project.

To cover possible cost escalation for steel and other raw materials between the Effective Date and, as to any WTG, the applicable NTP for such WTG, a price adjustment may be made in an amount as determined by referring to the GDPIPD. The first four percent (4%) of cost increase as reflected by the GDPIPD shall be borne by Seller. Owner shall pay fifty percent (50%) of any such increase beyond four percent (4%). In the event of an increase of more than ten percent (10%), Owner and Seller shall negotiate a mutually agreeable resolution of such price increase.

    4.1.1    (a) The Unit Price for each of the forty-four (44) WTGs with respect to which Owner has delivered NTP as of the date hereof shall be increased by a currency hedge cost of $26,303.09.

    (b)    The Unit Price for each of the other seventy-eight (78) WTGs with respect to which Owner has delivered NTP as of the date hereof shall be increased by a currency hedge

-9-

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F**

MPSANDTX0000682

00015

cost of $155,043.23.

(c)         Concurrently with the NTP for the remaining eighty-four (84) WTGs or thereafter, Owner may elect to convert any further payable Japanese Yen portion of the Contract Price with respect to such WTGs, except for the payments previously made under this Agreement, into US Dollars at the one month averaged exchange rate quoted in the Wall Street Journal, Western Regional Edition under the caption "Global Stocks and Currencies—Currencies" for the 30 trading days ending one week prior to the effective date of the conversion (or if such date is not a trading day, the first trading day thereafter) plus currency hedge cost (cost to be paid by Owner) offered by The Bank of Tokyo-Mitsubishi UFJ or other mutually agreeable bank (Seller shall use reasonable efforts to secure multiple quotes and shall provide the hedge cost based on the lowest offered quote); provided, however, that Owner (i) delivers a nonbinding written notice to Seller of its intention to make such conversion no later than five (5) Business Days prior to the proposed conversion date; and (ii) delivers binding and irrevocable instructions to Seller with respect to such conversion as early as practicable, but in no event later than 12 Noon, Pacific Time, on the proposed trading day.

(d)         In the event that Owner does not exercise such option as provided herein, then the Contract Price for the remaining eighty-four (84) WTGs shall remain payable in accordance with this Agreement (and any applicable agreement with respect to a particular Project) in Japanese Yen and US Dollars in the ratio that the two currencies bear to each other in the Contract Price. In the event that Owner does exercise such option as provided herein, then, following such currency conversion, the remaining payable Contract Price for the affected WTGs shall be payable solely in US Dollars.

4.1.2   The Contract Price is for all Wind Turbines and the Wind Turbine Work and includes packing costs, the costs of insurance, freight and delivery for transportation of the Wind Turbines to the US Port of Entry, the cost of freight and delivery (but not the off-loading) of the Wind Turbines at the US Port of Entry, and customs duties and other Taxes payable by Seller upon the importation of the Wind Turbines into the United States, but excludes all present and future taxes and duties including, any sales tax, use tax, value added tax, property tax, gross receipts taxes, taxes based on gross income (where assessed in lieu of sales or transfer tax), excise or other similar taxes payable within the United States, which taxes shall be paid by Owner (other than any taxes based on or measured by net income of Seller). If Seller is required by Applicable Laws to pay or collect any such taxes on the Wind Turbines and/or the Wind Turbine Work, then such tax shall be paid by Owner in addition to the Contract Price. The Contract Price also excludes (i) any unloading costs, costs for stacking Seller's trailer, costs for assembly, installation and erection in accordance with the Instruction Manual, and balance of plant costs, (ii) the Technical Advisory Fees during the erection and commissioning, which shall be paid additionally in accordance with Section 4.2.7, (iii) if Owner chooses to conduct a Power Curve Test, the additional price for Seller's technical advisor to provide technical assistance for one Power Curve Test shall be $19,200 and (iv) additional sets of Special Tools, if Seller is requested to supply more than the originally designated number of sets of Special Tools, which will be delivered within six (6) months from the Seller's receipt of Owner's written request at the additional price of $382,000 per set at FOB Japan Port Incoterms 2000. The prices for the above items exclude all present and future taxes and duties including, any sales tax, use tax, value

-10-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000683

00016

added tax, property tax, gross receipts taxes, taxes based on gross income (where assessed in lieu of sales or transfer tax), excise or other similar taxes payable within the United States, which taxes shall be paid by Owner (other than any taxes based on or measured by net income of Seller). If Seller is required by Applicable Laws to pay or collect any such taxes with respect to the above items, then such tax shall be paid by Owner in addition to the prices quoted for such items. The tax allocation provisions of this paragraph do not include taxes imposed on or with respect to any subcontractor or vendor of Seller, it being understood that Seller and/or any of its subcontractors or vendors shall be responsible for taxes of any nature imposed on or with respect to a subcontractor or vendor of Seller. At Owner's request, Seller shall allocate the Contract Price among the Wind Turbines themselves, freight and transportation charges, insurance, and other costs to the extent necessary to enable Owner to obtain sales tax exemption(s) in accordance with Applicable Law. The Contract Price shall be adjusted from time to time to reflect any additional order for the above items or any applicable Change Orders. In the event that any adjustment in the Contract Price results in an overpayment or underpayment having been made with respect to any payment of the Contract Price under <u>Section 4.2</u> hereof, the immediately following payment due under <u>Section 4.2</u> shall be adjusted accordingly.

4.1.3   On or before August 31, 2007, Seller will notify Owner of the purchase price of the cold weather package option described in Exhibit A-2 (as such specifications are finalized by the Parties following the Effective Date, the "CWP"), such price to be no greater than $120,000 (the "Seller CWP Option Price"). The CWP will be available at the Seller CWP Option Price for all WTGs shipped Ex Works manufacturing facility commencing in April 2009, subject to Seller's receipt of Owner's election to purchase the CWP on or prior to January 1, 2008. For up to fifty-three (53) WTGs, Owner shall have the choice of purchasing the CWP at either (i) the Seller CWP Option Price or (ii) a fixed price of $120,000 per WTG (the "Fixed CWP Price"). For each CWP Owner purchases at the Fixed CWP Price, Owner shall receive a Spare Parts credit in an amount equal to 1/53 x $2,915,000. Such spare parts credit shall apply only to WTGs which include the CWP. If Owner purchases the CWP at the Seller CWP Option Price and Seller subsequently provides the same CWP to other purchasers of MWT95/2.4 WTGs with scheduled deliveries in 2009 for a lower price, then the Seller CWP Option Price charged to Owner shall be automatically adjusted to such lower price and, if already paid, the amount overpaid shall be promptly refunded to Owner.

4.2   <u>Payment Schedule and Method</u>.   Owner shall pay the Contract Price to Seller by wire transfer to such account as may be directed by Seller in writing. Each invoice shall state the applicable amount which is due (i) for the US Dollar portion, and (ii) for the JP Yen portion (which, if applicable, shall also be expressed in US Dollars using the calculation method (including the currency hedge fee if applicable) set forth in Section 4.1.1), at the following times:

4.2.1.   [reserved]

4.2.2   <u>NTP</u>:   Within five (5) Business Days following each date that NTP has been delivered pursuant to Section 5.1 below, Owner shall deliver to Seller the Babcock Guaranty Agreement or a Payment Letter of Credit with respect to the applicable WTGs. On the date of the first two NTP notices, which is the Effective Date, Owner shall remit to Seller a payment in the amount of 2.5% of the combined Contract Price for all Units, based on the assumption that Owner has chosen 4.8m Towers for each Unit. Following Owner's selection of a 4.5m Tower

-11-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

for any Unit, Owner shall remit, at the time of and in addition to the next payment due pursuant to Section 4.2.4 or Section 4.2.5 below, the additional amount that would have been due up to and including such date if Owner had selected a 4.5m Tower on the Effective Date, and the Contract Price for the applicable Site shall be adjusted accordingly, such that all subsequent payments include the higher price for the 4.5m Tower.

4.2.3   Increase to 10% 18 Months Prior to the First Scheduled WTG Shipment.  18 months prior to the first scheduled shipment of WTG components from Japan to a particular Project designated in accordance with Section 15.2(d), Owner shall pay Seller an amount equal to seven and one-half percent (7.5%) of the Contract Price for such WTGs, upon the receipt of an invoice issued by Seller.

4.2.4   10% 12 Months Prior to the First Scheduled WTG Shipment:   12   months prior to the first scheduled shipment of WTG components from Japan to a particular Project designated in accordance with Section 15.2(d), Owner shall pay Seller an amount equal to ten percent (10%) of the Contract Price for such WTGs, upon the receipt of an invoice issued by Seller.

4.2.5   25% Payment Upon Shipment of Wind Turbines:   Upon   shipment   of   each WTG, whether Ex Works Seller's manufacturing facility or from storage pursuant to Section 5.3(F), Seller may invoice Owner for 25% of the Unit Price in the aggregate for all components shipped.  The invoiced amounts shall be paid to Seller no later than the last Business Day of the month in which (i) such Major Component is shipped, and (ii) Owner receives Seller's invoice for the WTG, provided that Owner receives Seller's invoice on or before the fifteenth (15th) day of the month.  If Owner receives Seller's invoice after the fifteenth (15th) day of the month, then Seller shall be paid the invoiced amount by no later than the last Business Day of the following month.

4.2.6   25% Payment Upon Delivery of Wind Turbines:   Upon delivery to the applicable pad at the Site of the last Major Component for each WTG, Seller may invoice Owner for 25% of the Unit Price in the aggregate for all components delivered.  The invoiced amounts shall be paid to Seller no later than the last Business Day of the month in which (i) such Major Component is delivered to the applicable pad at the Site, and (ii) Owner receives Seller's invoice for the WTG shipment, provided that Owner receives Seller's invoice on or before the fifteenth (15th) day of the month.  If Owner receives Seller's invoice after the fifteenth (15th) day of the month, then Seller shall be paid the invoiced amount by no later than the last  Business Day of the following month.

4.2.7   25% Upon Completion of Commissioning:   Owner shall pay Seller an amount equal to twenty five percent (25%) of the Contract Price upon the issuance or deemed issuance of the Commissioning Certificate of each WTG and Owner's receipt of Seller's invoice.  The invoiced amounts shall be paid to Seller no later than the last Business Day of the month in which the invoice is received by Owner, provided that Owner receives Seller's invoice on or before the fifteenth (15th) day of the month.  If Owner receives Seller's invoice after the fifteenth (15th) day of the month, then Seller shall be paid the invoiced amount by no later than the last Business Day of the following month.  For each WTG, if Commissioning is delayed more than two (2) weeks after it has begun due to the actions of Owner in default of its

-12-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000685

00018

obligations under this Agreement, Seller shall be entitled to receive an amount equal to twenty percent (20%) of the Contract Price in advance based on the original commissioning schedule and five percent (5%) of the Contract Price will be paid upon the completion of Commissioning of the delayed WTG.

4.2.8   5% Upon Substantial Completion: Owner shall pay Seller an amount equal to five percent (5%) of the Contract Price, less 200% of the aggregate value of all items on the Punch List (the "Punch List Holdback") which pertain to the WTGs if any, upon (i) the issuance of the Substantial Completion Certificate or the achievement of deemed Substantial Completion with respect to the WTGs, in each case in accordance with Section 9.3 (the "Substantial Completion Payment"), and (ii) Owner's receipt of Seller's invoice. The invoiced amounts shall be paid to Seller no later than the last Business Day of the month in which the invoice is received by Owner, provided that Owner receives Seller's invoice on or before the fifteenth (15th) day of the month. If Owner receives Seller's invoice after the fifteenth (15th) day of the month, then Seller shall be paid the invoiced amount by no later than the last Business Day of the following month. The Punch List Holdback retained by Owner shall be released to Seller each month as such Punch List items are completed, and any remaining amounts of the Punch List Holdback shall be paid within 5 Business Days following the issuance of the Final Completion Certificate in accordance with Section 9.4.

4.2.9   Technical Advisory Fees. Any Technical Advisory Fees set forth in Section 8.2 shall be paid by Owner within thirty (30) days after Owner's receipt of Seller's invoice on monthly basis.

4.2.10.   Additional Special Tools. The price for additional Special Tools ordered by Owner in accordance with Section 4.1.2 shall be paid by Owner to Seller within thirty (30) days after Owner's receipt of Seller's invoice. 50% of the price shall be paid upon the issuance of Owner's purchase order and the remaining 50% shall be paid upon delivery to the Site.

4.3   [Reserved].

4.4   Seller's Payment Security. In the event that Owner has delivered the Babcock Guaranty Agreement, in accordance with Section 4.2.2, Owner may at any time withdraw any of the Babcock Guaranty Agreements, but only after Owner has caused to be issued, and Seller has received, an irrevocable standby letter of credit in place of each withdrawn Babcock Guaranty Agreement in the form attached hereto as Exhibit C-3 (the "Payment Letter of Credit") from a bank or other financial institution whose long term unsecured debt is rated "A-" or better by Standard & Poor's Rating Group or at least A3 by Moody's Investors Services, Inc. Alternatively, Owner may issue such Payment Letter of Credit, in the first instant, as provided in Section 4.2.2. The Payment Letter of Credit shall be governed by the laws of the state of New York. The face amount of the Payment Letter of Credit shall be equal to the cancellation exposure stated in Exhibit R as of the date the relevant Payment Letter of Credit is issued. The face amount of the Payment Letter of Credit shall be increased each time the cancellation exposure stated in Exhibit R increases. In the event that the Payment Letter of Credit specifies an expiration date, such date shall not be earlier than three (3) months after the schedule date for the last payment under Section 4.2. If Seller has not been paid all payments under Section 4.2 through the Substantial Completion Milestone (i.e. 100% of the Contract Price less the Punch

-13-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000686

00019

List Holdback) by the date which is forty-five (45) days prior to the expiration date specified in the Payment Letter of Credit, then, no later than thirty (30) days prior to such expiration date, Owner shall cause such expiration date to be extended as necessary, so that the Payment Letter of Credit remains valid until Seller has received one hundred percent (100%) of the Contract Price less the Punch List Holdback. Should Owner fail to extend the validity of the letter of credit as so required, Seller shall be entitled to draw down an amount which is equal to the difference between the aggregate of payments received by Seller on account of the Contract Price and one hundred percent (100%) of the Contract Price. If, in the first instance, Owner issued the Babcock Guaranty Agreement in accordance with Section 4.2.2, then at such time as Owner supplies a Payment Letter of Credit, Seller shall return the original of the applicable Babcock Guaranty Agreement and indicate in writing that such guaranty has been fully released and discharged. At such time as Owner has paid 100% of the Contract Price less the applicable Punch List Holdback, Seller shall return the original Babcock Guaranty Agreement or the Payment Letter of Credit, as applicable, which corresponds to the Contract Price, as applicable, and indicate in writing that such guaranty or letter of credit has been fully released and discharged. It is understood that Owner intends to provide a Babcock Guaranty Agreement (or the Payment Letter of Credit) for WTGs and that any decision by Owner to replace a Babcock Guaranty Agreement with a Payment Letter of Credit can be made.

## Article 5
## Notice to Proceed; Deliveries of Wind Turbines

5.1     Delivery of Notice to Proceed.  Owner has delivered to Seller on the date hereof a written notice to proceed (the "Notice to Proceed" or "NTP") for 44 Wind Turbines and a separate NTP for 78 Wind Turbines, and shall comply with the provisions of Section 4.2.2. Owner shall hereafter deliver to Seller on or before August 31, 2007 an NTP for 84 Wind Turbines and shall comply with the provisions of Section 4.2.2 with respect to that NTP.

5.2     Designation of Project Sites.  Following its designation of any Site in accordance with Section 15.2(d), Owner may designate to Seller, in accordance with Section 15.2(d), an alternate site for a Project, which shall then be a Site, provided that any alternate Site must include at least twenty-five (25) Units.

5.3     Inland Transportation Feasibility Study and Transportation Adjustment

(A)  At least six (6) months prior to the first scheduled WTG shipment to each Site identified by Owner in accordance with Section 15.2(d), Seller shall conduct a Transportation Feasibility Study (the "Transport F/S") and identify all, to the best of its knowledge at that time, known costs reasonably necessary to deliver the WTGs to the pads at each Site from the US Port of Entry.  At such time, Seller will inform Owner of the approximate cost on an open book basis, as a rough order of magnitude, to be proposed to Owner based on the quotation supplied by transportation carriers.  Seller shall also specify in the Transport F/S all civil works on the Site which are necessary for the transportation of WTGs to the Site.  Such civil works shall be carried out at Owner's cost.

(B)  Owner shall have the right to review and comment, on a commercially reasonable basis, on any costs set forth in the Transport F/S, which shall be made no later than two (2) weeks from

-14-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000687

00020

Owner's receipt of the Transport F/S. Upon receipt of such comments, Seller shall evaluate and propose alternatives if available, and revise the Transport F/S accordingly, inform Owner of a not-to-exceed price of delivery and submit the revised Transport F/S to Owner within two (2) weeks upon receipt of such comments. Upon the receipt of the Transport F/S or its revision, Owner shall decide, within two (2) weeks, whether Owner or Seller will perform the inland transportation work for transportation to the Site.

(C)      If Seller is requested to provide transportation to another Site designated in accordance with Section 5.2, the actual transportation cost (including fuel cost and changes thereto), established as set forth above, plus five percent (5%) of such cost, shall be paid by Owner to Seller. Seller shall not be responsible for the difference between the actual cost and the expected cost informed in the Transport F/S.

(D)   Transportation price for delivery to the pads at each Site of the entire WTG shall be the actual cost established on an open book basis plus five percent (5%), but shall not exceed the fixed price established at the completion of the transport study.

(E)   In case Owner requests Seller to change the port of entry for the WTG component delivered from Japan for the purpose of minimizing the inland transportation cost from a port other than the US Port of Entry, the Contract Price shall be adjusted to cover such increase or decrease in price and the Delivery Schedule shall be also adjusted accordingly (the "Transportation Adjustment"). Such request shall be made within the reasonable periods in order not to affect the ocean transport arrangement made by Seller.

(F)   Seller shall arrange for and bear any costs of storage of the WTGs or their components Ex Works that is required to effect first delivery of the WTGs on or after April 1, 2009. Any WTGs placed into such storage shall be deemed shipped Ex Works once they are shipped from such storage.

     5.4    Delivery of Wind Turbines; Guaranteed Delivery Schedule. (A)   Provided that Owner shall have delivered the Notice to Proceed to Seller on or before June 5, 2007 for the first 44 Units, and on or prior to August 31, 2007 for the remaining 162 Units, and complied with the provisions of Section 4.2.2, Seller shall deliver each Wind Turbine only at the times set forth on and in accordance with the Delivery Schedule attached hereto as Exhibit D to a location designated by Owner adjacent to the crane pad location for such Wind Turbine at the Site (or DDP US Port of Entry if Owner does not select Seller delivery in accordance with Section 5.3), or if any such crane pad location may not be available at the time Seller is scheduled to deliver the Wind Turbine in accordance with Exhibit D, then to a storage location identified by Owner on or adjacent to the Site. Owner shall provide to Seller, and its subcontractors and vendors and their respective employees and agents such access across non-public roads, as is reasonably necessary in accordance with Section 8.3, to the Site and locations within the Site, or to the storage location on or adjacent to the Site, as designated by Owner and shown on the Site Plan attached as Exhibit B-2, as such access is reasonably necessary in accordance with Section 8.3, to permit Seller to perform the Wind Turbine Work, including the deliveries. (Seller shall be responsible for all access over public roads, including public roads situated within a particular Site, if any.) The access over non-public roads to the Site, and to such on-Site delivery locations provided by Owner, shall be broad enough and otherwise sufficient to permit access and egress

-15-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000688

00021

by heavy trucks and highway trailers and shall comply with the requirements of <u>Exhibit G,</u> <u>"Road Requirements for WTG Delivery"</u>. In the event that such access roads differ from the foregoing conditions, and the transport vehicle experiences wheel spinout or is otherwise unable to safely proceed to the Owner's designated crane pad location or the storage area, or is otherwise unable to safely return to the public roadway without additional measures (including towing equipment, cranes, alternative vehicles, and personnel), then Seller and Owner shall evaluate the options which may be available to overcome the situation and enable the safe delivery of the equipment to Owner's designated crane pad location or storage area and the safe return of the transport vehicle to the public roadway. Notwithstanding anything to the contrary in the forgoing, it is understood that Owner shall be responsible for the implementation and execution of such measures with respect to non-public access routes to and within the Site, and the additional costs and expenses associated therewith. Seller shall be entitled to an equitable adjustment in the Contract Price for additional costs and expenses incurred by Seller, if any (including demurrage charges claimed by the transport carrier) in connection with the transport and delivery of the equipment and egress of the transport vehicle from the Site, and an equitable adjustment in the schedule for delays, if any, associated with conditions materially different than the conditions set forth in <u>Exhibit G</u>, subject to the next sentence; and provided further, however, that in no event shall Seller be entitled to an adjustment in the Contract Price for additional costs and expenses incurred by Seller, if any (including demurrage charges claimed by the transport carrier), in connection with the storage, shipment, re-shipment delivery or re-delivery of Wind Turbines that are not delivered on a level and continuous basis as set forth in <u>Exhibit D</u>. Seller agrees to discuss in detail with Owner all requirements of the transport carrier, and to make commercially reasonable efforts to negotiate with the transport carrier the transportation and delivery requirements shown in <u>Exhibit G</u>. If, notwithstanding reasonable efforts and discussion with the Owner and transport carrier(s) to confirm the requirements in <u>Exhibit G</u>, Seller determines that more restrictive road requirements are necessary for prudent delivery to the crane pads at each Site, then within (90) days of the applicable NTP Seller shall have the right to submit a revised <u>Exhibit G</u> to Owner with the final road requirements. It is understood that Seller shall in no event be required to incur any additional costs, expenses or liabilities in connection with such negotiation or securing the agreement of the transport carrier to the requirements of <u>Exhibit G</u> except as such negotiation or securing the agreement of the transport carrier to the requirements of <u>Exhibit G</u> is made necessary by Seller's failure to deliver the WTGs on a level and continuous basis as set forth in Exhibit D.

(B)  Prior to loading at the US Port of Entry or unloading at the location designated by Owner adjacent to the crane pad location for such Wind Turbine at the Site, or at the storage location identified by Owner on or adjacent to the Site, Owner shall inspect each component for damage and road grime, record such damage and road grime, if any, and have it confirmed in writing by Seller. Seller shall not be responsible for any road grime or damage occurring after delivery in accordance with Section 5.4(C). Seller shall remove, or upon Seller's written request, Owner shall, at Seller's expense, cause BOP Contractor to remove any road grime from the delivered equipment, if any, identified during such inspection. If any damage is identified during such inspection, Seller shall either repair or replace the damaged component, provided, however, that if such damage was caused by Owner or BOP Contractor during such inspection, Owner shall reimburse Seller for the repair cost. If Owner selects Seller delivery in accordance with Section 5.3, Owner shall be responsible, subject to Section 5.4D, to unload or cause to be unloaded at the Site, all Wind Turbines, components, equipment, Parts and Special Tools delivered by Seller.

-16-

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F**

Subject to Section 5.4D, Owner or BOP Contractor shall complete the unloading of each Wind Turbine, components, equipment, Parts and Special Tools and complete the stacking of Seller's trailer, all as governed by Exhibit D and Section 5.3(F).

(C) If Owner selects Seller delivery in accordance with Section 5.3, then subject to Section 5.4D, delivery shall be completed for each Wind Turbine upon arrival at the adjacent crane pad location for such Wind Turbine at the Site, or the arrival of the carrier to Owner's storage location in the event that the Wind Turbine is delivered according to Exhibit D and Owner is nevertheless unable to take delivery at the crane pad at the scheduled delivery date. The responsibility, risk and cost with respect to the movement or re-delivery of Wind Turbines delivered by Seller in accordance with Exhibit D and Section 5.4D shall be borne by Owner. For the avoidance of doubt it is understood that Seller shall bear the obligation, responsibility or risk with respect to the movement or re-delivery of any Wind Turbines not delivered to the proper pad at the Site in accordance with Exhibit D, as provided in Section 5.4(D). Notwithstanding the foregoing, if the delivery of any Wind Turbine arrives more than ninety (90) days earlier than the scheduled delivery date for such Wind Turbine, Owner shall provide space to Seller (for the avoidance of doubt, such space provided by Owner shall not be required to meet the requirements of Section 5.5) in order to store such Wind Turbines at Owner's cost but at Seller's risk up to the scheduled date for delivery in the Delivery Schedule (notwithstanding anything to the contrary contained in Section 5.7) and Seller shall pick up and redeliver such Wind Turbines at Seller's cost and at the times set forth on and in accordance with the Delivery Schedule; provided, however, that notwithstanding such early delivery, if Owner accepts any such Wind Turbines when delivered upon arrival at the adjacent crane pad location, Seller shall bear no risk for the storage of such Wind Turbines and bear no cost for the pick up and re-delivery of such Wind Turbines. Owner shall not be required to have a crane available to unload deliveries which arrive prior to the scheduled delivery date. If a crane is available at the Site or storage location however, and Owner accepts delivery of such Wind Turbines, Owner will use commercially reasonable efforts to unload deliveries which arrive up to one (1) week prior to the scheduled delivery date. Any deviations from the Delivery Schedule shall be subject to the agreement of both parties.

D.      Deliveries of Wind Turbines to the Site shall be governed by the following provisions:

1)      Seller shall be responsible for delivering the wind turbine components to individual crane pads, unless Owner chooses to provide a staging area.

2)      Seller (or Seller's carrier) shall be responsible for all hauling permits, special conditions, road modifications and the like with respect to any public roadways, whether or not within the perimeter of the wind farm property. Owner shall be responsible for park roads and for any turnouts or other modifications to site leased property to allow access to park roads from public roads by Seller's transport vehicles.

3)      Seller shall deliver the quantity of complete turbines per week designated in Exhibit D, (including all components: tower sections, blades, hub, nacelle, and cargo box) in accordance with Exhibit D. For the purpose of calculating delay liquidated damages, towers from different fabricators shall be considered unique,

-17-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000690

00023

and only if all tower sections from the same fabricator have been delivered for any particular turbine will that turbine be considered complete.

4)      The parties anticipate that nominally 13 truck loads will be required for each turbine as follows:

| Component Turbine | Qty Req'd | Loading | Truck Loads Per |
|---|---|---|---|
| Nacelle | 1 | 1 per truck | 3 |
| Hub | 1 | 1 per truck | 2 |
| Tower Sections | 4 | 1 per truck | 4 |
| Cargo Box | 1 | 3 per truck | 0.3 |
| Blades | 3 | 1 w/ 95m blades | 3 |

TOTAL 12.3=>13

5)      Owner shall be required to unload no more than 50% above the scheduled number of delivery truckloads per day, and Owner shall not be required to unload any turbine component that is more than 10 units in excess of the total quantity of complete WTGs delivered to the site; provided, however, that in the event of a Force Majeure affecting Supplier or any other material disruption to Supplier's delivery logistics, Supplier and Buyer shall meet in order to establish a mutually agreed adjustment (interim or permanent) to the delivery schedule and logistics with the goal of minimizing demurrage charges, Buyer offloading costs, Supplier's transportation costs, and Liquidated Damages.

6)      Trucks and/or trailers which arrive on or before noon shall be unloaded within the same calendar day. If Owner fails to complete unloading and stacking within such calendar day, then the Owner shall reimburse Seller for actual demurrage and other charges incurred by Seller due to such Owner's failure to complete unloading and stacking.

7)      Trucks and/or trailers which arrive after noon shall be unloaded prior to noon of the following calendar day. If Owner fails to complete unloading and stacking within such period, then Owner shall reimburse Seller for actual demurrage and other charges incurred by Seller due to such Owner's failure to complete unloading and stacking.

8)      Seller shall provide daily notifications to Owner of equipment arrivals at the Site. No turbine component shall be considered delivered to the Site sooner than 24 hours after Owner is so notified of its arrival.

-18-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000691

00024

9)   No WTG deliveries shall be made on a day other than a Business Day without Owner's approval in advance.

10)   Owner and Seller shall meet at least 90 days prior to the first scheduled delivery to discuss delivery logistics and protocol.

5.5   Delay of Deliveries to the Site.

5.5.1   Delay Liquidated Damages.  If the delivery of the components and the Parts of the Wind Turbines does not occur at the times set forth on and in accordance with the Delivery Schedule, a preliminary version of which is attached hereto as Exhibit D, and which shall be replaced and revised in accordance with the last sentence of this Section 5.5.1), Seller shall pay to Owner the amounts set forth in the table below as liquidated damages ("Delivery Delay Liquidated Damages") for each day that the delivery of a Wind Turbine is delayed past the last date in the time frame set forth on the Delivery Schedule relating to such Wind Turbine ("Delivery Delay Day"); provided, however, that to the extent that any delay in delivery is caused by Excusable Delay, the Delivery Schedule shall be extended one day for each such day of Excusable Delay.  For the avoidance of doubt, the parties hereto agree that a Wind Turbine shall be "delivered" (i) when all component Parts and Major Components comprising such Wind Turbines which are necessary to achieve Mechanical Completion have been delivered in accordance with the provisions of Section 5.3 and Section 5.4 to the location designated by Owner adjacent to the crane pad location for such Wind Turbine at the Site or Owner's storage location on or adjacent to the Site in the event Owner is unable to take delivery of Wind Turbines that were delivered according to Exhibit D, or (ii) if Owner has not selected Seller delivery in accordance with Section 5.3, upon the arrival of such Parts and Major Components DDP at the US Port of Entry, ready for unloading by Owner.  Without limiting the foregoing, Seller shall provide four (4) weeks advance notice of the expected arrival date of its first delivery in order for Owner to mobilize its Wind Turbine receiving capacity at the Site.  Promptly following the Effective Date and in no event more than 120 days thereafter, the parties shall jointly develop, in consultation with the BOP Contractor, a final Delivery Schedule, which shall replace Exhibit D hereto, and which shall provide for delivery of WTGs, on a level and continuous basis in accordance with Section 5.4(D), no earlier than April 1, 2009 and no later than October 30, 2009.

| Number of Delivery Delay Days Late | Delivery Delay Liquidated Damages Payable Per Wind Turbine per Delivery Delay Day Incurred |
|---|---|
| For Delivery Delay Days Late prior to September 30, 2009 | |
| For the first (1st) through the fourteenth (14th) Delivery Delay Day | $0 |

-19-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000692

00025

| | |
|---|---|
| For the fifteen (15th) through the thirtieth (30th) Delivery Delay Day | $720 |
| For the thirty-first (31st) Delivery Delay Day through the ninetieth (90th) Delivery Delay Day | $780 |
| For each Delivery Delay Day beyond the ninetieth (90th) Delivery Delay Day | $900 |
| For Delivery Delay Days Late after September 30, 2009* | |
| For each Delivery Delay Day after September 30, 2009 through October 14, 2009** | $960 |
| For each Delivery Delay Day after October 14, 2009 through November 15, 2009** | $1,200 |
| For each Delivery Delay Day after November 15, 2009** | $2,400 |

*In the event that U.S. production tax credits are extended prior to December 31, 2009, and are obtained by Owner notwithstanding Seller's late delivery of WTGs, then the Liquidated Damages set forth in the first part of the above table shall apply to Seller for any day(s) of Delivery Delay Days Late.

**If Seller inland transportation is not elected, each such date shall be accelerated by the number of days equal to the difference between delivery at the US Port of Entry and delivery at the crane pad at each Site, as shown in Exhibit D.

5.6    Site Storage of Wind Turbine Spares, Consumables and Other on Site Facilities. Owner, at its expense, shall provide to Seller secure office on or adjacent to the Site which include the following features: (i) one double wide trailer (or equivalent space), unfurnished, for the exclusive use of Seller's personnel to conduct administrative activities associated with the performance of Seller's obligations hereunder, and (ii) indoor warehouse space not less than three thousand (3,000) square feet for the storage of Wind Turbine Spare Parts and consumables inventory.   The double wide trailer or equivalent space shall meet the following general requirements:

5.6.1    Air conditioned and have adequate protection against dust, dirt, and humidity, particularly for electrical and electronic parts.

5.6.2    Have installed a two-line telephone system (including all wires and infrastructure up to and including the wall jacks), high-speed internet access, utilities, and non-potable water, all of which shall be maintained by the Owner.

5.6.3    Indoor bathroom facilities.

-20-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

5.7   <u>Packing of Wind Turbines</u>.   Seller shall properly pack the Wind Turbines in accordance with the standard practice for such Wind Turbines and in such a manner as is necessary for safe intermodal and, where applicable, international transport and delivery to the pads at each Site, including proper covers over the end of the Towers and blade roots.

5.8   <u>Transfer of Title; Risk of Loss</u>.   Risk of loss of and damage to, and custody of, each Wind Turbine shall be transferred to Owner when it has been delivered, not unloaded, in accordance with Section 5.5.1.   Title to each Wind Turbine shall be transferred to Owner upon Seller's receipt of all payments through and including the milestone payment of twenty five percent (25%) of each Unit Price on the issuance or deemed issuance of the Commissioning Certificate (i.e. in the aggregate an amount equal to ninety-five percent (95%) of the Unit Price), provided however that if Owner has provided and maintains the Babcock Guaranty Agreement or Payment Letter of Credit in accordance with Section 4.4, title to each Wind Turbine shall be transferred to Owner upon (i) delivery of such Wind Turbine to the designated crane pad at the Site and (ii) Seller's receipt of all payments through and including the milestone payment of seventy percent (70%) of each Unit Price.

5.9   <u>Execution and Delivery of the Warranty Agreement, Service Agreement, and MHI Guaranty Agreement</u>.   Concurrently with execution of this Agreement, Seller and Owner shall enter into the Warranty Agreement, the Service Agreement, and MHI and Owner shall execute and MHI shall deliver to Owner the MHI Guaranty Agreement in the form specified in <u>Exhibit C-1</u>.

5.10   <u>Coordination with SCADA Contractor</u>.   Seller hereby acknowledges and agrees that the Computer Monitoring System will be supplied and installed by or on behalf of the SCADA Contractor under the scope of Owner.   Seller hereby agrees to cooperate with the SCADA Contractor in the installation of the Computer Monitoring System, including, without limitation, providing such information as shall be reasonably required to complete the interface between the Computer Monitoring System and the WTGs and the testing of the Computer Monitoring System on a timely basis; provided that the SCADA Contractor has executed such confidentiality and restricted use undertaking to Seller as Seller may reasonably request.   Seller shall notify Owner, within forty-five (45) days of the date hereof, of the contact information for a Seller representative to assist the SCADA Contractor with such questions as the SCADA Contractor shall reasonably make concerning the interface of the Computer Monitoring System with the WTGs.

5.11   <u>Project Acceptance Test</u>.   Seller shall commence the Project Acceptance Test as provided in the Project Acceptance Test Procedures attached hereto as Exhibit T-1 for each Wind Turbine not later than seven (7) Business Days after both (i) the Substantial Completion Date, and (ii) the SCADA is in operation.

**Article 6**
**Design; Issuance of Design Certificate**

6.1   <u>Design</u>.

-21-

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F**

MPSANDTX0000694

00027

(a)     Owner shall provide Seller with drawings illustrating the Site Condition, Site Plan and placement of crane pads, a copy of which shall be attached to this Agreement as Exhibit B-2 (the "Site Plan"). Seller shall provide any and all comments to Owner with respect to the Site Condition and Site Plan as soon as possible, but not later than fifty (50) days from the date Seller receives such Site Condition and Site Plan, such as application of Columnar Control Strategy to the Wind Turbines. If Owner should revise the Site Condition and/or Site Plan, Owner will promptly provide the same to Seller for comments, if any, on the same terms as the initial Site Plan, and Seller shall provide the Columnar Control Strategy as per 3.2.2 (j).

(b)     Seller shall not in any way be responsible for the Site Plan, including but not limited to the placement of crane pads and design of the foundations referred to in Section 6.1(a) above, except to provide the information required by Section 3.2.2(a), (b) and (j), and Section 6.3. No action of Seller pursuant to Section 6.1(a) will relieve Owner of responsibility for any errors or omissions in the Site layout, crane pads and the design of the foundations, nor any of its other contractual and legal obligations.

(c)     Acceptance or approval by Owner of drawings or other documents provided by Seller in respect of work proposed and/or designed by Seller or its subcontractor(s) will not relieve Seller of responsibility for any errors or omissions therein, nor for any of its other contractual and legal obligations.

(d)     Any changes to the WTGs or other equipment or materials made by Seller or its Affiliates after having been approved and/or confirmed by Owner, are to be marked on the drawings, with relevant dimensions and provided to Owner as soon as reasonably possible. A complete list of such approved changes, together with the related drawings, shall be provided to Owner on or before Final Completion.

(e)     Both Seller and Owner shall appoint a representative pursuant to Sections 8.4 and 8.5, respectively (Owner's representative may attend in person or by conference call, at his option) to attend weekly Project meetings to discuss, in part:

(i)     adherence to the Delivery Schedule and the schedule for the other Wind Turbine Work;

(ii)    delays and the reasons therefore and actions being taken;

(iii)   shortages of labor, plant or materials, and actions being taken;

(iv)    difficulties in the execution of subcontracts, if any, and actions being taken; and

(v)     any outstanding information previously requested by Owner or Seller.

(f)     Both Seller and Owner shall have a representative (Owner's representative may attend in person or by conference call, at his option) attend meetings when requested by the other and inform subcontractors when their presence is required.

-22-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000695

00028

6.2   Certificate of Design Approval. Seller shall provide Owner with the Certificates of Design Approval not later than the Substantial Completion Date, the form of which shall be attached to the Agreement as Exhibit Q. Seller shall not be required to furnish any other certificates, including any site specific certifications, or Garrad Hassan certifications. Seller shall perform at its own cost any changes to the WTGs or the Work necessitated by the Certificate of Design Approval when provided, and such modifications shall be included within the Warranty, the Power Curve Threshold Guaranty and the Availability Guaranty. Furthermore, to the extent that the Certificate of Design Approval when issued requires material changes to the scope, cost or timing of the BOP Contract, Seller shall be responsible for such changes.

6.3   Tower Load Data. In calculating the Tower Load Data to be furnished by Seller in accordance with Section 3.2.2(a), Seller shall take into account the criteria provided by the Independent Engineer if any, for such calculation and shall confirm with the Independent Engineer that such Tower Load Data incorporates the applicable criteria supplied by the Independent Engineer.

**Article 7**
**Insurance**

7.1   Insurance. The parties shall maintain insurance of the types, with the limits and for the periods specified in Exhibit H, Insurance, to this Agreement

**Article 8**
**Owner's Work, Seller's Technical Assistance and Variation**

8.1   Owner's Work. Owner shall undertake and complete the Owner's Work in accordance with the Requirements, the Specifications and the Instruction Manual.

8.2   Technical Assistance.

(a)   Scope of Technical Assistance. For the fee described in subsection (c) below, Seller shall observe, monitor and provide technical assistance (the "Technical Assistance") to Owner and its designees during the assembly, installation and erection by Owner (acting through the BOP Contractor) through Mechanical Completion of each Wind Turbine in compliance with the Specifications, and the Instruction Manual.

(b)   If Owner has any doubt in respect of, or does not know how to proceed regarding, its assembly, installation and erection work, Owner may notify Seller and, should it elect to do so, obtain Seller's Technical Assistance prior to taking any further actions. Seller shall forthwith notify Owner and BOP Contractor in writing if it obtains actual knowledge that any assembly, installation and erection of any WTG is not being performed in accordance with the Specifications or the Instruction Manual and advise Owner and BOP Contractor of the same in writing and as to those procedures of the Specifications or Instruction Manual that have not been correctly performed. In the event that Owner or Owner's employees, or employees of Owner's contractors fail to comply with any written advice given by Seller, Seller shall not have any liability or responsibility with respect to any subsequent malfunction of that WTG to the extent attributable to such failure to follow Seller's written advice. The foregoing shall create no

-23-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000696

00029

obligation of Seller to undertake quality control or quality assurance of the work of Owner and BOP Contractor.

(c)     Fee for Technical Advisory Service and Commissioning.     The services described in Section 8.2(a) above ("Technical Advisory Services") and Commissioning shall be compensated on a time and materials basis plus ten percent (10%), and shall be paid by Owner to Seller in accordance with Section 4.2.7, except to the extent that Owner elects to pay a fixed fee for all or a portion of such services pursuant to the following sentence. Within six (6) days of Owner's submittal to Seller of a detailed construction schedule, Seller shall provide Owner a proposal for a fixed fee for the Technical Advisory Services and Commissioning and Owner shall either accept or reject a fixed fee negotiated with Seller within thirty (30) days of receipt of Seller's initial proposal. For services not included in the fixed fee, the hourly rates in Exhibit O shall apply for Seller's personnel from outside the United States and may be increased from time to time based on the actual GDPIPD index. Seller agrees to use its best efforts to use qualified local labor at a rate of cost plus ten percent (10%). Furthermore, Seller agrees that correction of manufacturer and vendor problems shall be included within the Contract Price and shall not be an adder in the form of additional fees. Any fees paid for Technical Advisory Services or Commissioning shall be referred to as "Technical Advisory Fees".

(d)     Each Person provided by Seller to provide technical assistance (each, a "Technical Advisor"), whose time is being charged on an hourly basis pursuant to Section 8.2(c), shall submit a time sheet to Owner's Representative on a weekly basis.

(e)     The services provided by Seller and the payment of the fees described in this Section 8.2 shall not affect, modify or decrease Seller's obligations set forth in this Agreement or the Warranty Agreement with respect to any defects in materials, workmanship or design furnished by Seller.

8.3     Right of Access.  Owner hereby grants to Seller and to such persons or entities as Seller may reasonably designate in connection with Seller's performance of the Wind Turbine Work under this Agreement, full right of access to the Site during Seller's performance of the Wind Turbine Work hereunder.

8.4     Seller's Representative.     Seller shall appoint an individual to act as the representative and coordinator with respect to this Agreement on Seller's behalf (the "Seller's Representative") and shall so notify Owner in writing. The Seller's Representative shall act as the liaison for Seller's communications with Owner. The Seller's Representative shall be present at the Site during the erection and installation of each WTG by the BOP Contractor.

8.5     Owner's Representative.     Owner shall appoint an individual to act as the representative and coordinator with respect to this Agreement and the Site on Owner's behalf (the "Owner's Representative") and shall so notify Seller in writing.     The Owner's Representative shall act as the liaison for Owner's communications with Seller.

8.6     Variation and Adjustment.  If (i) the progress of Seller' Work, or any part thereof, shall be delayed, (ii) the Contract Price is affected, and/or (iii) any other provision of the Contract Documents is materially affected as a result of any variation ("Variation") in Seller's

-24-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

Work agreed to by Owner and Seller, or any Excusable Delay, or a change or subsequent enactment of an Applicable Law of the United States following the effective date of this Agreement, then provided that Seller and Owner have taken all reasonable steps to avoid or minimize the delay or the effects of such change of Applicable Law of the United States, Owner and Seller shall negotiate in good faith and mutually agree on an equitable extension of the time for performance, including the Delivery Schedule, and the Scheduled Substantial Completion Date, an equitable adjustment in the Contract Price, and/or an equitable adjustment in any other provision of the Contract Documents materially affected thereby.

**Article 9**
**Mechanical Completion, Commissioning,**
**Substantial Completion and Final Completion**

9.1    Mechanical Completion.

(a)    Owner shall be responsible for achieving Mechanical Completion of each individual WTG including making available for its own use all tools and necessary equipment that are required for the activities required for achieving Mechanical Completion including cranes except for the Special Tools.  Seller shall make available on or prior to the delivery to the applicable pad at the applicable Site of the first WTG for the use by Owner an appropriate number of  lifting beams for the erection of the Wind Turbines, and an appropriate number of lifting beams for unloading, based on the number of WTGs being installed at the Site in the following manner:  approximately one (1) lifting beam for each fifty (50) WTGs, but no less than one (1) lifting beam per Site (so long as such Site includes at least twenty-five (25) WTGs) and, each time the WTGs exceed a multiple of 50 by more than twenty-five (25), Seller shall supply an additional lifting beam.  Each lifting beam shall be provided as part of the Special Tools in accordance with Section 3.2.6.

(b)    Beginning on the date on which the first WTG achieves Mechanical Completion and on every date thereafter on which a WTG has achieved Mechanical Completion, Owner shall prepare, or cause to be prepared, and submit to Seller a Mechanical Completion Certificate certifying that the WTG has been properly assembled, erected and installed and that the WTG is ready to commence Commissioning and testing, substantially in the form of Exhibit J-1 attached hereto with respect to each such WTG as of such date.  Each such Mechanical Completion Certificate shall include a report containing all information relevant to the achievement of such Mechanical Completion, including the Mechanical Completion Checklist, and be presented in a form reasonably acceptable to Seller, with sufficient detail to demonstrate that Mechanical Completion has been achieved in accordance with the Requirements for each of the WTGs listed in such certificate, provided that, so long as Seller has complied with the Delivery Schedule, Seller shall not be required to receive more than four (4) Mechanical Completion Certificates for review per day.

(c)    Within three (3) days following the date on which a Mechanical Completion Certificate is received by Seller, Seller shall visually review each relevant WTG for purposes of satisfying itself that the matters set forth in the Mechanical Completion Checklist attached to such Mechanical Completion Certificate with respect to the assembly, erection and installation of such WTG have been performed in accordance with the Instruction Manual, and

-25-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION                MPSANDTX0000698
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

00031

within such three (3) day period, Seller shall either (i) countersign and deliver to Owner the Mechanical Completion Certificate for such WTG to indicate its agreement that such Mechanical Completion has been achieved, or (ii) if reasonable cause exists for doing so, notify Owner of Seller's belief that Mechanical Completion has not been achieved with respect to those certain WTGs specified therein. Any notice issued pursuant to this subparagraph (c) shall state in detail Seller's reasons for believing that any such WTG has not achieved Mechanical Completion and advise Owner and BOP Contractor of the actions required to achieve Mechanical Completion of such WTGs.

(i)     If and to the extent Owner reasonably agrees with such advice, Owner shall cause BOP Contractor to diligently complete the same in a good and workmanlike manner.

(ii)    If Owner does not agree with such advice of Seller, Owner shall notify Seller and Independent Engineer of the same and, within one day following receipt thereof, Independent Engineer shall report in writing whether Mechanical Completion has been achieved. If the Independent Engineer shall report that Mechanical Completion has been achieved, such report shall constitute the Mechanical Completion Certificate for all purposes, and the fees and expense of Independent Engineer in preparing such report shall be for the sole account of Seller. If the Independent Engineer shall report that Mechanical Completion has not been achieved, such report shall identify those actions remaining to be achieved, and the fees and expense of Independent Engineer in preparing such report shall be for the sole account of Owner. Owner shall cause BOP Contractor to diligently complete the same in a good and workmanlike manner. Upon completing such actions, Owner shall issue a new Mechanical Completion Certificate for such WTG for reconsideration by Seller. Such procedures shall be repeated as necessary until Mechanical Completion has been achieved for such WTG.

(d)     For the purpose of this Agreement, the date of achievement of Mechanical Completion for any individual WTG shall be the date on which the last iteration of the Mechanical Completion Certificate for such Wind Turbine was submitted to Seller. Seller shall not unreasonably withhold its signature to the Mechanical Completion Certificate and Seller's failure to either countersign such certificate or notify Owner of Seller's reasons for the failure to do so within such three (3) day period shall constitute a deemed signature by Seller of the Mechanical Completion Certificate.

(e)     By providing notice of Seller's belief that Mechanical Completion is not completed, or providing technical assistance, or accepting the Wind Turbine for Commissioning, Seller does not assume any liability or responsibility with respect to any of Owner's Work or other matter for which Owner requests technical support services, including, without limitation, the correct performance of Mechanical Completion and the achievement of timely completion of the Mechanical Completion.

(f)     Seller shall conduct the visual review described in Section 9.1(c) in a diligent manner while following the Mechanical Completion Checklist. It is understood that by countersigning the Mechanical Completion Certificate, Seller does not assume any liability or responsibility with respect to any of Owner's Work.

-26-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000699

00032

9.2     Commissioning.

(A)     Following the achievement of Mechanical Completion as provided in Sub-section 9.1(d), and the achievement of Energization of each Wind Turbine, and notwithstanding the deadline for achieving Commissioning set forth in Section 9.2(B), the Seller shall promptly commence the Commissioning of such WTG in accordance with Requirements, the Specifications and the Commissioning Procedures.  Seller shall complete the Commissioning of each WTG within the Guaranteed WTG Commissioning Period defined herein, provided that there are available WTGs for the commencement of Commissioning which have each achieved both Mechanical Completion and Energization.   Notwithstanding the foregoing, Seller shall make commercially reasonable efforts to complete the Commissioning of each WTG within three (3) Business Days under the same condition as described herein.

(B)     Seller shall complete Commissioning of all Wind Turbines within two (2) weeks following delivery and acceptance or deemed acceptance of the final Mechanical Completion Certificate and Energization of the final WTG (the "Guaranteed WTG Commissioning Period"), provided however that the Guaranteed WTG Commissioning Period shall be extended, Business Day by Business Day, upon the occurrence of, and for so long as any of the following event or condition exists, a) such condition that wind speed less than the cut-in speed for more than 4 hours per day between the hours of 9:00 a.m. and 5:00 p.m., and b) any other events set forth in this Agreement, which excuses Seller from performing the Wind Turbine Work including but not limited to Force Majeure and  Owner's Delay.   If U.S. production tax credits are in place and are scheduled to expire at the end of calendar year 2009, and if commissioning of any WTG is not achieved by the end of the Guaranteed WTG Commissioning Period, Seller shall pay as liquidated damages to Owner an amount equal to two thousand five hundred US Dollars (US $2,500) per day for each such WTG, until it is Commissioned.  In the event that the U.S. production tax credits (i) are not in place, or (ii) are in place and do not expire on or prior to December 31, 2009, and are obtained by Owner notwithstanding Seller's late Commissioning of WTGs, then in either case Seller shall be responsible for liquidated damages at the rate of nine hundred US Dollars (US $900) per day for each such WTG, until it is Commissioned.

(C)     In the event that a WTG has achieved Mechanical Completion, but Energization cannot be achieved within twenty-one (21) days following the Mechanical Completion of such WTG, then Seller shall conduct the initial part of Commissioning ("Pre-Commissioning"), provided that Owner provides, at its cost and expense, the alternative sources of electrical power necessary for such Pre-Commissioning.  Owner shall compensate Seller for any additional work associated with revisiting such WTG to finalize the Commissioning of such WTG on which Pre-Commissioning activities were performed during the period when Energization of such WTG was not achieved.  Notwithstanding the foregoing, it is understood that if the delay in achieving Energization of the WTG was attributable to Seller, then Seller shall absorb the cost for its additional work associated with revisiting the applicable WTG to finalize the Commissioning, and shall arrange, at its cost, for the alternative source of the electrical power which is necessary for such Pre-Commissioning during such period that the Energization is delayed.

-27-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000700

00033

9.2.1   In the event that Seller discovers during Commissioning that any part of the Mechanical Completion work was not performed satisfactorily, Seller shall promptly inform Owner of the same and, upon Owner's election and with Seller's consent, either (i) Seller will correct, at the Owner's expense, the part of the Mechanical Completion that was not satisfactorily performed, or (ii) Owner shall direct BOP Contractor to correct the part of the Mechanical Completion that was not satisfactorily performed.  Any time spent by Seller or BOP Contractor correcting, pursuant to the foregoing sentence, any part of the Mechanical Completion that was not satisfactorily performed shall be considered Excusable Delay in performing Commissioning.  For the avoidance of doubt, wind speed less than the cut-in speed for more than four hours per day between the hours of 9:00 a.m. and 5:00 p.m. with respect to any Wind Turbine shall be considered Excusable Delay in performing Commissioning of that Wind Turbine.

9.2.2   When Seller has completed the procedures as to a particular Wind Turbine outlined in the completed Commissioning Procedures and believes that it has achieved Commissioning as to that particular Wind Turbine, Seller shall so notify Owner in writing (which notice shall be accompanied by the completed Commissioning Procedures for such Wind Turbine indicating successful achievement of such items listed thereon).  Immediately thereafter, Owner shall conduct those investigations and inspections as it deems necessary or appropriate to determine if Commissioning of such Wind Turbine has in fact been achieved.  Within three days after the receipt of Seller's notice by Owner, Owner shall either (i) notify Seller that Commissioning of the Wind Turbine has been achieved, or (ii) notify Seller that Commissioning of the Wind Turbine has not been achieved and stating the reasons therefore.  Should Owner fail to respond to Seller's notice within such three (3) day period, the corresponding Wind Turbine shall be deemed to have achieved Commissioning.   Once a Wind Turbine has achieved Commissioning, Seller and Owner shall thereafter mutually prepare and execute a Certificate of Commissioning in the form attached hereto as Exhibit K establishing and identifying the Commissioning date of such Wind Turbine, which date shall be the date Seller delivered the last notice to Owner indicating achievement of Commissioning.  In the event Owner provides written notice that Commissioning of the Wind Turbine has not been achieved, including justifiable reasons thereof, Seller shall, at its sole cost and expense, immediately correct and/or remedy the conditions which so prevent Commissioning of the Wind Turbine.  Upon completion of such corrective and/or remedial actions, Seller shall resubmit its notice stating that it believes Commissioning of the Wind Turbine has been achieved (which notice shall be accompanied by the completed Commissioning Procedures for such Wind Turbine indicating successful achievement of such items listed thereon) and the foregoing procedures shall be repeated until Commissioning of the Wind Turbine has in fact been achieved.

9.2.3   Seller covenants to carry out all of the Wind Turbine Work under this Agreement remaining after Commissioning with as minimal amount of interference with the operation of the Wind Turbines as possible; provided, however, that Seller may direct Owner to shut down any Wind Turbine prior to Substantial Completion if (i) Seller desires to undertake any repairs or adjustments to such Wind Turbine that Seller believes are necessary or appropriate to perform its obligations under this Agreement or (ii) Seller believes such action is necessary or desirable to protect the Wind Turbine from damage.

-28-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000701

00034

9.3    Substantial Completion.  Seller shall be responsible for certifying, by no later than the Scheduled Substantial Completion Date, and pursuant to the Certificate of Substantial Completion in the form of Exhibit L, that the WTGs have achieved Substantial Completion. Upon receipt by Owner from Seller of a Certificate of Substantial Completion, Owner shall promptly countersign the same and deliver it to Seller, except as provided in subsection (a) of this Section 9.3.

(a)    Provided that Owner receives the notice under Section 9.3 at least ten (10) Business Days prior to the Seller's declaration of achievement of Substantial Completion, then within two (2) Business Days following the date on which a Certificate of Substantial Completion is received by Owner, and if reasonable cause exists for doing so, Owner may notify Seller of Owner's belief that Substantial Completion has not been achieved. Any notice issued pursuant to this subparagraph (a) shall state in detail Owner's reasons for believing that Substantial Completion has not occurred, and advise Seller of the actions required to achieve Substantial Completion ("Owner's Non-completion Notice"). If Owner receives Seller's notice less than ten (10) Business Days prior to the Seller's declaration, then the two (2) Business Days within which Owner may issue the Owner's Non-Completion Notice shall be increased by the number of Business Days by which Seller's notice is received is less than ten (10) Business Days prior to the date of Seller's declaration.

(b)    If Seller reasonably agrees with such advice in Owner's Non-completion Notice, Seller shall diligently complete the same in accordance with the Requirements, at its sole cost and expense. Upon completing such actions, Seller shall issue a new Certificate of Substantial Completion for reconsideration by Owner.

(c)    If Seller does not agree with the advice in Owner's Non-completion Notice, Seller shall notify Owner and Independent Engineer of the same and, within five (5) days following receipt thereof, Independent Engineer shall report in writing whether Substantial Completion has been achieved. If the Independent Engineer shall report that Substantial Completion has been achieved, such report shall constitute the Certificate of Substantial Completion for all purposes, and the fees and expense of Independent Engineer in preparing such report shall be for the sole account of Owner. If the Independent Engineer shall report that Substantial Completion has not been achieved, such report shall identify those actions remaining to be achieved, and the fees and expense of Independent Engineer in preparing such report shall be for the sole account of Seller. Seller shall thereupon diligently complete the actions in accordance with the Requirements. Upon completing such actions, Seller shall issue a new Certificate of Substantial Completion for reconsideration by Owner.

(d)    The procedures described in subsection (a) above shall be repeated as necessary until Substantial Completion has been achieved. For the purpose of this Agreement, the date of achievement of Substantial Completion shall be the first to occur of (i) the date on which Owner and Seller agree that Substantial Completion was achieved, (ii) the date that the Certificate of Substantial Completion is fully signed by Seller and Owner, (iii) the date that Seller delivers to Owner a Certificate of Substantial Completion if Owner does not timely issue an Owner's Non-completion Notice, or (iv) the date that the Independent Engineer certifies that Substantial Completion was achieved.

-29-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000702

00035

(e)  "Substantial Completion" means, as to the WTGs, the achievement of the following milestones for each Project at each Site:  (i) all of the Wind Turbines and all Wind Turbine Work with respect to the WTGs under this Agreement performed through such date has been performed, except as provided in the Punch List, in accordance with the Requirements, and Seller is not aware of any conditions that would otherwise entitle Owner upon Substantial Completion to Warranty Repair or Warranty Retrofit under the Warranty Agreement except as set forth on the Punch List; (ii) Seller has completed Commissioning with respect to all of the WTGs; (iii) the Commissioning Procedures in the form attached hereto as Exhibit M have been met or exceeded; (iv) Seller has completed all of the Wind Turbine Work to be provided under this Agreement in respect of the WTGs, other than any Punch List items; (v) Seller has prepared and submitted to Owner the Punch List with respect to the WTGs; (vi) receipt by Owner of a conditional waiver and release, in the form specified in Exhibit U-1, upon progress payment, of all liens, security interests or encumbrances that Seller or any of its subcontractors may have against Owner, the Project or the Site to the extent that payments have been received by Seller under this Agreement; (vii) Seller and Owner have entered into the Escrow Agreement and Seller has deposited the Escrow Items with Escrow Agent; (viii) with respect to Substantial Completion of the WTGs, Seller has delivered to Owner a general list of the types and recommended quantities of the Spare Parts per Section 3.2.2 (k) ; (ix) a stock of Spare Parts for the Wind Turbines is in storage at the Site or Seller's storage facilities at Mojave, California provided that the Spare Parts List are agreed by Owner and Seller within 60 days following the applicable NTP; and (ix) Seller has issued and Owner has countersigned a Substantial Completion Certificate substantially in the form attached hereto as Exhibit L.

(f)  Seller shall give Owner written notice at least ten (10) Business Days prior to the date by which Seller expects that it will achieve Substantial Completion and shall provide on such date a written Punch List.  The combined Punch List for the 44 WTGs shall not exceed $2,250,000 and shall not exceed $8,284,091 for the 162 WTGs. Owner shall be entitled to verify and, if necessary, correct or add to, the Punch List provided by Seller.  Notwithstanding the achievement of Substantial Completion, Seller shall remain obligated to complete the items on the Punch List in accordance with this Agreement.

(g)  In the event that Substantial Completion is not achieved due to reasons not attributable to Seller or its Affiliates by the Scheduled Substantial Completion Date, and such failure to achieve Substantial Completion continues for a period of 180 days from the Scheduled Substantial Completion Date (or such longer period as may be mutually agreed by Owner and Seller), and Seller has otherwise satisfied all requirements for Substantial Completion required to be satisfied by it, then Substantial Completion will be deemed to have occurred, and a deemed Substantial Completion Certificate shall be issued and accepted (including for purposes of the Warranty Agreement), and interest on the sums payable pursuant to Section 4.2.6 shall accrue at the rate of LIBOR plus two (2) percent during the period that there was a failure to achieve Substantial Completion until such sums are paid in full.

9.4  Final Completion.

(a)  Seller shall cause Final Completion to occur following the achievement of Substantial Completion of all Wind Turbines.  By no later than the Scheduled Final Completion Date, Seller shall deliver to Owner a signed Certificate of Final Completion in the form of

-30-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

Exhibit N to this Agreement certifying that the Project has achieved Final Completion.  Such Certificate of Final Completion shall include a report containing all information relevant to the achievement of Final Completion and be presented in a form reasonably acceptable to Owner, with sufficient detail to demonstrate that Final Completion has been achieved.  Upon receipt by Owner from Seller of a Certificate of Final Completion, Owner shall promptly countersign the same and deliver it to Seller, except as provided in subsection (b) of this Section 9.4.

(b)      Within two (2) Business Days following the date on which a Certificate of Final Completion is received by Owner, and if reasonable cause exists for doing so, Owner may notify Seller of Owner's belief that Final Completion has not been achieved.  Any notice issued pursuant to this subparagraph (a) shall state in detail Owner's reasons for believing that Final Completion has not occurred and advise Seller of the actions required to achieve Final Completion ("Owner's Non-finalization Notice").

(c)      If Seller agrees with such advice in Owner's Non-finalization Notice, Seller shall diligently complete the same in accordance with the Requirements.   Upon completing such actions, Seller shall issue a new Certificate of Final Completion for reconsideration by Owner.

(d)      If Seller does not agree with the advice in Owner's Non-finalization Notice, Seller shall notify Owner and Independent Engineer of the same and, within five (5) days following receipt thereof, the Independent Engineer shall determine and report in writing whether Final Completion has been achieved.  If the Independent Engineer shall report that Final Completion has been achieved, such report shall constitute the Certificate of Final Completion for all purposes, and the fees and expenses of the Independent Engineer in preparing such report shall be for the sole account of Owner.  If the Independent Engineer shall report that Final Completion has not been achieved, such report shall identify those actions remaining to be achieved, and the fees and expenses of the Independent Engineer in preparing such report shall be for the sole account of Seller; Seller shall thereupon diligently complete the actions in accordance with the Requirements.  Upon completing such actions, Seller shall issue a new Certificate of Final Completion for reconsideration by Owner.

(e)      The procedures described in subsection (a) above shall be repeated as necessary until Final Completion has been achieved.  For the purpose of this Agreement, the date of achievement of Final Completion shall be the first to occur of (i) the date on which Owner and Seller agree that Final Completion was achieved, (ii) the date that the Certificate of Final Completion is fully signed by Seller and Owner, (iii) the date that Seller delivers to Owner a Certificate of Final Completion if Owner does not timely issue an Owner's Non-finalization Notice, or (iv) the date that the Independent Engineer certifies that Final Completion was achieved.

(f)      "Final Completion" means the achievement of the following milestones: (a) Substantial Completion of all Wind Turbines has occurred as evidenced by Owner's delivery to Seller of countersigned Substantial Completion Certificates; (b) the Project Acceptance Tests have been successfully completed in accordance with the Project Acceptance Test Procedures (c) Owner has received a final waiver, in the form specified in Exhibit U-2, of all contractual liens and any mechanics' and materialmen's liens or other like liens available under Applicable Law

-31-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000704

00037

that Seller or any of its subcontractors or vendors may have against Owner, the Project or the Site; (d) without limiting Seller's obligation under Section 3.5 to discharge any liens that have been filed against the Owner, the Project or the Site by Seller or its subcontractors or vendors and without limiting Seller's duty to diligently continue seeking such waivers, if Seller shall have used any subcontractors or vendors, but Seller is unable after diligent effort to obtain all such final waivers and such subcontractor or vendor shall not have asserted any such lien against the Owner, the Project or the Site, a certificate or undertaking letter (in form and otherwise subject to approval of the Financing Parties and which shall be guaranteed by MHI) to protect Owner, the Project and the Site from any and all claims that may be made on account of such liens; (e) all As-Built Drawings (if any) have been delivered to, and accepted by, Owner; (f) all of Seller's supplies, personnel, rubbish and waste have been removed from the Site; (g) all Punch List items have been corrected or performed to Owner's reasonable satisfaction; and (h) Seller has issued and Owner has countersigned a Final Completion Certificate substantially in the form attached as Exhibit N, or achievement of Final Completion can be evidenced by an alternative method provided under Section 9.4 (e).

(g)     In the event that Final Completion is not achieved due to reasons not attributable to Seller or its Affiliates, and such failure to achieve Final Completion continues for a period of 180 days from the Scheduled Substantial Completion Date for the WTGs (or such longer period as may be mutually agreed by Owner and Seller), and Seller has otherwise satisfied all requirements for Final Completion required to be satisfied by it, then Final Completion will be deemed to have occurred, and a deemed Final Completion Certificate shall be issued and accepted, and interest on the sums of the Punch List Holdback payable pursuant to Section 4.2.6 shall accrue at the rate of LIBOR plus two (2) percent during the period following the occurrence of deemed Final Completion until such sums are paid in full.

(h)     If any Certificate described in this Article 9 is not issued timely due to Seller's breach of this Agreement (a "Certification Default"), the parties shall immediately begin discussions in good faith for a period up to seven (7) Business Days to endeavor to reach a mutually acceptable agreement with respect to such Certification Default.  If no mutually acceptable agreement is reached during such period, such disagreement will be referred to the Independent Engineer in accordance with Article 14.

9.5     Suspension.

9.5.1   Suspension by Owner.

(a)     Owner may suspend the progress of the installation and construction of the Project and order Seller to suspend the progress of the Wind Turbine Work or any part thereof for such time and in such manner as Owner may consider reasonably necessary or desirable in writing, provided however that Owner shall clearly describe the expected period of such suspension to Seller.  Owner, during such suspension, shall properly protect and secure the Project or such part thereof so far as is reasonably necessary in the opinion of Seller and the Independent Engineer.

(b)     In the event of any suspension pursuant to the preceding paragraph, Owner shall issue a Change Order in accordance with Section 9.6 which provides for an equitable

-32-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

adjustment in (i) the Delivery Schedule, (ii) the schedule of Wind Turbine Work including the Scheduled Substantial Completion Date, and (iii) the Contract Price and the Technical Advisory Fees; provided, however, that no Change Order shall be issued by Owner or required if such suspension is (A) otherwise provided for in this Agreement; or (B) necessary by reason of the fault or negligence of Seller hereunder. In the event that Owner suspends performance at the time when Seller is ready to ship the goods according to the Delivery Schedule in Exhibit D, or Owner directs the Seller not to ship when Seller would otherwise be required to ship in order to deliver the WTGs as required in Exhibit D, then Seller shall place the equipment into storage and the provisions of Section 9.5.3 shall apply. In addition to the costs and expenses set forth in Section 9.5.3(a), the cancellation fees charged by the transport carrier(s) shall be for Owner's account, to the extent the cancellation fees are incurred as a result of a shipment made as laid out in Exhibit D, and paid to Seller in accordance with Section 9.5.3(b). Alternatively, if a storage facility, reasonably acceptable to Seller, is available close to the Site, Owner may avoid cancellation fees properly payable by Owner by directing the Seller to ship the equipment to such storage facility close to the Site. In such event, the delivery milestone payment applicable to the suspended Wind Turbine Work (i.e. 25% of the Contract Price prorated per number of WTGs) may be invoiced by Seller and shall be paid in accordance with the provisions of Section 4.2.3 but only if delivery of the WTGs relating to the applicable suspended Wind Turbine work was performed in accordance with Exhibit D. In addition to the costs and expenses set forth in Section 9.5.3(a), the costs and expenses associated with unloading and placement of the equipment in the storage facility, and thereafter re-loading the equipment on the carrier, as well as the shipping costs and expenses to transport the stored equipment from the storage facility to the Site shall be for Owner's account and paid in accordance with Section 9.5.3(b) to the extent that Seller delivered the WTGs in accordance with the Delivery Schedule and shall otherwise be for Seller's account.

      (c)    If the progress of the construction, installation and/or Commissioning of the Project or any part thereof is suspended on the written instructions of Owner and if written permission to resume work is not given by Owner within a period of five (5) Business Days from the end of the expected suspension period provided in Section 9.5.1 (a), except if such suspension is under any of the conditions of the proviso clause set forth in Section 9.5.1(b), Seller may give written notice to Owner requiring permission, within seven (7) days from the receipt thereof, to proceed with the Wind Turbine Work or the portion of the Wind Turbine Work in regard to which progress is suspended. If, within the said time, such permission is not granted by Owner, Seller shall give written notice to Owner stating that unless such permission is given within ten (10) Business Days, the Agreement shall be deemed terminated at the end of such ten (10) Business Day period, and Owner shall compensate Seller in accordance with the schedule of Cancellation Fees; provided, however, that if Seller is receiving an extension of time hereunder and its reasonable costs and expenses are being paid pursuant to Section 9.5.1(b) within ten (10) Business Days after such costs and expenses are incurred, such termination shall not become effective for 180 days following such notice.

    9.5.2   Suspension by Seller.

In the event that any payments due under the Contract Documents are not received within thirty (30) days from the date payment is due, provided that the unpaid amounts are not the subject of a good faith dispute, Seller may suspend performance of the Wind Turbine Work upon fourteen

-33-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000706

00039

(14) days written notice to Owner.  Seller will resume performance promptly after all outstanding amounts due are received.  Upon doing so, Seller shall be entitled to an equitable adjustment in the Contract Price, and the time for performance of the Wind Turbine Work.

9.5.3   Storage During Suspension.

(a)   In the event of a suspension under this Section 9.5, whether ordered by (i) the Owner under 9.5.1 (except where the suspension is necessary by reason of the fault or negligence of Seller, including, but not limited to, failure to deliver the WTGs as set forth in the Delivery Schedule and in Section 5.4), or (ii) declared by Seller under 9.5.2, Seller shall be entitled to invoice the Owner for the reasonable actual costs and expenses incurred in connection with the following categories during the period of suspension:

(1) demobilization, preparation of goods to be placed in storage, storage and maintenance costs (including insurance premiums, rental or storage fees, and the cost of maintaining and refurbishing the equipment); and

(2) Interest which accrues on a monthly basis on the costs and expenses incurred by Seller in connection with the performance of the Wind Turbine Work through the commencement date of the suspension.  The monthly interest amount to be invoiced shall be calculated by multiplying an interest rate which is equal to LIBOR plus one and seventy-five hundredths of a percent (1.75%) times the difference between (x) the amount which appears in the Cancellation Table under Exhibit R for the month which corresponds with the commencement of the suspension and (y) payments received by Seller on account of the Contract Price, divided by twelve (12).

(b)   Seller shall submit invoices to Owner, under the preceding paragraph (a), each month for the costs, expenses incurred and interest accrued during the previous month.  Payment on such invoices shall be made on such invoices within fifteen (15) days from the date Owner receives Seller's invoice.

9.6   Change Order.

9.6.1   Change Order Process.  In addition to a Change Order agreed pursuant to Section 9.5.1(b), Owner may request changes in the Wind Turbine Work within the general scope of this Agreement consisting of additions, deletions, or other revisions.  If Owner so desires to change the Wind Turbine Work, it shall submit a change request to Seller in writing.  Within ten (10) Business Days of Seller's receipt of any such request, Seller shall submit a detailed proposal to Owner requesting the change stating (i) the increase or decrease, if any, in the Contract Price which would result from such change, and (ii) the effect, if any, upon the Delivery Schedule and/or any other guaranteed date of completion hereunder by reason of such proposed change, and (iii) the impact such change may have on any other provision in the Contract Documents affected by the change.  Owner shall have five (5) Business Days to accept or reject in writing Seller's proposal in relation to the requested change.  If Owner agrees with Seller's proposal, Owner and Seller shall execute a Change Order reflecting the requested change in the Wind Turbine Work and proposed adjustments, if any, in the Contract Price, the Delivery Schedule

-34-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000707

00040

and/or any other guaranteed date of completion hereunder, and/or any other equitable adjustment in such other provisions of this Agreement as are materially affected by the requested change. In the event Owner disagrees with Seller's proposal, Owner shall notify Seller that Owner has decided to withdraw its requested change. Should Owner fail to respond to Seller in writing within the foregoing five (5) Business Day period, Owner shall be deemed to have withdrawn its requested change.

9.6.2   No Change.  Seller shall not be required to implement a requested change in the Work by Owner if Seller reasonably believes the implementation of such change could impair its ability to achieve any of the performance guarantees, warranties or covenants set forth in the Contract Documents. Seller shall not perform any Change Orders until Owner has approved in writing the proposed adjustments or has expressly authorized Seller in writing to perform the Change Order prior to such approval.

9.6.3   No Unapproved Scope Changes.  Subject to Section 9.6.2, if Owner requires a Change Order, but the parties are unable to mutually agree upon the price for the Change Order, Seller shall perform the Change Order at its reasonable direct costs (as evidenced by supporting documentation), plus ten percent (10%), such amount to be reimbursed by Owner to Seller.

9.6.4   Change Order Caused by a Force Majeure Event.  If a Force Majeure Event occurs that materially adversely affects the Wind Turbine Work such that Seller's performance of the Wind Turbine Work is temporarily or permanently prevented, Seller shall be entitled to a Change Order reflecting the impact of such Force Majeure Event, including equitable extensions of guaranteed dates of completion, taking into account each day Seller's performance hereunder is prevented due to such Force Majeure Event and Seller's obligation to use all reasonable efforts to make up any lost days; provided, however, that (i) to the extent Seller is compensated for the effect of a Force Majeure Event by insurance required to be maintained pursuant to Article 7, or (ii) to the extent Owner would have been so compensated but for Seller's failure to provide such insurance, Seller shall not be entitled to a Change Order adjusting the Contract Price for such Force Majeure Event.  Seller must request such Change Order in writing within fifteen (15) Business Days after Seller first becomes aware or should reasonably have been aware of the event that Seller asserts is a Force Majeure Event. Nothing contained in this Section 9.6 shall affect Seller's obligations in accordance with Excusable Delays in respect of the occurrence of any Force Majeure Event.

9.7   Cancellation.

9.7.1   At any time, Owner may terminate this Agreement for convenience and pay the cancellation fee set forth in Exhibit R, net of any payments previously made to Seller.

### Article 10
### Representations And Warranties of Seller

Seller hereby represents and warrants to Owner as follows:

10.1   Due Organization; Good Standing.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and is qualified to do business in California and Texas, and in each other jurisdiction where failure to so qualify would

-35-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

have a material adverse effect on its ability to perform this Agreement, the Warranty Agreement and/or the Service Agreement and in respect of which no action relating to insolvency, liquidation or suspension of payments has, to the knowledge of Seller, been taken.

10.2   Due Authorization.   The execution, delivery and performance of this Agreement and each of the Contract Documents by Seller have been duly authorized by all necessary corporate action on the part of Seller and do not and will not require the consent of any trustee or holder of any indebtedness or other obligation of Seller or any other party to any other agreement with Seller.

10.3   Execution and Delivery.   This Agreement and each of the Contract Documents has been duly executed and delivered by Seller.   This Agreement and each of the Contract Documents constitutes the legal, valid, binding and enforceable obligation of Seller.

10.4   Governmental Approvals.   No governmental authorization, approval, order, license, permit, franchise or consent, and no registration, declaration or filing with any Governmental Authority is required on the part of Seller in connection with the execution, delivery and performance of this Agreement, the Warranty Agreement and/or the Service Agreement except those which have already been obtained or which Seller anticipates will be timely obtained in the ordinary course of performance of this Agreement.

10.5   Title to Wind Turbines.   When title to the Wind Turbines is transferred to Owner from Seller under Section 5.7, (i) Owner shall have good and marketable title to the Wind Turbines free and clear of all claims, liens or other encumbrances, other than any such liens or other encumbrances arising in connection with the performance of the Owner's Work, or which may subsequently arise in connection with Owner's failure to make payments as they become payable under the Agreement, (ii) no instrument or other document shall be required to be delivered to Owner in order to effect the sale of the Wind Turbines from Seller to Owner, or if any such instrument or other document is so required, then Seller shall have delivered such instrument or other document to Owner, and (iii) no component Part or the whole of any Wind Turbine shall be the subject of any retention of title in favor of any supplier thereof.

10.6   Documents.   Each document delivered pursuant to Section 3.2.2 shall be accurate and complete, and shall conform to the Requirements.

**Article 11**
**Indemnification**

11.1   General Indemnity.

(a)      Seller shall indemnify Owner and the Financing Parties and each of their officers, directors, shareholders, managers, members, partners, agents, employees, lenders, successors and assigns (each, an "Owner Indemnified Party" or collectively, the "Owner Indemnified Parties"), and shall defend, save and hold them harmless from and against all (i) losses and claims for bodily injury to or death of any third party individual or damage to any tangible property of a third party and against all claims, demands, proceedings, damages, liabilities, costs, charges and expenses (including reasonable legal fees) whatsoever in respect thereof or in relation thereto (but only if and to the extent that the indemnified party suffers loss in an amount greater than

-36-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000709

00042

amounts collected under applicable policies of insurance of which the indemnified party is a named or additional insured) incurred by or asserted against any of them arising out of or in consequence of (A) an event of default by Seller under this Agreement, or (B) the negligent acts or omissions or willful misconduct of Seller's employees, agents or subcontractors on the Site, and (ii) demands, charges, claims or liens by Seller's subcontractors arising from the failure of Seller to pay amounts due as a result of furnishing work or materials to Seller and all mechanics' liens filed in connection with the Wind Turbine Work as a result of Seller's breach of this Agreement, and (iii) losses and claims in respect of any Taxes imposed on or attributable to performance of Seller (excluding the sales, use and other Taxes payable by Owner hereunder). Seller shall owe no indemnity and shall be reimbursed for all sums paid and incurred under this Section 11.1(a) to the extent that the losses, claims, demands, proceedings, damages, liabilities, costs, charges, expenses or liens for which indemnity is claimed are caused by or arise from the negligence, willful misconduct or breach of contract of such Owner Indemnified Party or others. For avoidance of doubt, the parties agree that the obligations of Seller relating to the time of completion of the Wind Turbine Work and obligations giving rise to the payment of liquidated damages under this Agreement shall not give rise to a claim of indemnity under this Section 11.1. For purpose of this Section it is agreed and understood that an Owner Indemnified Party shall in no event be construed to fall within the meaning of a "third party".

(b)     Owner shall indemnify Seller and it subcontractors and vendors and their officers, directors, shareholders, managers, members, partners, agents, employees, successors and assigns (each a "Seller Indemnified Party" or collectively the "Seller Indemnified Parties") and shall defend, save and hold them harmless from and against all losses and claims for bodily injury to or death of any third party individual or damage to any tangible property of a third party and against all claims, demands, proceedings, damages, liabilities, costs, charges and expenses (including reasonable legal fees) whatsoever in respect thereof or in relation thereto (but only if and to the extent that the indemnified party suffers loss in an amount greater than amounts collected under applicable policies of insurance of which the indemnified party is a named or additional insured) incurred by or asserted against any of them arising out of or in consequence of (a) an event of default by Owner under this Agreement, or (b) the negligent acts or omissions or willful misconduct of Owner's employees, agents or subcontractors on the Site. Owner shall owe no indemnity and shall be reimbursed for all sums paid and incurred under this Section 11.1(b) to the extent that the losses, claims, demands, proceedings, damages, liabilities, costs, charges, expenses or liens for which indemnity is claimed are caused by or arise from the negligence, willful misconduct or breach of contract of such Seller Indemnified Parties or others. For purpose of this Section it is agreed and understood that a Seller Indemnified Party shall in no event be construed to fall within the meaning of a "third party".

11.2     Indemnity Against Infringement.   Seller shall indemnify and keep indemnified and hold harmless each Owner Indemnified Party from and against all claims, liabilities, losses and damages asserted by any person, together with all costs and expenses relating thereto (including reasonable legal fees), based upon any claim of infringement of any patent or other license or right to intellectual property (whether by way of trademark or otherwise) resulting directly or indirectly from the manufacture, sale, supply, or importation of the Wind Turbines or their use by Owner as designed or contemplated by the Operation Manual. Each party agrees to notify the other as soon as possible of any material matters with respect to which the foregoing indemnity may apply and of which the notifying party has knowledge. If notified in writing of

-37-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000710

00043

any action or claim for which Seller is to provide an indemnity, Seller shall, without limitation, defend such action or claim at its expense and pay the cost and damages and attorneys' fees awarded against Owner in such action or claim; provided, that Seller shall have the right to control the defense and settlement of all such actions or claims.

11.3    Treatment of Infringing Equipment.  If an order by any court of competent jurisdiction shall be obtained against Owner's or any other party's use or operation of the Wind Turbines or any part thereof by reason of any alleged infringement of any intellectual property right of any party (whether by reason of a patent or trademark or other license or right), Seller shall first be afforded a reasonable opportunity, at its expense but without limiting its indemnification obligations under Section 11.2, to diligently seek the discharge of any such order as aforesaid, and at Seller's election and expense to forthwith:

(i)    modify the Wind Turbines so that they become non-infringing;

(ii)    procure for Owner the unrestricted right to continue the use of the Wind Turbines for their entire useful life; or

(iii)    substitute for any infringing equipment, other non-infringing equipment having the capabilities equivalent to the infringing equipment or which otherwise satisfies Owner's needs,

it being understood that in the case of item (i) or item (iii), above, as the case may be,: (a) if it is determined by the Independent Engineer that the modification or the substitute constitutes a material change to the Specifications, Seller shall deliver to Owner a new Certificate of Design Approval (or other certificate in a form, from a person and pursuant to criteria mutually agreeable to Seller and Owner) based upon the Wind Turbines with the modification or substitution, or a written certification from GL or GL Equivalent that the modification or substitution does not adversely affect the statements made in the Certificate of Design Approval; (b) the modified Wind Turbine shall have the same or better performance specification; (c) the modification or substitution is reasonably not expected to result in increased operating, maintenance or replacement costs; and (c) the Independent Engineer confirms items (b) and (c) above.

**Article 12**
**Representations and Warranties of Owner**

Owner represents and warrants to Seller as follows:

12.1    Due Organization; Good Standing.    Owner is a Delaware limited liability company duly organized, validly existing and in respect of which no action relating to insolvency, liquidation or suspension of payments has, to the knowledge of Owner, been taken.

12.2    Due Authorization.  The execution, delivery and performance of this Agreement and each of the Contract Documents by Owner have been duly authorized by all necessary action on the part of Owner in accordance with Owner's charter documents and do not and will not require the consent of any trustee or holder of any indebtedness or other obligation of Owner or any other party to any other agreement with Owner.

-38-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000711

00044

12.3   <u>Execution and Delivery</u>.   This Agreement and each of the Contract Documents has been duly executed and delivered by Owner.   This Agreement and each of the Contract Documents constitutes the legal, valid, binding and enforceable obligation of Owner.

12.4   <u>Governmental Approvals</u>.   No governmental authorization, approval, order, license, permit, franchise or consent, and no registration, declaration or filing with any Governmental Authority is required on the part of Owner in connection with the execution, delivery and performance of this Agreement except those which have already been obtained or which Owner anticipates will be timely obtained in the ordinary course of performance of this Agreement.

12.5   <u>Site Access</u>.   No lease, easement or right of way from any third party is required on the part of Owner in connection with the execution, delivery and performance of this Agreement and each of the Contract Documents which has not already been obtained or which Owner anticipates will be timely obtained in the ordinary course of performance of this Agreement and each of the Contract Documents.

**Article 13**
**Excusable Delay; Default; Cure**

13.1   (a) <u>Excusable Delay</u>.   No delay in performance by any party hereunder shall constitute a default under this Agreement if, and to the extent, such delay is caused by an Excusable Delay.   In the event of an Excusable Delay the parties shall negotiate in good faith for equitable adjustments in price and schedule necessary and appropriate to mitigate as much as possible the effect of such Excusable Delay.

(b) <u>Unexcused Delays</u>.   The Seller shall use its best efforts to meet all of the schedule dates.   In the event that the Seller's progress is delayed, and/or Seller fails to meet any schedule dates for reasons which do not constitute Excusable Delays, notwithstanding any provision to the contrary, provided that Seller continues to perform the Wind Turbine Work with all diligence and uses its best efforts to mitigate such delay, the payment of the Delivery Delay Liquidated Damages under Section 5.5.1 and Section 9.2(B) shall constitute the sole liability of the Seller, and the exclusive remedy of the Owner, for delays by the Seller described in such Section 5.5 and Section 9.2(B) in meeting the requirements of such Sections.

13.2   <u>Default</u>.

(a) <u>Event of Default</u>.   If during the term of this Agreement either party materially breaches any of the material covenants or conditions of this Agreement, or if MHI or Babcock (so long as the Babcock Guaranty Agreement remains in effect) materially breaches any of its material obligations under their respective guaranty agreement, then the other party shall give notice to such breaching party of the material event of default, specifying in detail the nature thereof, and the amount thereof if it is a default which may be cured by the payment of money.

(b) <u>Bankruptcy Event of Default</u>.   It shall be an event of default hereunder with respect to a party hereto if such party, or if (with respect to Seller) MHI, or if (with respect to Owner) Babcock so long as the Babcock Guaranty Agreement remains in effect, becomes insolvent, or generally does not pay its debts as they become due, or admits in writing its

-39-

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F**

inability to pay its debts, or makes a general assignment for the benefit of creditors, or if insolvency, receivership, reorganization or bankruptcy proceedings are commenced by or against such party.

(c)  Cure Rights.  In the case of an event of default under Section 13.2(a), if, after the expiration of a grace period of thirty (30) days after the service of such notice, the event of default upon which such notice was based shall continue to exist (or in the case of an event of default which cannot with due diligence be remedied within a period of thirty (30) days, the breaching party fails to commence within a period of thirty (30) days after the service of such notice to remedy such event of default and to proceed with all due diligence thereafter to remedy such event of default within a reasonable period of time), then the breaching party shall be in default under this Agreement, and the non-breaching party shall be entitled to the remedies set forth in Section 13.2(e).

(d)  Financing Party Cure Rights.  Seller's right to exercise the option to terminate this Agreement pursuant to Section 13.2(e) is subject to Seller's first delivering to the Financing Parties, if any, and if Seller has been given notice of the address of such Financing Parties, simultaneously with delivery thereof to Owner, notice of Owner's failure to cure the default and Seller's intent to terminate as a result thereof. Each Financing Party shall have the option to cure such Event of Default or to cause the Financing Parties' designee to assume this Agreement provided such designee is not an MPS Competitor; provided, however, that with respect to a default that can be cured by the payment of money, the Financing Parties shall cure such Event of Default within ninety (90) days of receipt by Financing Parties of Seller's notice of intent to terminate; and provided, further, however, that with respect to a default that cannot be cured solely with the payment of money, the Financing Parties shall either (a) cure such Event of Default within ninety (90) days (subject to extension as may be provided in this Agreement) of receipt by Financing Parties of Seller's notice of intent to terminate or (b) the Financing Parties shall deliver notice to Seller indicating that the Financing Parties' desire for their designee to assume this Agreement within ninety (90) days after receipt of Seller's notice of intent to terminate, and such designee shall assume this Agreement and cure the default within 180 days of receipt by Financing Parties of Seller's notice of intent to terminate.  In either such case, Seller's right to terminate this Agreement shall be of no further force and effect upon the cure by the Financing Parties of such default and this Agreement shall continue in full force and effect. In addition, if a default has occurred and is continuing upon the expiration of the cure period granted hereunder, Seller shall then deliver to the Financing Parties an additional notice specifying the default.  In the case of the occurrence of a default that can be cured by the Financing Parties taking possession of the Project, the Financing Parties shall have the right to cure such default within thirty (30) days after acquiring possession of the Project if, within thirty (30) days after the further notice referred to above is given by Seller to the Financing Parties, the Financing Parties promptly proceed with diligence to exercise its rights to acquire possession of the Project through foreclosure or otherwise and notifies Seller of its election to do so.  Seller shall delay the exercise of its rights with respect to such default for such period of time as may be necessary for the Financing Parties, with the exercise of diligence, to acquire possession of the Project, not to exceed 180 days following the Seller's further notice.

(e)  Remedies.  In the case of a bankruptcy event of default pursuant to Section 13.2(b) or a default after any applicable cure period pursuant to Section 13.2(c), the non-

-40-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000713

00046

breaching party shall be entitled to all remedies in law or in equity on account of such default, but subject nevertheless to the provisions of Section 15.17, Limitation of Liability, including the right, in the non-breaching party's sole discretion, to either continue its rights and obligations under this Agreement in full force and effect or, by written notice to the breaching party, to terminate its obligations under this Agreement and all obligations of the non-breaching party hereunder. In any event, the non-breaching party shall continue to be entitled to any and all remedies under this Agreement or at law or in equity. The foregoing to the contrary notwithstanding, the failure or delay in giving a default notice by a non-breaching party under Section 13.2(a) shall not be construed as a waiver or admission by the non-breaching party with respect to such default.

### Article 14
### Dispute Resolution

14.1   Senior Representatives Discussion. All disputes between the parties hereto under this Agreement shall be referred to senior representatives designated by each of the parties hereto for discussion on an informal basis as promptly as practicable following delivery of a request for such discussion, but at least within seven (7) Business Days of delivery of such request.

14.2   Disputes Subject to Engineering Arbitration. Any engineering or technical dispute between the parties hereto which is expressly provided in Sections 6.3, 9.1(c), 9.3(c), 9.4(d) and 9.4(h) or which in accordance with the terms of this Agreement is to be referred for resolution to the Independent Engineer shall be resolved as provided herein. The disputing party shall deliver to the Independent Engineer and to the other party written notice stating (i) the general nature of each dispute, (ii) the amount or extent of such dispute, and (iii) supporting data for such dispute. The opposing party shall endeavor to submit any response to the disputing party and the Independent Engineer within ten (10) Business Days after receipt of the disputing party's last submittal (unless the Independent Engineer allows additional time), and the disputing party shall submit any reply thereto within three (3) business days of receipt thereof (unless the Independent Engineer allows additional time). Each party's submission shall be in the form of written statements of position by such party, and each party shall have the opportunity to respond to the written statements of the other party and to any requests for statements or information by the Independent Engineer; provided, however, that other than as provided in the immediately preceding sentence all such submissions by a party shall be made within three (3) Business Days of receipt of the submission or request to which it responds and notwithstanding any provision herein to the contrary, any unresolved disputed items shall be determined by the Independent Engineer within forty-eight (48) hours of receipt by the Independent Engineer of the parties' latest submissions of information. If the amount in controversy is less than US$1,000,000, then the decision of the Independent Engineer shall be final and binding on each of the Parties and may be enforced by either party as permitted under Section 15.4. If the Independent Engineer does not render a formal decision in writing within the time stated in this Section 14.2, the parties hall have ten (10) Business Days from the time the Independent Engineer's written decision was due, to initiate an action as set forth in Section 14.3. If the amount in controversy is equal to or greater than US$1,000,000, the decision of the Independent Engineer shall not be final and binding. With respect to such disputes, if either party is dissatisfied with the decision of the Independent Engineer, the parties may agree to refer the dispute to a second independent engineer to be selected by mutual agreement of the parties. If the parties agree to refer the

-41-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000714

00047

dispute to a second independent engineer, the parties and the second independent engineer shall follow the same procedures as set forth in this Section 14.2, and unless otherwise agreed by the parties, the decision of the second independent engineer shall be final and binding. If the parties do not agree to refer such dispute to a second independent engineer, then either party may initiate an action as set forth in Section 14.3. The parties shall each bear their own costs with respect to the arbitration of any such engineering dispute. When functioning as interpreter and judge under this Section 14.2, the Independent Engineer will take into consideration the results of any inspection or test performed, will not show partiality to Owner or Seller and shall apply New York law to the resolution of the dispute. The Independent Engineer will not be liable in connection with any interpretation or decision rendered in good faith in such capacity. Notwithstanding the foregoing, determinations of Mechanical Completion and Commissioning shall be as provided in Sections 9.1 and 9.2.

14.3    Disputes Subject to Litigation.  Any disputes, claims or controversies arising out of or related to this Agreement that are not resolved in accordance with Sections 14.1 or 14.2, may be resolved by a suit in equity, action at law, or other appropriate proceeding initiated by either party to this Agreement.

14.4    Specific Performance.  Notwithstanding anything to the contrary contained in this Article 14, if, due to a material breach or threatened material breach or default or threatened default, a party is suffering irreparable harm for which monetary damages are inadequate, such party may petition a court of competent jurisdiction for injunctive relief, specific performance or other equitable relief.

### Article 15
### General Provisions

15.1    Waiver.  Unless expressly provided herein no delay or omission by the parties hereto in exercising any right or remedy provided for herein shall constitute a waiver of such right or remedy nor shall it be construed as a bar to or waiver of any such right or remedy on any future occasion.

15.2    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of Seller, Owner and any subsequent Owner. After the Contract Price shall have been paid in full, this Agreement may be assigned, in whole or in part, without Seller's consent, by Owner to any Person; provided, however, that Seller's consent shall be required if such Person is an MPS Competitor. Seller's consent shall not be required for the assignment by Owner of the Contract Documents to an Affiliate of the Owner or to any special purpose project entity established to own the Project (unless such Affiliate or member of the special purpose project entity is an MPS Competitor). Seller agrees that Owner may grant at any time a security interest in this Agreement without Seller's consent. Except as expressly provided in this Section 15.2, no party may assign or transfer this Agreement, in whole or in part, except upon the prior written consent of the other party hereto, which consent shall not be unreasonably withheld. It shall be deemed reasonable for Seller to withhold consent to an assignment of this Agreement by Owner to any MPS Competitor. It shall be deemed reasonable for Owner to withhold consent to an assignment of this Agreement by Seller absent an agreement by MHI to guarantee performance by Seller's assignee. In connection with any permitted full or partial

-42-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000715

00048

assignment or grant of security interest under this Section 15.2, the parties agree to execute one or more consents to assignment with terms and conditions as may be reasonably requested by such assignee; provided, that each such assignee of the Agreement shall expressly acknowledge the rights and remedies of the Financing Parties hereunder (to the extent applicable) and shall assume any of the assigning party's obligations related thereto. Any assignment by Owner permitted under this Section 15.2 shall constitute a full release of the assignor provided that, (i) the assignee shall have assumed all obligations of the assignor and agree to be bound by all of the terms and conditions hereunder in a manner reasonably satisfactory to Seller and (ii) to the extent the Babcock Guaranty Agreement is required to remain outstanding, such agreement remains in full force and effect and such guarantor shall consent in writing to such assignment and confirm the continuing validity of such guaranty, or a replacement guaranty from a party reasonably acceptable to Seller as guarantor is provided in connection with the assignment.

(a)     Financing Assistance.   Seller shall provide such assistance as Owner may reasonably request, at Owner's expense, in connection with the sale of or obtaining financing for the Project.  Seller agrees that it shall make available to Owner and the Financing Parties information relating to the status of the Wind Turbine Work, including non-proprietary information relating to the design, engineering and testing of the Wind Turbines, estoppel certificates and such other matters as Owner may reasonably request.  Seller shall furnish such consents to assignment, certifications and representations and opinions of counsel addressed to Owner and the Financing Parties, as may be reasonably requested by Owner or the Financing Parties, and Owner shall promptly upon demand reimburse to Seller the actual expense in doing so.   At Owner's reasonable request, Seller shall cooperate, at Owner's expense, with the independent engineer and technical advisors, if any, of the Financing Parties.  The parties shall cooperate in including herein, by suitable amendment from time to time, any provision which the Financing Parties or any proposed Financing Parties reasonably request.

(b)     Assignments without Consent.   Notwithstanding anything to the contrary which may be contained herein, this Agreement or any right or obligation contained herein may be assigned (i) by Owner, to the Financing Parties, provided such Financing Party is not an MPS Competitor, as collateral security (and in connection therewith, Seller shall execute and deliver to the Financing Parties a consent agreement in a form reasonably requested by the Financing Parties), (ii) by Owner, to any Affiliate of Owner, except if such Affiliate is an MPS Competitor, in which event Seller's prior written consent shall be required, and provided that the assignee agrees to (x) assume all of the obligations of the Owner and (y) be bound by all of the terms and conditions of the Contract Documents.  In the event of a permitted assignment under item (ii), it is understood that the Babcock Guaranty Agreement (or the Payment Letter of Credit, as the case may be) shall remain in full force and effect, and such parent company guarantor under the Babcock Guaranty Agreement (or the issuing bank or financial institution of the Payment Letter of Credit) shall consent in writing to such assignment and confirm the continuing validity of such guaranty (or Payment Letter of Credit, as the case may be).  This Agreement may be otherwise assigned by the parties only upon the prior written consent of the other party, which consent shall not be unreasonably withheld, delayed or denied; provided, however, that Seller's consent shall not be required for the assignment by Owner of any of the Contract Documents to the Equity Group (unless the Equity Group includes an MPS Competitor), and it shall be deemed reasonable for Seller to withhold consent to an assignment of this Agreement to an MPS Competitor.  When duly assigned in accordance with the foregoing, this Agreement shall be binding upon and shall

-43-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000716

00049

inure to the benefit of the assignee; any other assignment shall be void and without force or effect.

(c)   Sale of WTGs.   Notwithstanding anything to the contrary, it is agreed and understood that (i) Owner will not, for a period of ten (10) years from the achievement of Substantial Completion for all Wind Turbines, sell the WTGs to an MPS Competitor; and (ii) if the WTGs are at any time sold, Owner agrees that such sale shall be made on an "AS IS" basis and Owner shall secure from the purchaser of the WTGs its written agreement that the purchase and use of the WTGs, and/or the use of any information or documentation received with such purchase and supplied by Seller to Owner, shall be without recourse to Seller or its Affiliates, whether in contract, tort (including negligence), warranty, strict liability or by reason of any other theory at law, in equity or otherwise.   The provisions of Section 15.2, Successors and Assigns, shall survive Final Completion of the Supply Agreement or its earlier Termination. Nothing in this Section 15.2 shall limit the rights of a valid assignee of Owner's rights under the Warranty Agreement.

(d)   Partial Assignment.   Owner from time to time by written notice to Seller shall establish a Site for each Project to which the WTGs will be delivered in accordance with this Agreement.  Such notice shall be given no later than nine (9) months prior to the first shipment under the Delivery Schedule applicable to the WTGs which will be assigned to such Site; provided, however, any CWP and/or Tower diameter elections to be made by Owner shall nevertheless be provided in accordance with the time period required in Section 4.1.3.   In connection with Owner establishing a Project at any Site, Owner shall assign the applicable WTGs to such Site and the parties shall enter into a replacement (A) Wind Turbine Generator Supply Agreement (the "Replacement TSA"), (B) Warranty, Performance Test and Availability Guaranty Agreement and (C) Wind Turbine Maintenance and Service Agreement.  Each such replacement agreement shall be in substantially the form of the corresponding agreement signed on the Effective Date with the following exceptions:

    i.    The following Exhibits to the Wind Turbine Generator Supply Agreement shall be revised to reflect any relevant matters specific to the Site: A-5, B-1, B-2, D, E-1, E-2, and G;

    ii.    The following Exhibits to the Warranty, Performance Test and Availability Guaranty Agreement shall be revised to reflect any relevant matters specific to the Site: A-5, B-1, B-2, E-1, E-2, K and M;

    iii.    The following Exhibits to the Wind Turbine Maintenance and Service Agreement shall be revised to reflect any relevant matters specific to the Site: D and I;

    iv.    All other Exhibits to the foregoing agreements shall be conformed as to Site location, number of WTGs, and so forth;

    v.    In addition to Seller's obligation to provide Columnar Control Strategy for each Site as and when required by Section 3.2.2(j), Seller shall perform a class verification and other preliminary reviews as appropriate (but not a

-44-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000717

00050

Site suitability study) to confirm the general suitability of the Wind Turbines at such Site;

vi.     The replacement agreements shall reflect such equitable adjustments to the Contract Price, schedule, and such other terms hereof as may be actually affected by such designation of a Site;

vii.    The schedule of deliverables set forth in Section 3.2.2 shall be adjusted as appropriate; and

viii.   Each Site shall include at least twenty-five (25) Units.

15.3   Notices.  Any notice required or authorized to be given hereunder or any other communications between the parties provided for under the terms of this Agreement shall be in writing (unless otherwise provided) and shall be served personally or by reputable express courier service or by facsimile transmission addressed to the relevant party at the address stated below or at any other address notified by that party to the other as its address for service. Any notice so given personally shall be deemed to have been served on delivery, any notice so given by express courier service shall be deemed to have been served on delivery, and any notice so given by facsimile transmission shall be deemed to have been served on dispatch. As proof of such service it shall be sufficient to produce a receipt showing personal service, the receipt of a reputable courier company showing such delivery or an activity report of the sender's facsimile machine showing the correct facsimile number of the party on whom notice is served and the correct number of pages transmitted. Any subsequent Owner of the Project shall be added to and included on the notice list in the event the Owner informs the other parties that it is an Owner and provides an address for service.

The parties' addresses for service are:

To Owner:

Babcock & Brown Infrastructure Group US LLC
2 Harrison Street
San Francisco, California 94105
Facsimile: (415) 267-1500
Telephone: (415) 512-1515
Attn: Hunter Armistead

With a copy to:

Babcock & Brown INFRASTRUCTURE GROUP US LLC
2 Harrison Street
San Francisco, California 94105
Facsimile: (858) 587-5831
Telephone: (858) 587-5826
Telephone: (415) 267-1638
Attn: Dean Russell and Eric Lillybeck

-45-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000718

00051

<u>And a copy to:</u>

Babcock & Brown Infrastructure Group US LLC
2 Harrison Street
San Francisco, California 94105
Facsimile: (415) 267-1500
Telephone: (415) 512-1515
Attn: General Counsel

<u>To Seller:</u>

Mitsubishi Power Systems Americas, Inc.
100 Bayview Circle, Suite 4000
Newport Beach, CA 92660
Attn: Mr. Ichiro Itoh
General Manager
Facsimile: (949) 856-4481
Telephone: (949) 856-8400

<u>With a copy to:</u>

Mitsubishi Heavy Industries, Ltd.
Nagasaki Shipyard & Machinery Works
1-1 Akunoura-Machi, Nagasaki
Nagasaki, 850-8610, Japan
Section Manager,
Wind Turbine Business Section , Machinery Business
Attn: Mr. R. Kimura
Facsimile: +81 95 834 3490
Telephone: +81 95 834 3472

<u>With a copy to:</u>

Mitsubishi Power Systems Americas, Inc
100 Bayview Circle, Suite 4000
Newport Beach, CA 92660
Attn: Richard Sidkoff, General Counsel
Telephone: (949) 856-4481
Facsimile: (949) 856-8400

15.4   <u>Consent to Jurisdiction</u>.   Each of the parties hereby irrevocably consents and agrees that any legal action or proceedings brought to enforce any decision of the Independent Engineer (or any second independent engineer) which is final and binding under the provisions of Section 14.2, or brought with respect to any dispute arising out of this Agreement which is not

-46-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

resolved under the provisions of Sections 14.1 or 14.2, may be brought in the United States District Court for the Central District of California and, if jurisdiction does not lie, then in the Superior Court for the County of Los Angeles, Central Division, and by execution and delivery of this Agreement, each of the parties hereby (i) accepts the non-exclusive jurisdiction of the foregoing courts for purposes of enforcement of any such decision of the Independent Engineer (or any second independent engineer) which is final and binding under the provisions of Section 14.2, and the non-exclusive jurisdiction of the foregoing courts for purposes of resolving any dispute arising out of this Agreement which is not resolved under the provisions of Sections 14.1 or 14.2, (ii) irrevocably agrees to be bound by any final judgment (subject to any appeal) of any such court with respect thereto, and (iii) irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venues of any suit, action or proceedings with respect hereto brought in any such court, and further irrevocably waives to the fullest extent permitted by law any claim that any such suit, action or proceedings brought in any such court has been brought in an inconvenient forum. EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY DISPUTE OR CONTROVERSY BETWEEN OR AMONG SUCH PARTIES BASED HEREON OR ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF THE PARTIES. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT. Each of the parties agrees that a final judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner to the extent provided by law.

15.5    Governing Law.    This Agreement and all matters arising hereunder or in connection herewith shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws.

15.6    Amendments.    This Agreement may be modified or amended only by an instrument in writing signed by the parties hereto.

15.7    Attachments Incorporated.    The Exhibits attached hereto are hereby incorporated and made a part of this Agreement.

15.8    Entire Agreement.    The terms and conditions set forth herein, together with those set forth on all Exhibits attached hereto and in the Contract Documents, constitute the complete statement of the agreement between Owner and Seller relating to the subject matter hereof. No prior statement, correspondence or parole evidence shall modify or affect the terms and conditions hereof or thereof nor shall such prior statements, correspondence or parole evidence be introduced or considered in any judicial or arbitral proceeding. Prior representations, promises, warranties or statements by any agent or employee of Seller or Owner that differ in any way from the terms and conditions hereof or thereof shall be given no effect.

15.9    Survival.    Notwithstanding the achievement of Final Completion or the earlier termination of this Agreement, the parties hereto shall continue to be bound by the provisions of Article 10, Representations and Warranties of Seller, Article 11, Indemnification, Article 12, Representations and Warranties of Owner, Article 14, Dispute Resolution, Section 15.2

-47-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000720

00053

Successors and Assigns, Section 15.4, Consent to Jurisdiction, Section 15.5 Governing Law, Section 15.12, Confidentiality, Section 15.14, Intellectual Property, Section 15.16, No Implied Warranties, Section 15.17, Limitation of Liability, Section 15.18, Time for Claims, and Section 15.19, Late Payment. Provisions of this Agreement which expressly so provide shall also survive the expiration or termination of this Agreement.

15.10   Attorneys' Fees.   In the event of any arbitration or litigation to enforce the provisions of this Agreement, the prevailing party in such arbitration or litigation shall be entitled to recover reasonable legal fees and costs from the losing party.

15.11   Site Regulations.   All pertinent regulations and rules which may be in effect at the Site regarding passes, badges, safety and proper conduct on the property shall be observed by Seller, Servicer, and agents and employees of each.

15.12   Confidentiality.

(a)   Seller hereby undertakes to keep confidential, except as may be explicitly approved by Owner, or as may be necessary for the proper discharge by Seller of its duties under this Agreement, or as may be necessary to be disclosed to taxing authorities and accountants preparing Seller's tax reports and filings or as may be necessary to respond to legal process, the terms and provisions of this Agreement, any and all wind data provided to Seller and/or Garrad Hassan by Owner and all details of Owner's business, the location and identification of the Project and the Site or any potential Site, the progress of any construction activities, and the business of any member of Owner.

(b)   Owner hereby undertakes to keep confidential, except as may be explicitly approved by Seller, or as may be necessary for the proper discharge by Owner of its duties under this Agreement, or as may be necessary to be disclosed to taxing authorities and accountants preparing Owner's tax reports and filings or as may be necessary to respond to legal process, all written proprietary and technical data of Seller; provided, that such data is either (i) clearly marked as being confidential, (ii) contained in a document captioned "Engineering Sheet," or (iii) the Specifications.   Notwithstanding the foregoing, Owner may also use confidential information of Seller for the repair, operation and maintenance of the Wind Turbines and in addition, Owner may disclose information to the Equity Group, prospective purchasers of the Project, the Financing Parties and any other Persons expressing interest in providing debt financing or refinancing or other credit support to Owner, and the agent or trustee of any of them; provided, however, that in each case such disclosures shall be subject to the written agreement of such Persons to keep Seller supplied confidential information confidential, upon terms and conditions substantially similar to those in this Agreement.   Owner shall not be required to procure such a written agreement from advisors who are subject to a legal or statutory fiduciary duty to Owner or to any such Person who has provided such written agreement.

(c)   Notwithstanding the provisions of subsections (a) and (b) above, Seller and Owner shall be entitled to the extent necessary for the performance of its respective duties hereunder to allow access to details relating to the business of the other party exclusively to such of its affiliates, directors, officers, employees and consultants who are directly concerned with the carrying out of its duties under this Agreement; provided, that each party shall inform each of

-48-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

such persons of the confidential nature of such information and of that party's obligations of confidentiality in respect thereof and such party shall be responsible for any breach of such obligations by any of its employees or consultants.

(d)   All public announcements in relation to the business of Seller or Owner shall, if they are to be made by the other party, be fully discussed in advance with, and approved by, the first party.

15.13   Wind Speed Projections.   Seller shall have no responsibility or liability for any purposes hereunder or under any other Contract Document for the collection or evaluation of the wind data collected prior to the Substantial Completion Date of all Wind Turbines, or for the accuracy of the wind speed projections and financial projections.

15.14   Intellectual Property.   Seller shall retain ownership of all intellectual property rights in the design and manufacture of the Wind Turbines.  Notwithstanding anything in the foregoing sentence to the contrary, Owner and each of its successors and permitted assigns shall have a continuing, non-exclusive right and license, for so long as any of them has any rights of ownership in or to the Wind Turbines, and on a royalty-free basis, to import, buy, sell, use, operate and otherwise work the Wind Turbines, to the fullest extent necessary for it to enjoy the exercise, vis-à-vis Seller of complete and unfettered rights of ownership and dominion over the Wind Turbines.

15.15   Counterparts.   This Agreement may be executed by the parties in one or more counterparts, all of which taken together, shall constitute one and the same instrument.

15.16   NO IMPLIED WARRANTIES.  (i) THE WARRANTIES OF SELLER SET FORTH IN, THE SECOND SENTENCE OF SECTION 3.6.1, SECTION 3.5, SECTION 5.6, ARTICLE 10, AND SECTION 11.2 OF THIS AGREEMENT AND (ii) THE WARRANTIES SET FORTH IN SECTION 5.1, SECTION 5.8, SECTION 5.10 AND THE GUARANTEES SET FORTH UNDER SECTION 3.2, AND ARTICLE 6 OF THE WARRANTY AGREEMENT ARE SELLER'S SOLE WARRANTIES AND PERFORMANCE GUARANTEES WITH RESPECT TO THE WIND TURBINES AND THE WIND TURBINE WORK AND ARE MADE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED.  SELLER MAKES NO OTHER WARRANTIES TO OWNER OR ANY OTHER PERSON WITH RESPECT TO THE DESIGN, MATERIALS, WORKMANSHIP, OR PERFORMANCE OF THE WIND TURBINES OR THE WIND TURBINE WORK, EITHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NOTWITHSTANDING ANYTHING TO THE CONTRARY, NOTHING IN THIS SECTION IS INTENDED TO (a) OPERATE AS A WAIVER OF OWNER'S RIGHT TO ENFORCE ANY OF THE OBLIGATIONS OR COVENANTS OF THE SELLER UNDER OTHER PROVISIONS OF THE SUPPLY AGREEMENT AND THE WARRANTY AGREEMENT, OR (b) NEGATE ANY WARRANTY PROVIDED UNDER THE SERVICE AGREEMENT.

15.17   Limitation of Liability.   Subject to the next sentence neither (i) the Seller and its subcontractors and vendors, nor (ii) the Owner and the Financing Parties shall be liable for any indirect, special, incidental or consequential damages, including loss of profit, loss of revenue,

-49-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

loss of tax benefit or tax credit, loss of use, loss of power, cost of replacement power, or cost of capital, claims of customers for loss of power or production, or for punitive damages, arising out of or in relation to the performance of this Agreement whether or not such liability is claimed in contract, tort (including negligence and strict liability), warranty, or any other legal or equitable theory. The foregoing exclusion shall not (i) preclude recovery, where applicable, of Delivery Delay Liquidated Damages which in the aggregate shall in no event exceed twenty percent (20%) of the Contract Price of each applicable Site (or Project), (ii) be construed to limit recovery under any indemnity for third party claims in Article 11, or with respect to a party's fraud or willful misconduct, or (iv) preclude recovery of interest under Section 9.5.3(a)(2) and Section 15.19. Not withstanding anything to the contrary in the foregoing, it is understood that the provisions of Section 15.10, Attorney's Fees, and any provision of this Agreement requiring a party to bear its own expenses, or a specific expense specified by name (such as the fees of the Independent Engineer under Section 9.3(c) and Section 9.4(d), or legal fees under Sections 11.1(a) and (b) and Section 11.2) shall not be construed to be consequential damages precluded by this Section 15.17. Notwithstanding anything to the contrary, it is further agreed and understood that Seller's and MHI's total liability under this Supply Agreement and under the Warranty Agreement, combined, shall not in the aggregate exceed the Contract Price of each applicable Site (or Project) whether or not such liability is claimed in contract, tort (including negligence and strict liability), warranty, or any other legal or equitable theory. Owner hereby expressly waives and releases Seller and MHI from any and all losses, damages or remedies in excess of such amounts; provided, however, the preceding limitation of liability shall not apply to, and no credit shall be issued against such liability for, Seller's indemnity obligations for third party claims set forth in Article 11.

(a)     Liquidated Damages Not a Penalty. The parties acknowledge and agree that because of the unique nature of the Wind Turbines and the unavailability of substitute equipment, it is difficult or impossible to determine with precision the amount of damages that would or might be incurred by Owner as a result of the failure to deliver the Wind Turbines to the applicable pads at the various Sites at the times set forth on and in accordance with the Delivery Schedule. It is understood and agreed by the parties that (i) Owner shall be damaged by failure to meet such obligations, (ii) it would be impracticable or extremely difficult to fix the actual damages resulting therefrom, (iii) any sums which would be payable in accordance with the foregoing failures are in the nature of liquidated damages, and not a penalty, and are fair and reasonable, and (iv) such payments each represent a reasonable estimate of fair compensation for the losses that may reasonably be anticipated from each such failure.

(b)     Exclusive Remedies. The remedies of the Owner and Seller expressly set forth in the Supply Agreement and the Warranty Agreement shall be exclusive. Where a remedy is not expressly provided in the Supply Agreement or the Warranty Agreement, then the Owner and Seller shall have its remedies at law or equity, but subject nevertheless to the provisions of this Section 15.17, Limitation of Liability. This provision is not intended to affect the remedies which Owner or Seller (in its capacity as Servicer) may exercise under the Service Agreement.

(c)     The provisions of this Section 15.17, "Limitation of Liability", shall survive Final Completion of the Supply Agreement, or its earlier termination.

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000723

00056

15.18   Time for Claims.  Any action or notice of arbitration by a party hereto arising under this Agreement shall be filed by no later than 365 days from the date of Final Completion. The parties hereto hereby waive, to the extent permitted by Applicable Law, any longer period available under Applicable Law, including any laws relating to statutes of limitation, in which to file an action or notice of arbitration.

15.19   Late Payments.  Any late payment due hereunder shall bear interest from the date such payment is due to but excluding the date such payment is received at an annual rate equal to the lower of (i) Prime Rate plus 2% or (ii) the highest rate permitted by applicable law.  For purposes hereof, "Prime Rate" means the Prime Rate as published in the Wall Street Journal, Western Regional Edition under the heading "Money Rates," or any successor publication as may be consented to by Owner and Seller, which consent shall not be reasonably withheld or delayed.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

-51-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000724

00057

IN WITNESS WHEREOF, this Agreement has been executed and delivered by the duly authorized representatives of Owner and Seller as of the date of the first written above.

BABCOCK & BROWN
INFRASTRUCTURE GROUP US LLC,
A Delaware limited liability company

By: _____

Name: DANIEL EIKORT

Title: VICE PRESIDENT

MITSUBISHI POWER SYSTEMS
 AMERICAS, INC.,
A Delaware corporation

By: _____

Name: ICHIRO Itoh

Title: SVP

*Wind Turbine Generator Supply Agreement*

-52-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000725

00058

**Appendix I**

**Definitions**

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F**

MPSANDTX0000726

Execution Copy

## APPENDIX I

### DEFINITIONS

"<u>Actual Output</u>" means the total energy produced by all Wind Turbines which shall be measured at the Project Meter.

"<u>Adjustment Period</u>" means the period of fifty (50) days from the date on which Substantial Completion is achieved.

"<u>Affiliate</u>" means any Person who (whether through one or more intermediaries) directly or indirectly controls, is controlled by, or is under common control with, any other Person.

"<u>Agreement</u>" means the Wind Turbine Generators Supply Agreement dated as of Effective Date, by and between Seller and Owner.

"<u>Annual Availability Guaranty Liquidated Damages</u>" shall have the meaning assigned in Section 6.2 of the Warranty Agreement.

"<u>AP Availability Guaranty Liquidated Damages</u>" shall have the meaning assigned in Section 6.1 of the Warranty Agreement.

"<u>Anniversary</u>" means the date in each calendar year following the specified event which is the same as the date of such specified event.

"<u>Applicable Laws</u>" or "<u>Applicable Law</u>" means any or all law(s), treaty(ies), ordinance(s), code(s), judgment(s), decree(s), directive(s), guideline(s), policy(ies), injunction(s), writ(s), order(s), rule(s), regulation(s), interpretation(s), Permit(s) described in Section 3.2.4 of the Supply Agreement or in Section 2.13 of the Service Agreement (as applicable), specific items set forth in <u>Exhibit E-1</u>, attached to the Supply Agreement, which are based upon requirements in Owner's Permits that are applicable to the Wind Turbines or the Wind Turbine Work and all similar forms of decisions of any Governmental Authority having jurisdiction over the Wind Turbines, the Site, transmission of electricity, performance of the obligations of Seller and Servicer under the Contract Documents and each other document, instrument and agreement delivered hereunder or in connection herewith, testing, Commissioning, operation and maintenance of the Wind Turbines, health and safety, or the environmental condition of the Wind Turbines or the Site.

"<u>Applicable Penalty Rate</u>" means the Power Price grossed up to include the after tax benefits of any PTCs applicable (if the Unit qualifies for PTCs) at the time that Project Damages, AP Availability Guaranty Liquidated Damages and Annual Availability Guaranty Liquidated Damages are calculated, and for the period such PTCs would be applicable, relating to the energy produced with respect to such revenue based upon Owner being taxed at the maximum marginal state and federal income tax brackets applicable to corporations.

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F**

"As-Built Drawings" means those documents which reflect changes made to the Specifications and Instruction Manual after the date of the Supply Agreement and before Final Completion.

"Associated Costs" means the costs and expenses incurred by the Independent Engineer and Owner in connection with the calculation of Certification Damages or any component thereof.

"Availability Guaranty" means the obligations of Seller pursuant to Sections 6.1 and 6.2 of the Warranty Agreement.

"Babcock" means BABCOCK & BROWN INTERNATIONAL PTY LTD, a company incorporated under the laws of the State of Victoria, Australia.

"Balance of Plant" or "BOP" means all procurement, design, equipment, materials and other items incorporated (or to be incorporated) in the Project, and construction, except for the Wind Turbine Work described in the Supply Agreement and Special Tools. Balance of Plant includes, but is not limited to, the engineering, design, civil and mechanical construction works, principally site preparation, roads, crane pads, gates, culverts, and foundations for transformers and Wind Turbines, the SCADA system, meteorological towers, and the Project Interconnection Facilities (including the WTG switchgear).

"Babcock Guaranty Agreement" is defined in Recital I to the Supply Agreement.

"BOP Contract" has the meaning ascribed to such term in the Recitals of the Supply Agreement.

"BOP Contractor" has the meaning ascribed to such term in the Recitals of the Supply Agreement.

"Business Day" means every day other than a Saturday, Sunday or a day on which banks are permitted or required to remain closed in Texas or New York.

"Calculated Energy Yield" or "CEY" shall have the meaning ascribed to this term in the Power Curve Test Procedure attached to the Warranty Agreement as Exhibit G.

"Certificate of Commissioning" means the certificate to be to be signed by the Owner and the Seller pursuant to Section 9.2.2 of the Supply Agreement in the form of Exhibit K to the Supply Agreement.

"Certificate of Design Approval" means the certificate to be issued by GL for the MHI MWT95/2.4 wind turbine generators with 80m hub height, attached to the Supply Agreement as Exhibit Q (deliverable).

"Certification Damages" means Project Damages plus Associated Costs, or the alternative measure of damages, if agreed by the parties, as provided in Section 5.4.2(b)(ii), and in either case payable in accordance with the provisions of Section 5.4.2(b) of the Warranty Agreement.

-2-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

"Certification Default" has the meaning ascribed to such term in Section 9.4(h) of the Supply Agreement.

"Change Order" is a written instrument signed by Owner and Seller stating their mutual agreement upon all of the following: (i) a change in the Wind Turbine Work, if any; (ii) the amount of the adjustment in the Contract Price, if any; and/or (iii) the extent of the adjustment in the Delivery Schedule, if any, and/or any other guaranteed date of completion under the Supply Agreement. Upon receiving a Change Order, Seller shall diligently perform the work set forth therein in accordance with and subject to all of the Requirements.

"Cold Weather Package" or "CWP" means an optional feature that extends the operational and survival range of the WTG, as described further in Exhibit A-2 to the Supply Agreement.

"Columnar Control Strategy" means the Columnar Control Strategy set forth in Exhibit A-5 to the Supply Agreement and Exhibit A-5 to the Warranty Agreement.

"Commission" or "Commissioning" means the process by which a WTG is Commissioned.

"Commissioned" means, with respect to each WTG, (a) Mechanical completion for such WTG has occurred, (b) the Commissioning Procedures have been successfully completed and the Commissioning Check Sheet has been completed and signed by Seller, (c) the Wind Turbine is ready for initial operation in accordance with the O&M Procedures manual, and (d) Owner or Owner's representative has countersigned the Certificate of Commissioning for such WTG.

"Commissioning Check Sheet" means the Commissioning check sheet attached to the Commissioning Procedure.

"Commissioning Procedures" means the Commissioning Procedures set forth in Exhibit M-1 to the Supply Agreement.

"Communications Protocol" has the meaning ascribed to such term in Section 3.2.2(e) of the Supply Agreement.

"Consumable Parts" shall mean all consumable parts and consumable supplies including, without limitation, lubricating oil and other lubricants, seals, rods, bolts, nuts and washers (other than bolts, nuts and washers for the foundation anchors), bushing, gaskets, filters, and other items normally consumed in the assembly, installation, erection, Commissioning or, only applicable to the Service Agreement, operation of the Wind Turbines. For the avoidance of doubt, bearings shall not be considered Consumable Parts.

"Contract Documents" means the Supply Agreement, the Warranty Agreement, the Service Agreement and each of the other appendices, exhibits, schedules, annexes and documents attached to, or delivered under, any of such documents.

"Contract Price" has the meaning ascribed to such term in Section 4.1 of the Supply Agreement.

-3-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000729

00062

"Delivery Delay Day" has the meaning ascribed to such term in Section 5.5.1 of the Supply Agreement.

"Delivery Delay Liquidated Damages" has the meaning ascribed to such term in Section 5.5.1 of the Supply Agreement.

"Delivery Point" means the physical point at which electric interconnection is made between the Project and the Interconnection Facilities, as further described in Attachment 1 to this Appendix I.

"Delivery Schedule" means the detailed Wind Turbine delivery shipment schedule set forth in Exhibit D to the Supply Agreement.

"Effective Date" means the date first set forth in the Supply Agreement.

"Energization" or "Energized" means the electrical energization of the control system of a Wind Turbine or the Wind Turbines, as the case may be, and the Project Interconnection Facilities from the Delivery Point, with the ability to deliver positive energy from the Wind Turbines through the Delivery Point.

"Energy Reduction Percentage" means the annual estimated percentage reduction in the total quantity of energy produced by the Project between the date as of which Certification Damages are to be paid and the date which is twenty (20) years from the Substantial Completion Certificate Date, which shall be determined by the Independent Engineer to be sufficient to reflect the Project having less than a twenty (20) year design life or being subject to operating parameters that are more restrictive or less beneficial than the operating parameters included in the Wind Turbine Specifications current at the time of the election to pay Certification Damages. In making such determination, the Independent Engineer may consider such information as is available to it and as it determines to be prudent to such determination, including the reasons stated by GL or GL Equivalent for not issuing a Certificate of Design Approval, and its experience with other wind energy projects, and the Independent Engineer shall engage in reasonable consultation with the Seller and the Owner in making such determination including, without limitation, at Seller's and Owner's election and their respective expense, participation in a joint inspection at the Site, and providing to Seller and Owner for comment a copy of Independent Engineer's proposed recommendations not less than fifteen (15) days prior to delivery of the same to Owner.

"Equity Group" means each Person that has a ownership interest in Owner.

"Escrow Agent" means the escrow agent under the Escrow Agreement.

"Escrow Agreement" means the Wind Turbine Escrow Agreement to be entered into by Owner with MHI on or prior to the Substantial Completion Date, substantially in the form of Exhibit P-1 to the Supply Agreement.

"Escrow Items" the documents described on Exhibit P-2 to the Supply Agreement.

-4-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000730

00063

"Excusable Delay" means a delay in performance resulting from a Force Majeure Event in connection with any Force Majeure Event:

i. the affected party shall give the other party written notice describing the Force Majeure Event promptly after the affected party becomes aware of such occurrence;

ii. the affected party shall give the other party as soon as reasonably possible but not more than five (5) days after the Force Majeure Event written notice estimating the Force Majeure Event's expected duration and probable impact on the performance of such party's obligations under the applicable Contract Document, and such affected party shall periodically furnish reports of new developments with respect thereto during the continuation of the Force Majeure Event;

iii. the suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event;

iv. no liability of either party which arose before the occurrence of the Force Majeure Event shall be excused as a result of the occurrence;

v. the affected party shall exercise all reasonable efforts to mitigate or limit damages to the other party;

vi. the affected party shall use reasonable efforts to continue to perform its obligations under the applicable Contract Document and to mitigate the event or condition excusing performance; and

vii. when the affected party is able to resume performance of the affected obligations under the applicable Contract Document, that party shall give the other party written notice to that effect, and the affected party promptly shall resume performance under such Contract Document.

"Expected Annual Output" means the output projected in the P50 Wind Report prepared by an independent wind consultant, to be delivered by Owner to Seller not later than sixty (60) days before the Substantial Completion Date and subject to Seller's verification and comment; provided, that to the extent that Owner and Seller mutually agree on a different assessment of the projected output based on the historic performance of the Wind Turbines, then the "Expected Annual Output" shall be such mutually agreed projected output. In the event that Seller has paid PCT Liquidated Damages, the Expected Annual Output shall be reduced to reflect the amount of reduced output as to which Seller has paid PCT Liquidated Damages.

"Extended Warranty Period" means the period commencing upon the expiration of the Initial Warranty Period and ending on the third anniversary of the expiration of the Initial Warranty Period.

"Final Completion" has the meaning ascribed to such term in Section 9.4(f) of the Supply Agreement.

-5-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000731

00064

"Final Completion Certificate" means the Final Completion Certificate to be issued pursuant to Section 9.4 of the Supply Agreement.

"Financing Parties" or "Financing Party" means (i) the Equity Group and any and all lenders providing senior or subordinated turbine financing, construction financing, interim or long-term debt financing or refinancing for the Wind Turbines (including prior to commencement of construction) or the Project, and (ii) the Equity Group providing leveraged lease-financing, equity project financing or any refinancing for the Wind Turbines or the Project, and in each case any trustee or agent acting on their behalf.

"Fixed CWP Price" has the meaning ascribed to such term in Section 4.1.3 of the Supply Agreement.

"Force Majeure Event" or "Force Majeure" means, with respect to any Contract Document, any event that is not within the reasonable control, directly or indirectly, of the party affected, and is not the direct or indirect result of that party's (a) negligence, (b) fault or (c) failure to perform its obligations under the Contract Documents and/or in accordance with Applicable Law including, without limitation: acts of war, sabotage, terrorism, rebellion, insurrection, acts of foreign enemies, military or usurped power or martial law, expropriation or confiscation of facilities or property by order of any Governmental Authority, fires, floods, hail, explosions, negative wind shear, lightning, lightning-induced surges, unexpected high and low voltage, transmission outages or sudden or disruptive electrical events or disturbances on transmitting utility's side of the Delivery Point or delays in the Project's interconnection to the Grid whether for receiving or delivering energy, the inability to deliver all or any portion of energy from the Project across the Delivery Point to the Grid, a Utility or transmitting utility-imposed curtailment, hurricanes or other extreme weather conditions in excess of the WTG Specifications, extraordinary airborne debris, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, water below the surface of the ground, earth movement including, but not limited to, earthquake, landslide, mud flow, earth sinking, earth rising or shifting, and other Acts of God, strikes (subject to the next sentence), crashing vehicles or aircraft, unavoidable casualties, vandalism, malicious mischief, theft and attempted theft, and changes or enactments of Applicable Laws in the United States. In the case of Seller, Servicer and any of their Affiliates (collectively, "Mitsubishi"), Force Majeure Event expressly does not include any failure of performance of any contractual provision by Mitsubishi (except to the extent caused by a Force Majeure Event), any strikes, lockouts or other labor disputes in Mitsubishi's factories or the factories of any of Mitsubishi's suppliers or subvendors (other than national strikes), unavailability, late delivery or breakage of equipment or materials (except to the extent caused by a Force Majeure Event), and economic hardship.

"GL" means Germanischer Lloyd.

"GL Equivalent" means (i) Det Norske Veritas, or (ii) any other design certification entity qualified and recognized by the wind power industry to be capable of certifying the design life of wind turbines and mutually acceptable to Seller and Owner.

"GDPIPD" means the Gross Domestic Product Implicit Price Deflator, as published in the Survey of Current Business by the United States Bureau of Economic Analysis, Department

-6-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000732

00065

of Commerce, or in any successor publication, or such substitute index as may be consented to by Owner and Servicer, which consent shall not be unreasonably withheld or delayed. A substitute index shall be used only as necessary to substitute for abandonment of the GDPIPD index by the Department of Commerce after the effective date of the Supply Agreement, in order to restore the measure of price escalation as contemplated herein.

"Governmental Authority" means any federal, state, local or other governmental, judicial, public or statutory instrumentality, tribunal, agency, authority, body or entity, or any political subdivision thereof, having legal jurisdiction over the matter or person in question.

"Grid" means the electrical transmission system beyond the Delivery Point inclusive of the Interconnection Facilities within the meaning of the Interconnection Agreement.

"Guaranteed Annual Time Availability" shall have the meaning assigned in Section 6.2 of the Warranty Agreement.

"Guaranteed AP Time Availability" shall have the meaning assigned in Section 6.1 of the Warranty Agreement.

"Guaranteed WTG Commissioning Period" shall have the meaning assigned in Section 9.2(B) of the Supply Agreement.

"Hazardous Substances" means substances defined as "hazardous substances," "pollutants" or "contaminants" in Section 101 of the CERCLA (42 U.S.C. Section 9601; those substances defined as "hazardous waste," "hazardous materials" or "regulated substances" by the RCRA; those substances designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. Section 1321); those substances defined as "hazardous materials" in Section 103 of the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 et seq. at Section 1802); those substances regulated as a hazardous chemical substance or mixture or as an imminently hazardous chemical substance or mixture pursuant to Sections 6 or 7 of the TSCA (15 U.S.C. Sections 2605, 2606); those substances defined as "contaminants" by Section 1401 of the SDWA (42 U.S.C. Section 300f), if present in excess of permissible levels; those substances regulated by the Oil Pollution Act; those substances defined as a pesticide pursuant to Section 2(u) of the FIFRA (7 U.S.C. Section 136(u)); those substances defined as a source, special nuclear or by-product material by Section 11 of the AEA (42 U.S.C. Section 2014); those substances defined as "residual radioactive material" by Section 101 of the UMTRCA (42 U.S.C. Section 7911); those substances defined as "toxic materials" or "harmful physical agents" pursuant to Section 6 of the Occupational Safety and Health Act (2 U.S.C. Section 651 et seq. at Section 655); those substances defined as hazardous wastes in 40 C.F.R. Part 261.3; those substances defined as hazardous waste constituents in 40 C.F.R. Part 260.10, specifically including Appendix VII and VIII of Subpart D of 40 C.F.R. Part 261; those Substances designated as hazardous substances in 40 C.F.R. Parts 116.4 and 302.4; those substances defined as hazardous substances or hazardous materials in 49 C.F.R. Part 171.8; those substances regulated as hazardous materials, hazardous substances, or toxic substances in 40 C.F.R. Part 1910; and in the regulations adopted and publications promulgated pursuant to any Hazardous Substance Laws, whether or not such regulations or publications are specifically referenced herein.

-7-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

"Hazardous Substance Laws" means:  (a) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Section 9601 et seq.) ("CERCLA"); (b) the Federal Water Pollution Control Act (33 U.S.C. Section 1251 et seq.) ("Clean Water Act" or "CWA"); (c) the Resource Conversation and Recovery Act (42 U.S.C. Section 6901 et seq.) ("RCRA"); (d) the Atomic Energy Act of 1954 (42 U.S.C. Section 2011 et seq.) ("AEA"); (e) the Clean Air Act (42 U.S.C. Section 7401 et seq.) ("CAA"); (f) the Emergency Planning and Community Right-to-Know Act (42 U.S.C. Section 11001 et seq.) ("EPCRA"); (g) the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. Section 136 et seq.) ("FIFRA"); (h) the Oil Pollution Act of 1990 (P.L. 101-380, 104 State 486); (i) the Safe Drinking Water Act (42 U.S.C. Sections 300f et seq.) ("SDWA"); (j) the Surface Mining Control and Reclamation Act of 1974 (30 U.S.C. Sections 1201 et seq.) ("SMCRA"); (k) the Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.) ("TSCA"); (l) the Uranium Mill Tailings Radiation Control Act of 1978 (42 U.S.C. Section 7901 et seq.) ("UMTRCA"); and (m) all other Applicable Laws which govern Hazardous Substances, and the regulations adopted and publications promulgated pursuant to all such foregoing laws.

"IEC Standard" means IEC 61400-1, Second Edition 1999-02, Wind Turbine Generator Systems for Class IIA conditions with respect to the WTGs having eighty meter (80m) Towers.

"Independent Engineer" or ("IE") means Garrad Hassan or R.W. Beck, or if neither is available, an independent engineer to be mutually agreed by the parties from the following list of engineering consultants:

(i)     Risoe Test Station;

(ii)    Det Norske Veritas;

(iii)   Germanischer Lloyd;

(iv)    Energy Research Center of the Netherlands;

(v)     Deutsches Windenergie-Institute; and

(vi)    Any other independent engineer or engineering firm mutually agreed by the parties; provided, that if the parties fail to agree on an engineer from the above list within five (5) Business Days of the first discussion of the selection of such engineer, each of the above listed engineering firms shall be contacted in the order listed above and the first to accept the engagement shall be the Independent Engineer.  If none of the above accepts, then the Independent Engineer shall be determined in accordance with the Rules.

"Initial Performance Test" means the functional and systems test of the Wind Turbines to be conducted at the MHI factory.

"Initial Warranty Period" means the period commencing on the Substantial Completion Date, and ending for all Wind Turbines on the second anniversary of the Substantial Completion Date; provided, however, that in the event of deemed Substantial Completion pursuant to Section

-8-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000734

00067

9.3(g) of the Supply Agreement, the Initial Warranty Period shall end on the second anniversary of the date when the deemed Substantial Completion occurred.

"Instruction Manual" means the Seller's instruction manual to be delivered pursuant to Section 3.2.2(h) of the Supply Agreement, consisting of the O&M Procedures Manual, the Turbine Installation and Erection Manual and the Turbine Service and Maintenance Manual.

"Interconnection Agreement" means that certain Interconnection Agreement in respect of the Project.

"Interconnection Facilities" means the transmission provider's interconnection facilities, as further described in Attachment 1 to this Appendix I.

"LIBOR" means, for any day, a rate per annum equal to the "London Interbank Offered Rate (Libor)" for a three (3) month period as set forth in the Money Rates section of The Wall Street Journal, Western Regional Edition ("The Wall Street Journal"), on such day (or, if The Wall Street Journal is not published on such day, the next preceding Business Day on which the Wall Street Journal is so published); provided that, if The Wall Street Journal is no longer published or the applicable LIBOR rate is no longer quoted therein, then "LIBOR" shall be a reasonably comparable rate as shall be mutually agreed upon by Seller and Owner.

" Major Components" means the main gearbox, generator, step-up transformer, inverter/power converter, GFRP blade, blade bearings, turbine controller, rotor head housing with spindle, tower structure, yaw gear, yaw bearing, main shaft, main bearings, pedestal for main shaft bearings, main hydraulic unit, and nacelle bed plate, but excluding any Consumable Parts contained in each such component.

"Maintenance Schedule" has the meaning ascribed to such term in Section 2.1(a) of the Service Agreement.

["MEASNET" means Measuring Institute Network of Europe.]

"Measured Annual Time Availability" shall have the meaning assigned in Section 6.2 of the Warranty Agreement.

"Measured AP Time Availability" shall have the meaning assigned in Section 6.1 of the Warranty Agreement.

"Measured Energy Yield" or "MEY" shall have the meaning ascribed to this term in the Power Curve Test Procedure attached to the Warranty Agreement as Exhibit G.

"Mechanical Completion" means with respect to an individual WTG, that a Mechanical Completion Certificate has been issued in respect of such WTG by the Owner and confirmed by Seller without any outstanding work indicated pursuant to Section 9.1 of the Supply Agreement, and includes the achievement of the following for such Wind Turbine: (a) all turbine equipment associated with such fully assembled Wind Turbine has been assembled, erected and installed in accordance with the Specifications and the other Requirements and is checked for adjustment; (b) such Wind Turbine operates as a single unit capable of generating electricity continuously for

-9-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000735

00068

delivery to the service breaker in the Wind Turbine controller; (c) the Mechanical Completion Checklist provided as Exhibit J-2 of the Supply Agreement has been completed; and (d) the Wind Turbine is ready to commence Commissioning.

"Mechanical Completion Certificate" means the certificate described in Exhibit J-1 to the Supply Agreement to be issued by Owner pursuant to Section 9.1 of the Supply Agreement.

"Mechanical Completion Checklist" means the checklist in the form of Exhibit J-2 of the Supply Agreement attached to the Mechanical Completion Certificate.

"MHI" means Mitsubishi Heavy Industries, Ltd., a corporation organized and existing under the laws of Japan.

"MHI Guaranty Agreement" is defined in the Recitals to the Supply Agreement.

"MPS Competitor" means any Person and its Affiliates (other than any such Affiliate that (i) is in the business of making equity or debt investments in energy projects, and (ii) is not engaged in the business of designing and/or manufacturing, wind turbine generators, Major Components, control systems and/or related software) that designs and/or manufactures, wind turbine generators, Major Components, control systems and/or related software.

["NIST" means National Institute of Standards and Technology.]

"Noise Level Test" means the tests conducted pursuant to the Noise Level Test Procedures.

"Noise Level Test Procedures" means the procedures set forth in Exhibit I to the Warranty Agreement and used to determine whether the Wind Turbines satisfy the Noise Warranty.

"Noise Warranty" has the meaning ascribed to such term in Section 5.1(x) of the Warranty Agreement.

"Non-Manufacturer Downtime" means the period of time that a WTG is not in "RUN" or "STANDBY" mode due solely to (a) Force Majeure, (b) electrical outages or failures of the Balance Of Plant, Delivery Point or the Interconnection Facilities, (c) maintenance or repair of the Project's electrical infrastructure, grid system, transformers or any portions thereof to which the Wind Turbines are interconnected including, without limitation, the Balance Of Plant, Delivery Point or the Interconnection Facilities, (d) Scheduled Maintenance for purposes of determining Time Availability, not to exceed one hundred twenty-eight (128) hours per WTG during the first year after the Substantial Completion Date, and eighty-eight (88) hours per WTG per year thereafter during the remainder of the Warranty Period, (e) electrical outages or failures of the Project not caused by the Wind Turbines, (f) in the event of a Power Curve Test where Owner is responsible for the costs and expenses of such test, and a Power Curve Test pursuant to the procedures of Section 3.3.6(a) of the Warranty Agreement, a shutdown of a Wind Turbine affecting the measurement of a Reference Turbine as further described in Exhibit G to the Warranty Agreement (Power Curve Test Procedure), and (g) Operational "STOP" (Emergency or Normal) due to Alarms & Faults resulting from outside of the following environmental and

-10-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000736

00069

operational parameters (Note: bracketed [] values set forth below subject to confirmation based on final CWP specifications on or before August 31, 2007):

[A] Parameters for Standard Wind Turbine (not equipped with CWP)

1. Wind Speed:
    a. High Wind Shutdown : Cut-out (VA4003N)
        i. 25 m/s for 10 minutes
        ii. 30 m/s for 2 seconds
            (Reset condition : 20m/s for 10 minutes)
    b. Downwind Mode (VA4006W)
    c. Software Yaw Limit (YW3001N, YW3002N)
    d. Low Wind Shutdown (VA4012N, GE1500N)
    e. Nacelle Shock High (SS2504S)
        A shutdown of a Wind Turbine in accordance with detecting extreme shock such as earthquake by a shock sensor
    f. Nacelle Vibration High (VA1401M, VA1401S, VA1402S, VA1403M, VA1403S, VA1404S)

2. Temperature:  (when temperature goes "out-of-design" conditions of IEC Class II Standard Condition):
    a. Ambient Temperature Low: =< -10 deg C  (F-91) (AM4100N)
    b. Ambient Temperature High: => +40 deg C   (F-92) (AM4101N)

3. Operating Grid:

    a. Voltage:
        i. Outside of range within 690 Volts +/- 10% (GR1805S)
        ii. Under and Over Voltage (Note:  The undervoltage must be outside MHI's stipulated low-voltage ride through capability to be non-manufacturer downtime):  (GR1802M, GR1802S)
        iii. Over Voltage:  (F-63)
        iv. Over Power:  (F-56, A-37)

    b. Frequency:
        i. Outside of range within 60 Hz +/- 5% (GR1809S)
        ii. Over and Under Frequency 1.2 Hz Higher or Lower :  (GR1800S, GR1801S)

    c. Harmonics:
        i. Reactor High Temperature  (Note:  Harmonics originating external to the turbine):  (F-71)

4. Wind Direction
Columnar Wind Stop (VA4002W)
    A shutdown of a Wind Turbine in accordance with Columnar Control Strategy if any, adopted and attached as Exhibit A-5 of the Warranty Agreement.

-11-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000737

00070

5. Warming Up for Start-up during cold condition
Warming Up on Cold Condition  (VA4013W)

[B] Parameters of Wind Turbine equipped with CWP

1. Wind Speed:
    a. High Wind Shutdown : Cut-out (VA4003N)  at temperature => -10☐
        i. 25 m/s for 10 minutes
        ii. 30 m/s for 2 seconds
          (Reset condition : 20m/s for 10 minutes)
    b. High Wind Shutdown : Cut-out (VA4003N)  at temperature <-10☐
        i. [20 m/s for 10 minutes]
        ii. [25 m/s for 2 seconds]
          (Reset condition : [17m/s for 10 minutes])
    c. Downwind Mode (VA4006W)
    d. Software Yaw Limit (YW3001N, YW3002N)
    e. Low Wind Shutdown (VA4012N, GE1500N)
    f. Nacelle Shock High (SS2504S)
       A shutdown of a Wind Turbine in accordance with detecting extreme shock such
       as earthquake by a shock sensor
    g. Nacelle Vibration High (VA1401M, VA1401S, VA1402S, VA1403M, VA1403S,
       VA1404S)

2. Temperature:    (when temperature goes "out-of-design" conditions of IEC Class II
Standard Condition):
    c. Ambient Temperature Low: [=< -20 deg C]  (F-91) (AM4100N)
    d. Ambient Temperature High:  => +40 deg C   (F-92) (AM4101N)

3. Operating Grid:

    e. Voltage:
        i. Outside of range within 690 Volts +/- 10% (GR1805S)
        ii. Under and Over Voltage (Note:  The undervoltage must be outside MHI's
          stipulated low-voltage ride through capability to be non-manufacturer
          downtime): (GR1802M, GR1802S)
        iii. Over Voltage:  (F-63)
        iv. Over Power:  (F-56, A-37)

    f. Frequency:
        i. Outside of range within 60 Hz +/- 5% (GR1809S)
        ii. Over and Under Frequency  1.2 Hz Higher or Lower :  (GR1800S,
          GR1801S)

    g. Harmonics:
        i. Reactor High Temperature  (Note:  Harmonics originating external to the
          turbine): (F-71)

-12-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000738

00071

4.  Wind Direction
Columnar Wind Stop (VA4002W)
    A shutdown of a Wind Turbine in accordance with Columnar Control Strategy if any, adopted and attached as Exhibit A-5 of the Warranty Agreement.

5.  Warming Up for Start-up during cold condition
Warming Up on Cold Condition  (VA4013W)

6.  Icing

Notwithstanding the foregoing, Non-Manufacturer Downtime does not include (i) Unscheduled Maintenance, (ii) breach of the Warranty, (iii) Warranty Repairs and Warranty Retrofits, (iv) Project and Wind Turbine shutdowns pursuant to Owner's lawful exercise of the remedies provided in Section 5.5 of the Warranty Agreement, (v) alleged infringement pursuant to Sections 8.1 and 8.2 of the Warranty Agreement, and (vi) any of the items (a) through (g) above where such WTG would not otherwise be in RUN or STANDBY mode for reasons that are attributable to Seller (or Servicer) or a defect in or a malfunction of the Wind Turbines.

"Notice to Proceed" or "NTP" has the meaning ascribed to such term in Section 5.1 of the Supply Agreement.

"NTP Deadline" means either June 5, 2007, pertaining to the first 44 WTGs or August 31, 2007 for the subsequent 162 WTGs, by which dates Owner shall issue the applicable NTP in order for Seller to keep the contractual obligation such as, but not limited to, price, delivery schedule, delay penalty and so on.

"O&M Procedures Manual" means the complete system instructions and procedures for the operation, service and maintenance of the Wind Turbines in accordance with Prudent Wind Industry Practices, including the Operation Manual, Turbine Service and Maintenance Manual, Seller's and any applicable subcontractors' recommended list of Parts, lubrication requirements, frequency of Scheduled Maintenance, and certain safety information and precautionary measures for the Wind Turbines, which O&M Procedures Manual for Wind Turbines is part of the Instruction Manual to be prepared and delivered by Seller to Owner pursuant to Section 3.2.2(h) of the Supply Agreement.

"Operations Subcontractor" or "Operator" means the Person contracted by Owner (but for the avoidance of doubt shall not include the Servicer) for management and operation of the Project (other than the scope of the Services Agreement).

"Operation Manual" has the meaning ascribed to such term in Exhibit B of the Service Agreement.

"Owner" means Babcock & Brown Infrastructure Group US LLC, a Delaware limited liability company, in its capacity as Owner under the Supply Agreement, the Warranty Agreement and the Service Agreement.

-13-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000739

00072

"Owner Delays" means an event that wholly or partly prevents or delays Seller's performance of any obligation arising under the Contract Documents due to (i) Owner's failure to provide unfettered access or any required permits or (ii) any interference by Owner and/or the BOP Contractor prior to the full and complete performance of the Supply Agreement by Seller.

"Owner Indemnified Party" has the meaning ascribed to such term in Section 11.1 of the Supply Agreement.

" Owner's Non-completion Notice" has the meaning ascribed to such term in Section 9.3(a) of the Supply Agreement.

" Owner's Non-finalization Notice" has the meaning ascribed to such term in Section 9.4(b) of the Supply Agreement.

"Owner's Permits" means permits other than those which will be obtained by Seller under Section 3.2.4 of the Supply Agreement. Owner's Permits include, but are not limited to the Land Use Permit, the Conditional Use Permit, building permits, and environmental permits.

"Owner's Representative" has the meaning ascribed to such term in Section 8.5 of the Supply Agreement.

"Owner's Work" means (i) the design, engineering and construction obligations assigned to Owner, as opposed to Seller, pursuant to the Contract Documents pertaining to the civil and other works, Site foundation design and construction (including access roads, layout design and preparation of the Site for the Wind Turbine delivery), and electrical works, details of which are set forth in Exhibit I to the Supply Agreement; (ii) obtaining the necessary permits from Governmental Authorities in connection with such Owner's Work (but expressly excluding any such Governmental Authority permits required in connection with the transportation of the Wind Turbines or Towers to the Site); (iii) obtaining the right to the use of the land constituting the Site from third parties, as required; and (iv) any other acts required to complete the Project at the Site that are not expressly allocated to Seller pursuant to the Contract Documents.

"P50 Wind Report" means the output projected by the Independent Engineer as set forth in the report attached to the Warranty Agreement as Exhibit M.

"Parts" means all appliances, parts, instruments, appurtenances, accessories, furnishings, materials and other equipment used in the WTGs.

"Payment Letter of Credit" shall have the meaning ascribed to this term in Section 4.4 of the Supply Agreement.

"PCT Committee" shall have the meaning ascribed to this term in Section 3.3.4(a) of the Warranty Agreement.

"PCT Liquidated Damages" has the meaning ascribed to such term in Section 3.3.6(e) of the Warranty Agreement.

-14-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000740

00073

"Performance Test" means a collective or individual reference, as the context requires, to the Project Acceptance Test, the Noise Level Test and the Power Curve Test.

" Performance Test Procedures" means, collectively, the Project Acceptance Test Procedures, the Noise Level Test Procedures and the Power Curve Test Procedures.

" Permits" means a waiver, exemption, variance, certificate, franchise, permit, authorization, license or similar order of or from, or filing or registration with, or notice to, any Governmental Authority having jurisdiction over the matter in question.

"Person" means any individual, corporation, association, partnership, limited liability company, joint stock company, trust, unincorporated organization, joint venture, government or political subdivision or agency thereof.

"Power Curve" means Seller's specified output of a Wind Turbine at varying wind speeds, as set forth in Exhibit A-3 to the Warranty Agreement.

"Power Curve Test" or "PCT" means the tests conducted pursuant to the Power Curve Test Procedures attached as Exhibit G to the Warranty Agreement.

"Power Curve Test Certificate" means the document, substantially in the form of Exhibit G-1 of the Warranty Agreement, by which PCT Committee certifies that the Power Curve Test conducted with respect to the Reference Turbine has been successfully completed and passed.

"Power Curve Test Procedures" means the procedures set forth in Exhibit G to the Warranty Agreement, used to determine whether or not the Reference Turbine passes the Power Curve Test.

"Power Curve Threshold" means 95% of the CEY as defined and determined pursuant to Section 1.3.1 of Exhibit G to the Warranty Agreement.

"Power Curve Threshold Guaranty" has the meaning ascribed to such term in Section 3.2 of the Warranty Agreement.

"Power Price" means the price per kWh established from time to time under the Power Purchase Agreement for the sale of the electrical energy generated by the Project, provided, however, that at no time will the Power Price be greater than twelve cents (US$0.12) per kilowatt hour.

"Power Purchase Agreement" and "PPA" means the agreement for the purchase and sale of electrical energy and/or renewable energy credits, each as produced by the Project, to be entered into from time to time by and between Utility and Owner, as the same may be amended, restated, novated or modified from time to time.

"Price List" shall mean the list of Servicer's normal and standard prices for a Part, as initially set forth in Exhibit D to the Service Agreement and as updated from time to time after the date of the Service Agreement pursuant to Section 2.10 of the Service Agreement.

-15-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F

MPSANDTX0000741

00074

"Pre-Commissioning" has the meaning ascribed to such term in Section 9.2(C) of the Supply Agreement.

"Prohibition of Turbine Operation Order" has the meaning ascribed to such term in Section 5.5(a) of the Warranty Agreement.

"Project" means a particular number of integrated MHI MWT95/2.4 MW model wind turbines in the wind-powered electricity generating plant to be located on a particular Site, consisting of all structures, facilities, appliances, lines, conductors, instruments, equipment, apparatus, components, roads and other property comprising and integrating the entire facility and all other equipment, labor, services and materials to be furnished under the Supply Agreement and the BOP Contract.

"Project Acceptance Test" has the meaning ascribed to such term in Exhibit T-1 of the Supply Agreement.

"Project Acceptance Test Procedures" means the procedures set forth in Exhibit T-1 to the Supply Agreement.

"Project Damages" means the amount equal to the present value of the amounts determined by application of the following formula for each year from the date as of which Seller elects to pay Certification Damages, or as of the last day of the Warranty Period, whichever is earlier, until the date which is twenty (20) years from the Substantial Completion Date as follows:

(Energy Reduction Percentage) X (Expected Annual Output) X (Applicable Penalty Rate)

discounted at a rate equal to eight and one-half percent (8.5%).

"Project Interconnection Facilities" means all the land rights, materials, equipment, and facilities installed to permit the delivery of electrical energy generated by the Wind Turbines to the Delivery Point, and all electrical interconnection, switching, metering, relaying, and communication and safety equipment required under the Interconnection Agreement on the Project side of the Delivery Point, the WTG switchgear, the electrical works, including the Substation, collection system between WTG switchgear and the Substation, and all related cables, pipe ducting, control work, and equipment.

"Project Meter" means the revenue meter, or collection of revenue meters, located within the Project and used to measure the Actual Output that is sold to the Utility, as further described in Attachment 1 to this Appendix I.

"Prudent Wind Industry Practices" means the exercise of that degree of skill and diligence, and of such practices, methods and acts, at a minimum, as would ordinarily be expected in the wind power generation industry in the United States from a prudent owner, supplier and/or operator or service provider (as applicable) acting lawfully, reliably and safely in connection with wind power generation facilities and equipment similar to the Project and the Wind Turbines.

-16-

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. NO. 3:10-CV-276-F