

TAB 11

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION


GENERAL ELECTRIC COMPANY,

        Plaintiff,

   vs.                   CASE NO. 3:10-CV-00276-F

MITSUBISHI HEAVY INDUSTRIES,
LTD., and MITSUBISHI POWER
SYSTEMS AMERICAS, INC.,

        Defendants.

_____


VIDEOTAPED DEPOSITION OF

GREGORY WUNDER


Thursday, July 14, 2011

9:13 a.m.


4500 MacArthur Boulevard, Mulberry Room

Newport Beach, California


Reported by Kyung Lee-Green, CSR No. 12655, CLR

```
 1                    APPEARANCES OF COUNSEL

 2        For Plaintiff General Electric Company:

 3              PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
                BY:   DAVID J. BALL, ESQ.
 4              2001 K Street, NW
                Washington, DC  20006
 5              (202)223-7352
                dball@paulweiss.com
 6

 7        For Defendants Mitsubishi Heavy Industries, Ltd., and
          Mitsubishi Power Systems Americas, Inc., and
 8        Gregory Wunder:

 9              FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER,
                LLP
10              BY: THOMAS H. JENKINS, ESQ.
                901 New York Avenue, NW
11              Washington, DC 20001
                (202)408-4000
12              tom.jenkins@finnegan.com

13

14        Also Present:

15              Sonia Williams, Esq.

16              Joseph Block, Videographer

17

18

19

20

21

22

23

24

25
```

1          A     Correct.

2          Q     Is the revenue recorded -- withdrawn.

3                I -- I just want to take an example to help me

4     understand.  This is just an example.  Okay?

5          A     Uh-huh.

6          Q     Let's say that there was a wind turbine that

7     Mitsubishi sold to a customer in calendar year 2009.

8     All right.  The contract was signed in calendar year

9     2009.  And the money was paid in calendar year 2009.

10    But the wind turbine wasn't actually delivered to the

11    site until calendar year 2010.

12                Would the revenue for that wind turbine be

13    recognized in 2009 or would it be recognized in 2010 or

14    would it be handled some other way?

15         A     My understanding from the accounting is that

16    it is not recognized until it's all at site.

17         Q     Okay.  If we look at the revenue numbers --

18    year-by-year revenue numbers in Exhibit 2, can we infer

19    from these numbers that the year in which Mitsubishi's

20    wind turbine was actually delivered to the customer's

21    site is the same year in which the revenue was

22    recognized?

23         A     That's correct.

24         Q     And can we infer that the revenue for

25    commissioning a wind turbine was recognized the same

# TAB 12

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT, MUTUAL RELEASE AND AMENDMENT TO WIND TURBINE GENERATOR SUPPLY AGREEMENT

This **Settlement Agreement, Mutual Release and Amendment to Wind Turbine Generator Supply Agreement** (the "Agreement"), is made and dated as of October 8, 2010, by and among **Mitsubishi Power Systems Americas, Inc.**, a Delaware corporation ("MPS" or "Mitsubishi") and **Mitsubishi Heavy Industries, Ltd.**, a corporation organized under the laws of Japan ("MHI")[1] on the one hand, and **Edison Mission Energy**, a Delaware corporation ("EME") on the other hand, all of whom are sometimes referred to collectively as the "Parties" and singularly as a "Party".

### RECITALS

A.      MPS and EME entered into that certain Wind Turbine Generator Supply Agreement, dated as of March 28, 2007 (as amended or modified to date, including pursuant to that certain Change Order No.1 dated June 19, 2008 ("Change Order No.1")) (the "Master TSA"), pursuant to which MPS agreed to sell and EME agreed to purchase (a) eighty three (83) Wind Turbines (as defined in the Master TSA) to be delivered in each of years 2008 and 2009 for a combined total of one hundred and sixty six (166) Wind Turbines, together with (b) certain Special Tools (as defined in the Master TSA) and manuals for the installation, operation and maintenance of the Wind Turbines and other necessary documentation as set forth in the Master TSA. The 83 Wind Turbines which were originally to be delivered in 2008 under the Master TSA are referred to in this Agreement as the "2008 Turbines" and the 83 Wind Turbines which were originally to be delivered in 2009 under the Master TSA are referred to in this Agreement as the "2009 Turbines".

B.      MPS and EME also entered into that certain Wind Turbine Generator Maintenance and Services Agreement, dated March 28, 2007, pursuant to which MPS agreed to provide certain maintenance services in respect of the Wind Turbines (the "Master Services Agreement").

C.      MHI entered into that certain Guaranty of Wind Turbine Supply Agreement in favor of EME pursuant to which MHI guaranteed the performance of MPS under the Master TSA and the Master Services Agreement (the "Master Guaranty").

D.      Twenty nine (29) of the 2008 Turbines (the "Goat Wind Turbines") have been delivered by MPS to an EME wind energy project site located in Sterling and Coke Counties, Texas (the "Goat Wind Project"). The remaining fifty four (54) 2008 Turbines (the "Taloga Turbines") are currently in storage locations in the United States as set forth in Change Order No.1. EME intends to deploy the Taloga Turbines at a wind energy project site in Dewey County, Oklahoma (the "Taloga Project").

---

[1] MHI is a party to this Agreement for the purpose of acknowledging that it has read the Agreement, affirming its guaranty obligations and confirming it will enter into guaranty obligations under the Project Specific Documents as set forth herein and for the purpose of the releases provided in Section 6.2 herein and Section 7.13 hereto.

LA1 - 146259.03

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269657

E.     MPS has manufactured the 2009 Turbines and is storing each of the components of the 2009 Turbines in the configuration, quantities and locations set forth in Exhibit A hereto and such 2009 Turbines include cold weather package and narrow tower configuration.

F.     EME intends to deploy twenty three (23) of the 2009 Turbines (the "Pinnacle Turbines") at a wind energy project site located in Mineral County, West Virginia (the "Pinnacle Project").

G.     After the execution of the Master TSA, the following disputes have arisen between EME on the one hand and MPS and MHI on the other hand:

On March 19, 2010, EME filed Case No. 30-2010-00355044 against MPS and MHI in the Superior Court of the State of California for the County of Orange. On August 9, 2010, EME filed its Omnibus Second Amended Complaint for: (1) Fraudulent Inducement; (2) Breach of Warranty; (3) Breach of the Covenant of Good Faith and Fair Dealing; (4) Breach of the Covenant of Good Faith and Fair Dealing; (5) Breach of the Covenant of Good Faith and Fair Dealing; (6) Breach of the Covenant of Good Faith and Fair Dealing; (7) Declaratory Judgment; (8) Reformation; (9) Breach of the Covenant of Good Faith and Fair Dealing; (10) Joint and Several Liability Against MHI; and (11) Anticipatory Breach of Contract (the "Complaint");

On September 9, 2010, MPS filed its Cross-Complaint of Defendant and Cross-Complainant Mitsubishi Power Systems Americas, Inc. Against Plaintiff and Cross-Defendant Edison Mission Energy (the "Cross-Complaint") alleging three causes of action against EME, including: (1) Breach of Contract; (2) Breach of the Covenant of Good Faith and Fair Dealing; and (3) Declaratory Judgment. The allegations in the Complaint and Cross-Complaint, and all other matters in Case No. 30-2010-00355044, are collectively referred to herein as "the Lawsuit".

H.     After extensive negotiations regarding the issues in dispute in the Lawsuit, the Parties have reached an agreement to settle and release certain claims, demands, and/or liabilities by and amongst them as more fully set forth herein.

I.     The Parties have also agreed to enter into separate project specific Wind Turbine Generator Supply Agreements, Wind Turbine Generator Maintenance and Services Agreements and associated guaranties in respect of each of the Taloga Project, the Goat Wind Project and the Pinnacle Project.

J.     The Parties wish to enter into this Agreement to reflect the foregoing arrangements, certain changes to the Master TSA and their agreement regarding the remaining sixty (60) 2009 Turbines not intended for deployment at the Pinnacle Project.

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269658

00931

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, and in consideration of the mutual undertakings set forth herein, the Parties agree as follows:

## AGREEMENT

## ARTICLE I

### PAYMENT OF SETTLEMENT AMOUNTS

**Section 1.1** **Payment.** Subject to EME's rights and remedies under this Agreement, the Project Specific Documents (as defined in Section 2.1 below) and the obligations of MPS and MHI in such agreements and in this Agreement, EME shall pay Mitsubishi an amount equal to $40,000,000 (the "Settlement Amount") in settlement of all claims released under Article VI herein. The Settlement Amount shall be paid in three installments as follows:

(a)     $20,000,000 on the Effective Date of this Agreement (as defined in Section 5.4 of this Agreement),

(b)     Subject to Section 5.3 of this Agreement, $10,000,000 upon the Project Substantial Completion Date (as such term is defined in the Project Specific Documents for the Taloga Turbines (herein, the "Taloga Turbine Documents")). Notwithstanding the foregoing, if the Project Substantial Completion Date has not occurred by September 15, 2011 (the "Taloga Scheduled Completion Date") due to MPS being the primary and substantial cause of the delay to the Taloga Project's critical path to achieve Substantial Completion, then, EME shall be allowed a day for day delay in payment (for the number of critical path days of delay primarily and substantially caused by MPS). For the avoidance of doubt, "primary and substantial cause" as used in this paragraph shall mean that but for MPS' delay, the Substantial Completion Date would not have been delayed. If EME does not proceed with the construction of the Taloga Project, the Project Substantial Completion Date will be deemed to have occurred, and the $10,000,000 payment will be made on, the Taloga Scheduled Completion Date; and

(c)     Subject to Section 5.3 of this Agreement, $10,000,000 upon the Project Substantial Completion Date (as such term in the Project Specific Documents for the Pinnacle Turbines (herein, the "Pinnacle Turbine Documents")). Notwithstanding the foregoing, if the Project Substantial Completion Date has not occurred by December 15, 2011 (the "Pinnacle Scheduled Completion Date") due to MPS being the primary and substantial cause of the delay to the Pinnacle Project's critical path to achieve Substantial Completion, then, EME shall be allowed a day for day delay in payment (for the number of critical path days of delay primarily and substantially caused by MPS). For the avoidance of doubt, "primary and substantial cause" as used in this paragraph shall mean that but for MPS' delay, the Substantial Completion Date would not have been delayed If EME does not proceed with the construction of the Pinnacle Project, the Project Substantial Completion Date will be deemed to have occurred, and the $10,000,000 payment will be made on, the Pinnacle Scheduled Completion Date.

LA1 - 146259.03

3

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269659

## ARTICLE II

## PROJECT SPECIFIC TURBINE DOCUMENTATION

**Section 2.1  Execution of Project Specific Documentation.** Each of EME, MPS and MHI hereby agrees to execute and deliver to the other the following documents to which they are a party, (the "Project Specific Documents"):

(a)  a separate Wind Turbine Generator Supply Agreement for each of the Taloga Turbines, the Goat Wind Turbines and the Pinnacle Turbines;

(b)  a separate Wind Turbine Generator Maintenance and Service Agreement for each of the Taloga Turbines, the Goat Wind Turbines and the Pinnacle Turbines;

(c)  a separate Guaranty by EME in favor of MPS guaranteeing the performance of its respective affiliate under each of the Wind Turbine Generator Supply Agreements and Wind Turbine Generator Maintenance and Service Agreements referred to in Section 2.1 (a) and (b) above; and

(d)  a separate Guaranty by MHI guaranteeing the performance of MPS under each of the Wind Turbine Generator Supply Agreements and Wind Turbine Generator Maintenance and Service Agreements referred to in Section 2.1 (a) and (b) above.

As set forth in Section 5.4 of this Agreement, execution and delivery of the Taloga Turbine Documents shall be a condition precedent to the effectiveness of this Agreement. Each of EME, MPS and MHI agree to use commercially reasonable efforts to execute and deliver the Pinnacle Turbine Documents within (60) days after the Effective Date and the Project Specific Documents for the Goat Wind Turbines (the "Goat Wind Turbine Documents") within ten (10) days after the Effective Date. Except as expressly set forth herein, following the execution of the Project Specific Documents, the Master TSA, the Master Services Agreement and the Master MHI Guaranty shall cease to govern the Taloga Turbines, the Goat Wind Turbines and the Pinnacle Turbines which shall be governed solely by the Project Specific Documents set forth in this Section 2.1. The Project Specific Documents will be in substantially the same form as the Master TSA, the Master Services Agreement and the other associated master turbine supply documentation with such project specific conforming changes as are required for each project.

**Section 2.2  Taloga Turbines.** The Taloga Turbine Documents shall include the following terms:

(a)  specific construction, erection, delivery, commissioning and completion dates for the Taloga Project together with a detailed manpower loaded work plan showing the detailed requirements of EME and MPS in connection with the Taloga Project ( the "Taloga Work Plan"), an agreed copy of which is attached as Exhibit B hereto;

(b)  MPS shall reasonably cooperate with EME in a timely manner such that the Independent Engineer (as defined in the Master TSA) shall be able to produce and deliver a report on a timely basis to Oklahoma Gas & Electric as set forth in Section 7.01(c) of

LA1 - 146259.03

4

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269660

that certain Power Purchase Agreement between Taloga Wind, LLC and Oklahoma Gas & Electric dated September 25, 2009;

(c)     that, with respect to the Taloga Project: (i) subject to the approval of Oklahoma Gas & Electric, RW Beck shall be the Independent Engineer (as defined in the Taloga Turbine Documents), (ii) Nerak, Inc. shall be the Test Engineer (as defined in the Taloga Turbine Documents); and (iii) that provided EME is in compliance with Section 11.3.2 of the Master TSA or the corresponding Section in the Taloga Turbine Documents, then EME shall choose any two of the following turbines: 43, 45 and 53 (as set forth in the site plan attached to the Taloga Turbine Documents) as the Reference Turbines (as such term is defined in the Taloga Turbine Documents); and

(d)     that, in respect of the Taloga Turbines, the balance of the Contract Price (as defined in the Master TSA) is $8,501,280.61 (which, for the avoidance of doubt shall not be subject to any Escalation Adjustment (as defined in the Master TSA, other than the escalation adjustment in respect of labor rates described in Section 3.2 below). Such amount, together with the Technical Advisory Fee and the Commissioning Fee (each as defined in the Master TSA) will be paid in accordance with a payment schedule to be attached to the Taloga Turbine Documents.

Section 2.3     **Pinnacle Project**.  The Pinnacle Turbine Documents shall include the following terms:

(a)     specific construction, erection, delivery, commissioning and completion dates for the Pinnacle Project together with a detailed manpower loaded work plan showing the detailed requirements of MPS and EME in connection with the Pinnacle Project (collectively the "Pinnacle Work Plan");

(b)     that the amount of $59,610,056.54 ÷ 931733100 JY, previously paid by EME to MPS under the Master TSA (being an amount equal to twenty five percent (25%) of the total Contract Price for the 2009 Turbines under the Master TSA) in respect of the 2009 Turbines be fully credited against the amounts payable by EME (or its affiliate) in respect of the Pinnacle Turbines;

(c)     that a remaining amount to be paid for the purchase of the Pinnacle Turbines shall be set forth in the Pinnacle Turbine Documents and shall be paid in accordance with the payment schedule attached hereto as Exhibit C, which shall also be attached to the Project Specific Wind Turbine Generator Supply Agreement for the Pinnacle Project;

(d)     that in the event EME decides not to deploy the Pinnacle Turbines at the Pinnacle Project, MPS shall permit EME to designate one alternative project site for the Pinnacle Turbines, or with the consent of MPS (which consent shall not be unreasonably withheld, conditioned or delayed), sell the Pinnacle Turbines to a third party purchaser (in which case MPS shall perform all of the warranty obligations and service obligations to such third party and MHI will enter into a guaranty with such third party in the same form as the Master Guaranty); and

(e)     in the event (i) the Pinnacle Turbine Documents are not

LA1 - 146259.03

5

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269661

00934

executed within 60 days from the date hereof and EME decides not to deploy the Pinnacle Turbines at the Pinnacle Project, and (ii) EME does not designate one alternative project site for deployment of the Pinnacle Turbines by March 30, 2011, then (x) the amount set forth in Section 2.3(b) above shall be fully credited against the amounts payable by EME in respect of the Pinnacle Turbines, (y) EME shall pay to MPS the remaining balance due in respect of delivery of the Pinnacle Turbines, and take title to, and risk of loss of, the Pinnacle Turbines, not later than August 30, 2011 and (z) EME shall have the right to extend the storage and maintenance arrangement with MPS for the Pinnacle Turbines outlined in Section 3.3 below until August 30, 2012 and thereafter as mutually agreed by MPS and EME.

**Section 2.4    Goat Wind Project.** The Goat Wind Turbine Documents shall provide that a remaining amount of $4,110,836.79 (the "Final Goat Payment") shall be paid to MPS for the purchase of the Goat Wind Turbines and that such amount will be paid in full satisfaction of matters by and between EME and MPS relating to delivery, commissioning, substantial completion, power factor issues and Final Completion of the Goat Wind Turbines, other than expressly reserved in Section 6.2(b) below. On the Effective Date, EME shall (a) pay an amount equal to fifty percent (50%) of the Final Goat Wind Payment to MPS, and (b) deposit an amount equal to the remaining fifty percent (50%) of the Final Goat Wind Payment into an escrow account to be administered in accordance with an escrow letter mutually agreed by EME and MPS. The amount deposited into escrow pursuant to Section 2.4(b) shall be released to MPS upon the execution of the Goat Wind Turbine Documents.

## ARTICLE III

### ESCALATION ADJUSTMENT, STORAGE AND MAINTENANCE

**Section 3.1    Deletion of Escalation Adjustment.** The Parties agree that the Contract Price in respect of the 2008 Turbines and the 2009 Turbines set forth in the Master TSA shall not be subject to an Escalation Adjustment as contemplated in Section 5.1.6 (ii) of the Master TSA. The Parties therefore agree that:

(a)    Section 5.1.6 of the Master TSA shall be amended by deleting clause (ii) thereof which reads: "(ii) the Escalation Adjustment, if the Escalation Adjustment is required in accordance with Exhibit X (the "Escalation Adjustment Procedure")";

(b)    all references to the Escalation Adjustment be deleted from the Master TSA;

(c)    Exhibit X shall be deleted in its entirety from the Master TSA; and

(d)    none of the Project Specific Documents shall include an escalation adjustment to the contract price set forth thereunder.

**Section 3.2    Labor Escalation Adjustment.** Exhibit L to the Master TSA shall be replaced with a new Exhibit L which is attached hereto and which contains the adjustments to labor rates formerly contained in Exhibit X to the Master TSA. The Parties acknowledge that any references in the Master TSA or in any Project Specific Agreement to adjustments to labor

LA1 - 146259.03                                         6

MPSANDTX0269662

rates shall refer to the adjustment provisions of new Exhibit L.

**Section 3.3    Storage and Maintenance Fees for Taloga Turbines and Pinnacle Turbines**. MPS shall provide storage and maintenance services for the Taloga Turbines and the Pinnacle Turbines in accordance with the long term storage and maintenance procedures attached as Exhibit D (the "Storage Procedures"), provided however that nothing contained in such Storage Procedures shall amend or alter the terms of the Master TSA, the Taloga Turbine Documents, the Pinnacle Turbine Documents or the Goat Turbine Documents. In respect of the Taloga Turbines, until the Taloga Turbines are delivered pursuant to the Taloga Turbine Documents, EME shall continue to pay MPS the sum of (i) the actual storage costs paid by MPS to third party contractors for all Taloga Turbine components being stored plus a fee of ten percent (10%), (ii) the actual labor costs paid by MPS to third party contractors for storage and maintenance services plus a fee of ten percent (10%) and (iii) the contractual manpower rate under the Master Services Agreement for labor performed by MPS' employees (the items referred to in subsections (i) through (iii) collectively the "Storage and Maintenance Costs"). In respect of the Pinnacle Turbines, EME shall pay MPS the Storage and Maintenance Costs for the period commencing on the Effective Date until the Pinnacle Turbines are released from storage for delivery to the Pinnacle Project.

## ARTICLE IV

## REMAINING 60 TURBINES

**Section 4.1    Existence, Maintenance and Insurance of Remaining 60 Turbines**. MPS hereby represents that all of the 2009 Turbines have been manufactured and include the cold weather package and narrow tower configuration and that the current storage locations and serial numbers of the components of the 2009 Turbines are listed in Exhibit A to this Agreement. MPS shall, at its sole cost, maintain and store the 2009 Turbines contemplated by the Master TSA which are not intended for the Pinnacle Project (the "Remaining 60 Turbines") in accordance with the Storage Procedures and maintain customary insurance policies in respect of the Remaining 60 Turbines at all times prior to the transfer of title and delivery to EME or to a third party purchaser as contemplated in this Agreement. The Parties agree that, subject to the terms of this Agreement, with respect to the Remaining 60 Turbines, the Master TSA remains in full force and effect, provided however that, (a) EME shall have no obligation to take delivery of any of the Remaining 60 Turbines unless it elects to deploy any of such Remaining 60 Turbines for its wind energy projects under development pursuant to Section 4.2 of this Agreement, (b) if EME does elect to deploy any of such Remaining 60 Turbines for its wind energy projects under development pursuant to Section 4.2 of this Agreement, the purchase price for such Remaining 60 Turbines shall be the Remaining 60 Turbine Purchase Price set forth in Section 4.2 of this Agreement, and (c) unless EME elects to exercise its rights under Section 4.2 of this Agreement, the sole liability of EME to MPS with respect to the Remaining 60 Turbines shall be the Cover Payments and the Auction Price Delta Payments, all subject to the Difference Cap.

**Section 4.2    EME Due Consideration to Deploy Remaining 60 Turbines**. During the period commencing on the date of this Agreement and ending on the third $(3^{rd})$ anniversary of this Agreement (the "60 Turbine Postponement Period"), EME shall give due consideration to deploying the Remaining 60 Turbines for its wind energy projects under development, taking

LA1 - 146259.03                                                             7

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269663

into account factors including, but not limited to, the Remaining Turbine Purchase Price (as defined below), turbine efficiency, turbine performance, site suitability, warranty terms and financeability of the Remaining 60 Turbines, all as compared to other turbines available in the market. If EME elects to deploy some or all of the Remaining 60 Turbines pursuant to this Section 4.2, EME and MPS shall enter into turbine supply documentation in substantially the same form as the Taloga Turbine Documents (with such conforming changes as are required for the purchase of the Remaining 60 Turbines and the specific project), which turbine supply documentation shall include a payment schedule in substantially the same form as the payment schedule contained in the Master TSA including a requirement of EME to post a letter of credit on terms and conditions set forth in the Master TSA. If EME decides to deploy any of the Remaining 60 Turbines under this Section 4.2, the purchase price for such Remaining 60 Turbines (the "Remaining 60 Turbine Purchase Price") shall equal (a) the total number of kilowatts of capacity represented by such Remaining 60 Turbines multiplied by (b) U.S. $1,400.

### Section 4.3    Third Party Sales of Remaining 60 Turbines.

(a)    Notwithstanding EME's rights under Section 4.2 above, during the 60 Turbine Postponement Period, MPS shall give due consideration to selling the Remaining 60 Turbines to a third party not affiliated with either EME or MPS (a "Third Party Purchaser") on commercially reasonable terms and with warranties and other general terms and conditions (other than purchase price) which are no less favorable to the Third Party Purchaser that those set forth in the Taloga Turbine Documents, including, but not limited to a guaranty from MHI in substantially the same form as provided under the Taloga Turbine Documents.

(b)    If MPS receives a firm, written offer from a Third Party Purchaser to purchase some or all of the Remaining 60 Turbines, MPS shall, prior to entering into any agreement with such Third Party Purchaser for the purchase and sale of such Remaining 60 Turbines, notify EME of such offer, which notice shall include, reasonable details regarding all of the terms of the offer, including the price per kW, other payment terms, delivery schedule, warranty and service terms, the material terms of any other proposed agreements with the Third Party Purchaser and all other key terms of such offer (the "Purchase Notice"). EME agrees to maintain in confidence all information received in respect of the Purchase Notice.

(c)    EME shall, within 30 days after receipt of the Purchase Notice either (i) elect to accept delivery and complete its purchase of that portion of the Remaining 60 Turbines to which the Purchase Notice relates for an amount equal to (x) the price per kW purchase price set forth for the turbines in the Purchase Notice plus (y) the difference between the Remaining 60 Turbine Purchase Price less the price set forth in the Purchase Notice (which amount in (y) shall be subject to the Difference Cap as set forth in Section 5.1 below), or (ii) consent to the sale to such Third Party Purchaser of that portion of the Remaining 60 Turbines to which the Purchase Notice relates on the terms set forth in the Purchase Notice.

(d)    If EME elects to accept delivery and complete its purchase of the Remaining 60 Turbines set forth in the Purchase Notice, EME, MPS and MHI (as applicable) shall, within 60 days following such election by EME, enter into turbine supply documentation in substantially the same form as the Taloga Turbine Documents (with such conforming changes

LA1 - 146259.03

8

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269664

as may be required).

(e)   If EME elects to consent to the sale of that portion of the Remaining 60 Turbines set forth in the Purchase Notice to a Third Party Purchaser, MPS shall proceed with such sale on the terms set forth in the Purchase Notice, and, within 10 days following the consummation of such sale by MPS, MPS shall provide EME with a notice of such sale (the "Sale Notice"), which Sale Notice shall include copies of all related transaction documents and details of the total aggregate purchase price received or to be received by MPS from the Third Party Purchaser in connection with such purchase and sale (the "Third Party Purchase Price"). EME agrees to maintain in confidence all information received in respect of the Third Party Purchase Price. If MPS fails to consummate the sale to the Third Party Purchaser within 120 days after EME consenting to such sale, MPS shall not consummate such sale without first repeating the procedures set forth in this Section 4.3. MPS shall promptly provide EME with such additional information as EME shall reasonably request in respect of the Third Party Purchase Price and EME shall be permitted to inspect and audit all documentation and the books and records of MPS that pertain to such sale and MPS shall make all such documentation, books and records available to EME promptly upon request. If, following such audit by EME, EME disputes the Third Party Purchase Price, such dispute shall be resolved in accordance with the dispute resolution procedures set forth in Article 20 of the Master TSA.

(f)   Upon (i) the date which is sixty (60) days following the Sale Notice, which date shall be extended on a day for day basis for each day MPS does not allow EME access or information to audit the Third Party Purchase Price in accordance with Section 4.3(e) above), or, (ii) if EME has disputed the Third Party Purchase Price, within sixty (60) days following the final resolution of the Third Party Purchase Price pursuant to the dispute resolution procedures set forth in Article 20 of the Master TSA, EME shall elect to either (x) pay to MPS an amount (the "Cover Payment") equal to (A) the Remaining 60 Turbine Purchase Price, less (B) the Third Party Purchase Price, provided that in no event shall the aggregate of all Cover Payments and Auction Delta Payments (as defined in Section 4.4(b) below) exceed the then existing Difference Cap (as defined in Section 5.1 below) or (y) provide notice to MPS that EME does not wish to pay the Cover Payment at such time and that it desires MPS to replace the Remaining 60 turbines sold to the Third Party Purchaser with identical model wind turbines generators to those sold to the Third Party Purchaser and provide serial numbers and locations of the turbine components for such replacement wind turbine generators.

(g)   If EME elects to provide notice to MPS that it does not wish to pay the Cover Payments at the time then MPS shall replace the Remaining 60 Turbines following any such sale to the Third Party Purchaser with identical model wind turbines in accordance with Section 4.3(f) above, EME shall not be required to pay the Cover Payment at the time of such sale to a Third Party Purchaser,  MPS shall promptly replace the Remaining 60 Turbines sold to the Third Party Purchaser and promptly provide serial numbers and locations for each of the replacement turbines and the replacement wind turbine generators shall be deemed to be Remaining 60 Turbines for the purposes of this Agreement.

(h)   Notwithstanding anything to the contrary in this Section 4.3, if a Third Party Purchaser prohibits disclosure to EME of the information required to be included with any Purchase Notice or any Sale Notice, then MPS shall not proceed with a sale to such

LA1 - 146259.03                                          9

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269665

Third Party Purchaser (without EME's consent).

### Section 4.4    Sale at Auction.

(a)    At any time during the 60 Turbine Postponement Period, EME may request, by written notice to MPS, that MPS have all or whatever portion of the Remaining 60 Turbines which remain unsold to EME or a Third Party Purchaser offered at public auction (in the markets of Japan, the US, Canada and Mexico only). Within 30 days after EME's written notice, MPS shall provide written consent to such request. MPS may not unreasonably withhold, condition or delay its consent. If MPS consents to such a request, MPS shall within 30 days following the provision of its written consent have all or whatever portion of the Remaining 60 Turbines which remain unsold to EME or a Third Party Purchaser offered at public auction (in the markets of Japan, the US, Canada and Mexico only). For proprietary and trade secret reasons, competitors of MPS (and its affiliates) in the manufacture of wind turbines will not be acceptable purchasers at auction. Any such public auction shall be performed by a nationally recognized auctioneer and pursuant to terms reasonably acceptable to EME and MPS. The Remaining 60 Turbines sold under such public auction shall be sold for all cash, with warranty terms substantially the same as those set forth in the Master TSA and MPS shall represent and warrant to the purchaser that such Remaining 60 Turbines (i) were new when placed into storage and (ii) have been maintained in accordance with the Storage Procedures. The Parties agree that in connection with an auction other than one conducted under clause (d) below, the minimum bid price for the Remaining 60 Turbines will be $1,180/kw.

(b)    The Parties agree that EME and MPS shall be permitted to bid at any such public auction. If EME successfully purchases all or any portion of the Remaining 60 Turbines at a public auction, in addition to the price payable by EME at such auction, EME shall make an Auction Delta Payment to MPS. For the purposes of this Agreement the "Auction Delta Payment" be an amount equal to the difference between (i) the Remaining 60 Turbines Purchase Price less (ii) the amount paid for the purchase of the Remaining 60 Turbines at such auction, provided that in no event shall the aggregate of all Auction Delta Payments and Cover Payments exceed the Difference Cap (as defined in Section 5.1 below). MPS shall provide all of the auction sale documents to EME promptly following the auction.

(c)    Within 60 days following the consummation of a sale of any of the Remaining 60 Turbines at public auction to a third party (or to MPS if it is the successful bidder), EME shall pay to MPS an amount equal to the Auction Delta Payment, provided that in no event shall the aggregate of all Auction Delta Payments and Cover Payments exceed the Difference Cap (as defined in Section 5.1 below).

(d)    If at the end of the 60 Turbine Postponement Period any of the Remaining 60 Turbines remain unsold, MPS shall have such Remaining 60 Turbines offered at public auction (in the markets of Japan, the US, Canada and Mexico only) within 90 days after the end of the 60 Turbine Replacement Period and the provisions of Section 4.4 (b) and (c) shall apply.

LA1 - 146259.03                                    10

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269666

## ARTICLE V

### DIFFERENCE CAP, SOLE REMEDY, NO LIABILITY, CONDITIONS TO EFFECTIVENESS

**Section 5.1** **Difference Cap.** Notwithstanding anything contained in this Agreement, in no event shall EME's total liability with respect to the aggregate amounts of the Cover Payments and the Auction Delta Payments exceed Thirty One Million, Five Hundred U.S. Dollars ($31,500,000) (the "Difference Cap"). Further the Difference Cap shall be immediately reduced if EME purchases any of the Remaining 60 Turbines to an amount equal to (i) $31,500,000 multiplied by (ii) the quotient of (x) the Remaining 60 Turbines not purchased by EME divided by (y) sixty (60). Upon payment by EME to MPS of the Final Goat Wind Payment, the Difference Cap shall be automatically reduced by US $1,500,000.

**Section 5.2** **Cover Payment and Auction Delta Payment Sole Remedy.** Unless EME has elected to take delivery of any of the Remaining 60 Turbines under Section 4.2 above, in which case EME's payment liability to MPS shall be as set forth in Section 4.2 above and confirmed in the Project Specific Documents evidencing such purchase, (a) making the Cover Payment and the Auction Delta Payment (which are in all cases subject to the Difference Cap as set forth in Section 5.1) shall be EME's sole obligation in respect of the Remaining 60 Turbines and (b) MPS's sole and exclusive remedy in respect of a failure by EME to perform any obligations under this Agreement or the Master TSA with respect to the Remaining 60 Turbines shall be a claim against EME for Cover Payments and Auction Delta Payments in amounts not to exceed the Difference Cap.

**Section 5.3** **No liability for Cover Payments or Auction Delta Payments if MPS Materially Fails to perform at Taloga Project or Pinnacle Project.** If MPS (a) in bad faith fails or unjustifiably refuses to deliver or commission the Taloga Turbines or the Pinnacle Turbines or provide technical assistance in the delivery, mechanical completion or commissioning of the Taloga Turbines or the Pinnacle Turbines in accordance with MPS' contractual obligations, or (b) abandons its obligations under the project specific Wind Turbine Generator Supply Agreement for the Taloga Turbines or the Pinnacle Turbines, then EME shall have no obligation to pay and EME shall be expressly released from (a) any obligation to consider the Remaining 60 Turbines in its future development plans, (b) any obligation to pay any amounts in respect of the Cover Payments, (c) any obligation to pay any amounts in respect of the Auction Delta Payments and (d) any obligation to make the Settlement Payments set forth in Section 1.1(b) or Section 1.1(c).

**Section 5.4** **Conditions to Effectiveness of this Agreement.** This Agreement shall be effective on the date upon which the following conditions precedent are satisfied (the "Effective Date"):

(a)     the execution and delivery of this Agreement by all of the Parties hereto (by its execution of this Agreement, MHI expressly consents to the terms of this Agreement and reaffirms its obligations under the Master Guaranty);

(b)     the execution and delivery by the Parties of the Taloga Turbine

LA1 - 146259.03                                                11

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269667

Documents;

        (c)     the satisfactory inspection by EME of the Taloga Turbines which EME agrees to use its commercially reasonable efforts to complete within 5 business days after the date hereof.; and

        (d)     payment by EME to MPS of the $20,000,000 required under Section 1.1 above.

**Section 5.5**   **Covenant regarding Separate Agreements**. The Parties agree that promptly, but in no event later than 2 Business Days after the Effective Date, they shall enter into two separate agreements, one amending the Master TSA and the other a settlement agreement, containing the same terms set forth in this Agreement. Such separate agreements shall fully replace this Agreement. This Agreement shall remain in full force and effect until execution of such separate agreements.

## ARTICLE VI

## DISMISSALS, MUTUAL RELEASE OF THE LAWSUIT (SA)

**Section 6.1**   **Dismissals**. Within 2 days after the Effective Date, the Parties shall file a dismissal of the Lawsuit with prejudice substantially in the form attached hereto as Exhibit E.

**Section 6.2**   **Mutual Release Of Claims In The Lawsuit.**

        (a)     Subject to the obligations imposed by this Agreement and except as to any claims that may arise out of the future breach of this Agreement or a future breach of any of the applicable surviving agreements between the parties, EME, MPS, and MHI (on behalf of themselves and anyone who may claim through them, including without limitation, their heirs, successors, assigns, affiliates and each of their respective employees, officers, directors, representatives, partners, members, agents, attorneys and beneficiaries) each release the other (including, without limitation, their heirs, successors, assigns, employees, officers, directors, representatives, agents, attorneys and beneficiaries) from any and all known actions, causes of action, obligations, costs, expenses, attorney's fees, damages, losses, claims, liabilities and demands whatsoever, disclosed and undisclosed, arising out of or in any way related to the agreements, acts, allegations or conduct between the parties raised, arising out of or related to the claims in the Lawsuit, at any time prior to the Effective Date of this Agreement; and

        (b)     Subject to Section 6.2(a), the Parties further agree that the release herein expressly excludes any and all claims for breach of the continuing obligations of the Parties under this Agreement, any of the Project Specific Documents or any other surviving agreement, including, without limitation, the equipment warranty, power curve warranty, availability warranty, noise guarantee, contractual indemnity, intellectual property warranty, warranty of title or otherwise or any matters related to the 1.0MW wind turbine generators manufactured and sold by MHI and MPS and owned by EME or its affiliates.

LA1 - 146259.03        12

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269668

## ARTICLE VII

### MISCELLANEOUS

**Section 7.1    Attorneys' Fees and Costs.** The Parties shall be responsible for the payment of their own court costs, attorneys' fees, litigation expenses, and other sums which have been expended or incurred to date in conjunction with the matters referenced in this Agreement, including all attorneys' fees and costs incurred in connection with the Lawsuit.

**Section 7.2    Representations and Warranties of the Parties.**

(a)    Except as expressly set forth herein or any of the Project Specific Documents, no Party (nor any officer, agent, employee, representative, or attorney) has made any statement or representation to any other Party regarding any fact relied upon in entering into this agreement, and no Party is relying upon any statement, representation, or promise of any other Party (or any officer, agent, employee, representative or attorney) in executing this Agreement, or in making this settlement, except as expressly stated in this agreement;

(b)    The Parties each represent and declare that in executing this Agreement they have relied solely upon their own judgment, belief, and knowledge, and the advice and recommendation of their own independently selected counsel, concerning the nature, extent, and duration of their rights and claims; and

(c)    No Party, their heirs, their successors, their assigns, nor any other person acting in concert with them has assigned, transferred, or granted any of the claims, demands, or causes of action that are settled and resolved by this Agreement and/or asserted in the Lawsuit.

**Section 7.3    Confidentiality Regarding Settlement.** Except as otherwise required by law or required by their auditors, the Parties agree that the terms of this Agreement shall be confidential. In addition to any disclosures the Parties and/or their independent auditors determine, in their sole and absolute discretion, that the respective Parties are required by law to make, the Parties agree to use the language detailed in Exhibit "E" in response to any inquiries or as a public statement regarding this settlement.

**Section 7.4    Counterparts.** This agreement may be executed in one or more counterparts and shall be read to amend the Master TSA, or other applicable agreements between the Parties, only as expressly stated herein, each of which agreements shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties may execute this agreement via facsimile or pdf.

**Section 7.5    Entire Agreement.** To the extent, and only to the extent that this Agreement modifies the Master TSA, or other applicable agreements between the Parties, for purposes of settling the claims in the Lawsuit, this Agreement constitutes the final and exclusive agreement between the Parties, and all prior and contemporaneous agreements representations, negotiations, and understandings of the Parties, oral or written, inconsistent with the terms herein

LA1 - 146259.03                                                      13

between the date of the Master TSA, as subsequently modified, was executed and the Effective Date herein, are superseded and merged into this Agreement.

Section 7.6    Modification.  No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless the same is in writing and signed by all Parties.

Section 7.7    Construction.  This Agreement was not drafted by any one party and shall not be construed or interpreted against any one party.

Section 7.8    Severability.  If any provision or other portion of this Agreement shall become illegal, null or void or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null, or void or against public policy, the remaining portions of this Agreement shall not be affected and shall remain in force and effect to the fullest extent permissible by law.

Section 7.9    No Admission of Liability.  This Agreement represents a compromise disposition of controverted claims, and by executing this Agreement, none of the Parties admit liability for any of the matters discussed in this Agreement or alleged in the Lawsuit.

Section 7.10   Successors and Assigns.  Each and all covenants and conditions of this Settlement Agreement shall inure to the benefit of, and shall be binding upon, the heirs, successors in interest, assigns, and legal representatives of the Parties.

Section 7.11   Governing Law.  This Agreement and all matters arising hereunder or in connection herewith shall be governed by and construed in accordance with the internal laws of the State of New York without regard to conflicts of laws or choice of laws principles (other than Section 5-1401 of the General Obligations Law).

Section 7.12   Capitalized Terms.  Capitalized terms used herein and not defined shall have the meaning set forth in the Master TSA.

Section 7.13   Defaults.  The Parties agree and acknowledge that, as of the Effective Date of this Agreement, none of the Parties have any knowledge of any default under the Master TSA, the Master Services Agreement and the Master Guaranty.

[Signature Page follows]

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269670

00943

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement, Mutual Release and Amendment to Wind Turbine Generator Supply Agreement on the day and year first written above.

**MPS:**

MITSUBISHI POWER SYSTEMS AMERICAS, INC.,
a Delaware corporation

By: _____
Name:    Koji Hasegawa
Title:    President and Chief Executive Officer

**MHI:**

MITSUBISHI HEAVY INDUSTRIES LTD.,
a corporation organized under the laws of Japan

By: _____
Name:
Title:

*MPS and MHI Signature Page to Settlement Agreement, Mutual Release and Amendment to Wind Turbine Generator Supply Agreement*

LA1 - 146259.03

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269671

**IN WITNESS WHEREOF,** the Parties have executed this Settlement Agreement, Mutual Release and Amendment to Wind Turbine Generator Supply Agreement on the day and year first written above.

**EME:**

EDISON MISSION ENERGY,
a Delaware corporation

By: _____
Name:    Ronald L. Litzinger
Title:    Chairman of the Board, President and Chief Executive Officer

*EME Signature Page to Settlement Agreement, Mutual Release and Amendment to Wind Turbine Generator Supply Agreement*

LA1 - 146259.03

**CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F**

MPSANDTX0269672

00945

## EXHIBIT A

### INVENTORY OF 2009 TURBINES

(including configuration, quantities and location)

LA1 - 146259.02

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269673

00946

Nacelle Front Module Component Serial Number List

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 31 | N-W 4227 | Japan |
| 2 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 32 | N-W 4228 | Japan |
| 3 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 33 | N-W 4229 | Japan |
| 4 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 34 | N-W 4230 | Japan |
| 5 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 35 | N-W 4231 | Japan |
| 6 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 36 | N-W 4232 | Japan |
| 7 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 37 | N-W 4233 | Japan |
| 8 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 38 | N-W 4234 | Japan |
| 9 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 39 | N-W 4235 | Japan |
| 10 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 40 | N-W 4236 | Japan |
| 11 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 41 | N-W 4237 | Japan |
| 12 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 42 | N-W 4238 | Japan |
| 13 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 43 | N-W 4239 | Japan |
| 14 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 44 | N-W 4240 | Japan |
| 15 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 45 | N-W 4241 | Japan |
| 16 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 46 | N-W 4242 | Japan |
| 17 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 47 | N-W 4243 | Japan |
| 18 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 48 | N-W 4244 | Japan |
| 19 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 49 | N-W 4245 | Japan |
| 20 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 50 | N-W 4246 | Japan |
| 21 | 0F208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 51 | N-W 4247 | Japan |
| 22 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 52 | N-W 4248 | Japan |
| 23 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 53 | N-W 4249 | Japan |
| 24 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 54 | N-W 4250 | Japan |
| 25 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 55 | N-W 4251 | Japan |
| 26 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 56 | N-W 4252 | Japan |
| 27 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 57 | N-W 4253 | Japan |
| 28 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 58 | N-W 4254 | Japan |
| 29 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 59 | N-W 4255 | Japan |
| 30 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 60 | N-W 4256 | Japan |
| 31 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y13 | N-W 9073 | San-Diego Port |
| 32 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y14 | N-W 9074 | Japan |
| 33 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y15 | N-W 9075 | San-Diego Port |
| 34 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y16 | N-W 9076 | San-Diego Port |
| 35 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y17 | N-W 9077 | San-Diego Port |
| 36 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y18 | N-W 9078 | San-Diego Port |
| 37 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y19 | N-W 9079 | San-Diego Port |
| 38 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y20 | N-W 9080 | San-Diego Port |
| 39 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y21 | N-W 9081 | San-Diego Port |
| 40 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y22 | N-W 9082 | San-Diego Port |
| 41 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y23 | N-W 9083 | San-Diego Port |
| 42 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y24 | N-W 9084 | San-Diego Port |
| 43 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y25 | N-W 9085 | San-Diego Port |
| 44 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y26 | N-W 9086 | San-Diego Port |
| 45 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y27 | N-W 9087 | San-Diego Port |
| 46 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y28 | N-W 9088 | San-Diego Port |
| 47 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y29 | N-W 9089 | San-Diego Port |
| 48 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y30 | N-W 9090 | San-Diego Port |
| 49 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y31 | N-W 9091 | San-Diego Port |
| 50 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y32 | N-W 9092 | San-Diego Port |
| 51 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y33 | N-W 9093 | San-Diego Port |
| 52 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y34 | N-W 9094 | San-Diego Port |
| 53 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y35 | N-W 9095 | San-Diego Port |
| 54 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y36 | N-W 9096 | San-Diego Port |
| 55 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y37 | N-W 9097 | Japan |

**EXHIBIT "A"**

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269674

Nacelle Front Module Component Serial Number List

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 56 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y38 | N-W 9098 | Japan |
| 57 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y39 | N-W 9099 | Japan |
| 58 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y40 | N-W 9100 | Japan |
| 59 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y41 | N-W 9101 | Japan |
| 60 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y42 | N-W 9102 | Japan |
| 61 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y43 | N-W 9103 | Japan |
| 62 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y44 | N-W 9104 | Japan |
| 63 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y45 | N-W 9105 | Japan |
| 64 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y46 | N-W 9106 | Japan |
| 65 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y47 | N-W 9107 | Japan |
| 66 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y48 | N-W 9108 | Japan |
| 67 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y49 | N-W 9109 | Japan |
| 68 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y50 | N-W 9110 | Japan |
| 69 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y51 | N-W 9111 | Japan |
| 70 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y52 | N-W 9112 | Japan |
| 71 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y53 | N-W 9113 | Japan |
| 72 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y54 | N-W 9114 | Japan |
| 73 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y55 | N-W 9115 | Japan |
| 74 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y56 | N-W 9116 | Japan |
| 75 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y57 | N-W 9117 | Japan |
| 76 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y58 | N-W 9118 | Japan |
| 77 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y59 | N-W 9119 | Japan |
| 78 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y60 | N-W 9120 | Japan |
| 79 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y61 | N-W 9121 | Japan |
| 80 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y62 | N-W 9122 | Japan |
| 81 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y63 | N-W 9123 | Japan |
| 82 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y64 | N-W 9124 | Japan |
| 83 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | Y65 | N-W 9125 | Japan |

CONFIDENTIAL. OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269675

Nacelle Rear Module Component Serial Number List

| Order # | PI Name | Type | Factory | RNo | Mill | Storage Location |
|---|---|---|---|---|---|---|
| 1 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 42 | N-W 4070 | Galveston Port |
| 2 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 43 | N-W 4071 | Galveston Port |
| 3 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 44 | N-W 4072 | Galveston Port |
| 4 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 45 | N-W 4073 | Galveston Port |
| 5 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 46 | N-W 4074 | Galveston Port |
| 6 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 80 | N-W 4108 | Galveston Port |
| 7 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 81 | N-W 4109 | Galveston Port |
| 8 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 82 | N-W 4110 | Galveston Port |
| 9 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 83 | N-W 4111 | Galveston Port |
| 10 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 1 | N-W 4257 | Galveston Port |
| 11 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 2 | N-W 4258 | Galveston Port |
| 12 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 3 | N-W 4259 | Galveston Port |
| 13 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 4 | N-W 4260 | Galveston Port |
| 14 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 13 | N-W 4269 | San-Diego Port |
| 15 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 14 | N-W 4270 | San-Diego Port |
| 16 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 15 | N-W 4271 | San-Diego Port |
| 17 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 16 | N-W 4272 | San-Diego Port |
| 18 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 21 | N-W 4277 | San-Diego Port |
| 19 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 22 | N-W 4278 | San-Diego Port |
| 20 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 23 | N-W 4279 | San-Diego Port |
| 21 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 24 | N-W 4280 | San-Diego Port |
| 22 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 25 | N-W 4281 | San-Diego Port |
| 23 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 26 | N-W 4282 | San-Diego Port |
| 24 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 27 | N-W 4283 | San-Diego Port |
| 25 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 29 | N-W 4285 | San-Diego Port |
| 26 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 36 | N-W 4292 | San-Diego Port |
| 27 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 38 | N-W 4066 | Longview Port |
| 28 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 39 | N-W 4067 | Longview Port |
| 29 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 40 | N-W 4068 | Longview Port |
| 30 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 1 | N-W 4197 | Longview Port |
| 31 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 9 | N-W 4205 | Longview Port |
| 32 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 11 | N-W 4207 | Longview Port |
| 33 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 12 | N-W 4208 | Longview Port |
| 34 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 13 | N-W 4209 | Everett Port |
| 35 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 18 | N-W 4214 | Longview Port |
| 36 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 19 | N-W 4215 | Longview Port |
| 37 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 20 | N-W 4216 | Longview Port |
| 38 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 21 | N-W 4217 | Longview Port |
| 39 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 22 | N-W 4218 | Longview Port |
| 40 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 23 | N-W 4219 | Longview Port |
| 41 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 24 | N-W 4220 | Longview Port |
| 42 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 25 | N-W 4221 | Longview Port |
| 43 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 26 | N-W 4222 | Longview Port |
| 44 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 27 | N-W 4223 | Longview Port |
| 45 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 28 | N-W 4224 | Longview Port |
| 46 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 29 | N-W 4225 | Longview Port |
| 47 | 0E208 | EDISON 2009 | MWT95/2.4 | Nagasaki | 30 | N-W 4226 | Longview Port |
| 48 | 0E208 | EDISON 2009 | MWT92/2.4 | Yokohama | 75 | N-W 4103 | Longview Port |
| 49 | 0E208 | EDISON 2009 | MWT92/2.4 | Yokohama | 76 | N-W 4104 | Longview Port |
| 50 | 0E208 | EDISON 2009 | MWT92/2.4 | Yokohama | 79 | N-W 4107 | Longview Port |
| 51 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 5 | N-W 4261 | Everett Port |
| 52 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 6 | N-W 4262 | Everett Port |
| 53 | 0E208 | EDISON 2009 | MWT95/2.4 | Yokohama | 7 | N-W 4263 | Everett Port |

CONFIDENTIAL OUTSIDE ATTORNEY EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER: CIV. ACT. N. 3:10-CV-276-F

MPSANDTX0269676