**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

GENERAL ELECTRIC COMPANY,

      *Plaintiff,*

v.

MITSUBISHI HEAVY INDUSTRIES,
LTD., AND MITSUBISHI POWER
SYSTEMS AMERICAS, INC.,

      *Defendants.*

Civil Action No. 3:10-CV-276-F

**OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE**
**EXPERT REPORT OF MICHAEL A. CARRIER**

TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................. 1

ARGUMENT ...................................................................................................... 3

I.    Governing Legal Standard ......................................................................... 3

II.   GE's Motion to Strike Should Be Denied.................................................. 4

  A.    Summary of Professor Carrier's Background and Opinion.................................... 4

  B.    Professor Carrier Does Not Opine on Any Ultimate Question of Law ................. 6

  C.    Professor Carrier's Opinions Rest on a Reliable Foundation and are Relevant .... 9

  D.    GE's Disagreements With Predicate Facts in Professor Carrier's Report Are
        Without Merit ................................................................................................ 13

    1.    Bonuses Provided to Employees ..................................................... 14

    2.    GE Engaged in Patent Blocking ..................................................... 15

    3.    GE Was More Likely To Know About Prior Art ............................. 16

    4.    Competitive Harm Is Helpful In Understanding Motive.................. 17

CONCLUSION .................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aspex Eyewear, Inc. v. Elite Optik, Inc.*,
No. 98-CV-2996, 2002 WL 1751381 (N.D. Tex. Apr. 4, 2002) ................................... 9

*Borg Warner, Inc. v. Honeywell Int'l, Inc.*,
750 F. Supp 2d 596 (W.D.N.C. 2010) ........................................................................... 8

*Buckley v. Airshield Corp.*,
116 F. Supp. 2d 658 (D. Md. 2000) .............................................................................. 8

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 539 (1993) ........................................................................................... 3, 4, 13

*Fuji Photo Film Co. v. Jazz Photo Corp.*,
394 F.3d 1368 (Fed. Cir. 2005) (GE Motion 4) ........................................................... 9

*Gibbs v. Gibbs*,
210 F.3d 491 (5th Cir. 2000) ....................................................................................... 4

*Guy v. Crown Equip. Corp.*,
394 F.3d 320 (5th Cir. 2004) ....................................................................................... 4

*Joovy LLC v. Target*,
No. 06-cv-616F, 2012 WL 1006695 (N.D. Tex. Mar. 17, 2010) ................................ 13

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ..................................................................................................... 3

*Micro Chemical Inc v. Lextron Inc.*,
317 F.3d 1387 (Fed. Cir. 2003) .............................................................................. 4, 13

*Pharmacia Corp. v. Par Pharm, Inc.*,
No. 01-6011, 2004 WL 5614917 (D.N.J. Feb. 18, 2004) ............................................ 8

*Pipitone v. Biomatrix, Inc.*,
288 F.3d 239 (5th Cir.2002) ....................................................................................... 13

*Ring Plus, Inc. v. Cingular, Witness LLC*,
637 F. Supp. 2d 423 (E.D. Tex. 2009) ......................................................................... 9

*Seaboard Lumber Co. v. United States*,
    308 F.3d 1283 (Fed.Cir.2002) ....................................................................... 4

*Sercu v. Lab. Corp. of Am.*,
    3:09-CV-0619-LRH-RAM, 2011 WL 181402 (D. Nev. Jan. 15, 2011) .................... 13

*Therasense, Inc. v. Becton, Dickenson & Co.*,
    No. C-04-02123, 2008 WL 2037732 (N.D. Cal. May 12, 2008) .................................. 8

*Thompson v. Rowan Companies*,
    No. 06-3218, 20007 ................................................................................... 4

*Total Clean LLC v. Ondeo Naleo Co.*,
    2003 WL 25676464 (W.D. Tex. 2003) ........................................................... 13

*U.S. ex rel. Pogue v. Diabetes Treatment Centers of America*,
    474 F. Supp. 2d 75 (D.D.C. 2007) ................................................................. 3

*United States v. Leuben*,
    812 F.2d 179 (5th Cir. 1987) ....................................................................... 8

*United States v. Long*,
    300 Fed. Appx. 804 (11th Cir. Nov. 25, 2008) ............................................... 8

*United States v. Piperi*,
    101 F.3d 697 (5th Cir. 1996) ....................................................................... 8

*United States v. Simmons*,
    470 F.3d 1115 (5th Cir. 2006) ..................................................................... 8

*Viterbo v. Dow Chem. Co.*,
    826 F.2d 420 (5th Cir. 1998) ....................................................................... 13

*Waco International v. KHK Scaffolding Houston, Inc.*,
    278 F.3d 523 (5th Cir. 2002) ....................................................................... 8

*Wlliams v. Guadalupe County Texas*,
    No. SA-04-CA-1058-RF, 2006 WL 17677690 (W.D. Tex. 2006) ............................ 13

**RULES**

Fed. R. Civ. P. 12(f) ...................................................................................... 3

Fed. R. Evid. 702 ................................................................................ 3, 10, 11, 13

**BOOKS AND ARTICLES**

David F. Noble, AMERICA BY DESIGN 93 (1977)............................................................. 12

Defendants Mitsubishi Heavy Industries, Ltd. and Mitsubishi Power Systems Americas, Inc. (collectively, "Mitsubishi") respectfully submit this opposition to the Motion of General Electric Company to Strike the Expert Report of Professor Michael Carrier (Doc. No. 607).

## INTRODUCTION

Professor Carrier has offered an analysis showing that GE's patent blocking strategies made it more likely that GE intended to deceive the patent office. Unhappy with Professor Carrier's opinions, GE moves to exclude them. GE claims that Professor Carrier improperly opines on an ultimate legal issue. His report shows the contrary. Professor Carrier has opined on the corporate strategies of GE in procuring U.S. patents to block competitors, and his opinions regarding these strategies serve to inform whether the evidence of record establishes intent. Professor Carrier repeatedly testified in his deposition that he does not intend to opine on any legal conclusions at trial – which he acknowledges are issues for the Court to decide. In fact, GE's own rebuttal expert has agreed that Professor Carrier has not opined on the ultimate issue of intent.

Contrary to GE's assertions, Professor Carrier's opinions are relevant and helpful. In any inequitable conduct case, proof of deception almost always is based on circumstantial evidence. This is because, as GE's rebuttal expert acknowledged, individuals seldom come forward and acknowledge that they acted with intent to deceive. (MHI App. 2). At trial, Mitsubishi will provide powerful and convincing proof of how and why GE Wind set its sight on dominating the U.S. wind market not by superior product quality, but by obtaining patents on technology – whether or not GE had invented

the technology – necessary for connecting wind turbines to the grid.  GE Wind applicants

knew that its competitors had been practicing this technology for years.  Professor

Carrier's opinions and expertise provide useful insights and help one understand the array

of facts that contribute to the telling of the entire story.

GE's motion quibbles over the persuasiveness of Professor Carrier's opinions.  At

most, GE's arguments go to the weight to be accorded to Professor Carrier's opinions

rather than their admissibility.  For example, Professor Carrier opines that GE's strategy

of seeking "broad method patents" is one indicator of a patent blocking strategy.  GE

complains that these practices are "perfectly legal and even encouraged" (GE Motion 8),

but this misses Professor Carrier's point.  As Professor Carrier explains and GE's rebuttal

expert concedes, a company is more likely to capture material prior art through broadly

written claims.  Professor Carrier opines that these strategies, combined with a strong

financial motive to obtain market share, make it more likely that GE Wind intended to

deceive the patent office when it filed the '705 patent.

While GE may disagree with his conclusions, Professor Carrier's opinions are

admissible because he is well qualified to understand the anti-competitive business

strategies that inspire inequitable conduct.  Professor Carrier has also laid a solid

foundation for his opinions, and he is qualified to opine based on his many years of

observing and studying anti-competitive business strategies involving intellectual

property.  In fact, Professor Carrier has written more than any other person in this country

on the intersection of antitrust and intellectual property law.  GE may be unhappy that

Mitsubishi has engaged as an expert witness one of America's pre-eminent experts in this

2

area, and may be even less happy that his opinions support Mitsubishi's contention that

GE engaged in misleading conduct with intent to deceive the PTO.  But GE has failed to

demonstrate that Professor Carrier lacks the knowledge and experience necessary for the

admissibility of his opinions.

**ARGUMENT**

## I.      Governing Legal Standard

Although GE does not cite the federal rule procedurally governing the present

motion, by its caption and the relief sought, GE apparently relies on Fed. R. Civ. P. 12(f)

directed to motions to strike.  That rule, however, is limited to pleadings – an expert

report is not a pleading and, therefore, not subject to it.  Mitsubishi has not filed Professor

Carrier's expert report with the Court or otherwise made it part of the record in this case.

Thus, there is nothing for the Court to "strike."  *See U.S. ex rel. Pogue v. Diabetes

Treatment Centers of America*, 474 F. Supp. 2d 75, 80 (D.D.C. 2007) (disclosure of

expert report is neither testimony nor a pleading, and therefore cannot properly be

stricken under the Federal Rules of Civil Procedure).

GE's motion seeks more generally to exclude his anticipated testimony at trial.  As

such, Mitsubishi assumes for the sake of argument that the Motion is intended as a

*Daubert*-type motion to exclude Professor Carrier's trial testimony.  *See Daubert v.

Merrell Dow Pharm., Inc.*, 509 U.S. 539 (1993); *see also Kumho Tire Co. v. Carmichael*,

526 U.S. 137 (1999).  Under Federal Rule of Evidence 702, an expert may be qualified

by virtue of his "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.

Every *Daubert* factor need not be satisfied for expert opinions to be admitted; the

3

standard is a flexible one that allows a court to admit testimony it finds reliable and

relevant.  *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).  Fifth Circuit

law governs.  *See Micro Chemical Inc v. Lextron Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir.

2003) (applying Fifth Circuit case law to *Daubert* challenge).

Professor Carrier's testimony satisfies the criteria of *Daubert*.  It is reliable and

relevant.  Moreover, this matter is to be tried to the bench.  "Most of the safeguards

provided for in *Daubert* are not as essential in a case such as this where a district judge

sits as the trier of fact in place of a jury."  *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir.

2000).  "*Daubert* requires a binary choice – admit or exclude – and a judge in a bench

trial should have discretion to admit questionable technical evidence, though of course he

must not give it more weight than it deserves."  *Thompson v. Rowan Companies*, No. 06-

3218, 20007 WL 724646 (E.D. La. Mar. 6, 2007) (quotations and citation omitted); *see

also Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1301-02 (Fed.Cir.2002)

(explaining that in the context of a bench trial the *Daubert* standard must still be applied

but the concerns about expert evidence misleading a jury "are of lesser import").

## II.     GE's Motion to Strike Should Be Denied

### A.     Summary of Professor Carrier's Background and Opinion

Over the last twenty years, Professor Carrier has studied extensively the behaviors

of companies in various industries when seeking and obtaining patents.  *See* MHI App.

42 (Dep. Tr. 31-32) (explaining that he has "spent an academic career figuring out how

patents are used in different industries and different markets."); *see id*. 57 (Dep. Tr.

129:1-2) ("I have, throughout my career, focused on how patents are used").  He is Yale-

educated and has authored over one hundred articles and presentations. *See* MHI App.

63-74 (Prof. Carrier's CV). His book – *Innovation for the 21st Century: Harnessing the*

*Power of Intellectual Property and Antitrust Law* (Oxford Press) – is the first book

wholly covering the intersection between patent and antitrust law. It received global

acclaim. (GE App. 8 ¶19). His book discusses inequitable conduct, as do other articles

written by him. MHI App. 44 (Dep. Tr. 39-41). Professor Carrier has consulted with

companies in numerous industries and has read "countless" patents in the course of his

scholarship. MHI App. 42-43 (Dep. Tr. 32, 35, 37). He is on the board of advisors of the

American Antitrust Institute and is one of the "go-to people whenever a patent issue

comes up." MHI App. 45 (Dep. Tr. 44). Professor Carrier is not a professional witness

and does not make a living by providing litigation support – in fact, he has never been

deposed before this case.

On May 14, 2012, Professor Carrier has submitted a 48-page expert report with

extensive findings and analysis. *See* GE App. 1-49 (Doc. 608). "Patent blocking" is,

according to his report, "the use of patents to harm competitors rather than to protect any

innovation of the applicant." Carrier Report at ¶ 3 (GE App. 3). In his report, Professor

Carrier explains the indicators of a patent-blocking strategy and how GE's conduct

exhibited these indicators. *See* Carrier Report ¶¶ 5-17, 44-145 (GE App. 4-8, 16-48).

Professor Carrier also identifies patterns in GE's conduct – conduct indicating a

willingness to obtain and attempt to enforce patents irrespective of their invalidity in

order to gain market share. (GE App. 30-32). He concludes: "GE Wind's pursuant of a

patent-blocking strategy makes three material facts more likely" – (1) that "GE Wind's

competitors already had conceived the technology", (2) that "GE Wind knew about that prior art", and (3) that "GE Wind had a motive not to disclose that prior art when it applied for the patent in dispute." *Id*. at ¶ 4 (GE App. 4).

GE chose to file its motion to strike before the start of expert depositions.   The motion to strike was filed on June 4, 2012.  (Doc. 607).  GE deposed Professor Carrier on June 12, 2012.  (MHI App. 38-61).  Mitsubishi deposed GE's rebuttal expert, Professor Paul Janicke, on June 14, 2012.  (MHI App. 1-37).

### B.    Professor Carrier Does Not Opine on Any Ultimate Question of Law

GE leads off its motion with the argument that "Professor Carrier impermissibly opines as to an ultimate issues of intent to deceive" in this matter.  *See* GE Motion at 3-5 (Doc. 607).  This is incorrect.  Professor Carrier offers expert opinions that help the Court decide subsidiary issues of fact.  As GE admits, he opines that GE Wind's patent-blocking behavior makes it "more likely" that the applicants knew about the prior art and had a motive not to disclose that prior art to the patent office.  *See* GE Motion 4 (Doc. 607) (quoting Professor Carrier's report).  Nowhere in his expert report does he opine that any particular GE Wind employee had an intent to deceive the patent office.

In fact, Professor Carrier repeatedly testified in his deposition that he will not be opining on any ultimate legal issue in this case.  App. 54 (Dep. Tr. 91:25 – 92:1-2) ("Nowhere in my report do I ever offer an opinion on an ultimate issue in this litigation."); App. 41 (Dep. Tr. 19:7-10) ("I am not opining that any particular individual had the requisite intent to have engaged in inequitable conduct."); App. 57 (Dep. Tr. 127:19-21) ("I have not opined on the ultimate issue in my report, and I don't plan to do

so."); App. 53 (Dep. Tr. 87:16-20) ("I never understood that to be my responsibility, and so I limited my report to the question of relevance and whether or not it was more likely.").[1]

Instead, as Professor Carrier explained, he employs his expertise in the fields of intellectual property and antitrust law to assist the Court in "connecting the dots" to reach its own conclusion.  *See* MHI App. 54, 56-57 (Dep. Tr. 92, Tr. 125, 128).  "Based on my scholarship and my study throughout my career of how patents are used in various industries, in various markets, . . . I am able to piece together this evidence in a way that is designed to be helpful to the trier of fact to look at various pieces of evidence related to spreadsheets and monitoring and the filing of patent applications, incentives, disincentives, regulatory structures."  MHI App. 57 (Dep. Tr. 128:14-24).  In this respect, Professor Carrier "take[s] an array of evidence that otherwise could appear to be a group of unconnected dots, and allow those dots to be connected in a way that makes clear how this range of activity could shed light on an issue that absent the expert's involvement might not be so readily apparent."  MHI App. 54 (Dep. Tr. 92:5-12).

The mere fact that Professor Carrier's conclusions – which are based on his years of experience and studies – bear on the issue of intent to be decided by the Court does not support their exclusion.  In fact, the opposite is true:  it reinforces their relevance and

---

[1] *See also* MHI App. 57 (Dep. Tr. 127:16-21) ("I'm not offering an opinion on the ultimate issue in this litigation."); MHI App. 53 (Dep. Tr. 89:22-23) ("Again, I do not opine on the ultimate issue."); MHI App. 41 (Dep. Tr. 18:18-19) ("I have not opined on the ultimate issue in this case.  I was not asked to opine on it, nor have I opined on it in my report."); MHI App. 54 (Dep. Tr. 90:1-3) ("I'm not here today to offer an opinion on the ultimate issue in this case.").

helpfulness to the Court in deciding whether certain GE Wind employees acted with intent to deceive the patent office.  *See United States v. Leuben*, 812 F.2d 179, 184 (5th Cir. 1987); *United States v. Piperi*, 101 F.3d 697 (5th Cir. 1996); *see also United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (behavior testimony from psychologist is admissible).[2]

GE's rebuttal expert, Professor Paul Janicke, agreed that Professor Carrier does not opine on the ultimate issue of intent in his expert report.  *See* MHI App. 33 (Dep. Tr. 131-132).  In Professor Janicke's words, Professor Carrier is "saying that these patent blocking strategies provide motivation for fraud" but his report does not opine on whether GE Wind employees intended to deceive the patent office.  *See id.*  Professor Janicke further acknowledged that his own rebuttal report opined directly on the issue of intent and therefore exceeded the scope of Professor Carrier's report.  *See id.* MHI App. 33-34.

The case law cited by GE is inapposite.  In each cited inequitable conduct case, the federal court allowed the testimony of the expert but excluded those portions that opine directly on the subjective intent of the patent applicants.  *See, e.g., Therasense, Inc. v. Becton, Dickenson & Co.,* No. C-04-02123, 2008 WL 2037732, at *2-5 (N.D. Cal. May 12, 2008) (cited in GE Motion 5); *Pharmacia Corp. v. Par Pharm, Inc.*, No. 01-6011,

---

[2] *See Waco International v. KHK Scaffolding Houston, Inc*., 278 F.3d 523, 533 (5th Cir. 2002) (district court did not abuse its discretion in allowing a lawyer expert to testify as to what the law was as it related to questions of fact); *United States v. Long*, 300 Fed. Appx. 804, 814-15 (11th Cir. Nov. 25, 2008) (expert's opinion that defendant's business bore all the hallmarks of a Ponzi scheme was admissible).

2004 WL 5614917, at *2 (D.N.J. Feb. 18, 2004) (cited in GE Motion 4); *Buckley v.*

*Airshield Corp.*, 116 F. Supp. 2d 658, 662 (D. Md. 2000) (cited in GE Motion 4); *Borg*

*Warner, Inc. v. Honeywell Int'l, Inc.*, 750 F. Supp 2d 596, 611, 616 (W.D.N.C. 2010).[3]

As Professor Carrier does not opine on subjective intent (MHI App. 41), none of the

cases cited by GE support the motion to strike.  *Accord Aspex Eyewear, Inc. v. Elite*

*Optik, Inc.*, No. 98-CV-2996, 2002 WL 1751381, at *34-35 (N.D. Tex. Apr. 4, 2002)

(denying motion to exclude inequitable conduct witness where non-movant pointed out

that its expert "will not testify as to whether the patentee . . . has engaged inequitable

conduct").

### C.    Professor Carrier's Opinions Rest on a Reliable Foundation and are Relevant

GE does not dispute that an expert may assist the trier of fact by connecting the

dots.  Federal courts in Texas and elsewhere have permitted experts to testify in

inequitable conduct cases in such circumstances.[4]  Indeed, GE's rebuttal expert also

recognized this role of experts in a trial on inequitable conduct.  Professor Janicke, who is

---

[3] GE also cites *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) (GE Motion 4), but that case does not address the question of the admissibility of expert testimony and does not even address inequitable conduct.

[4] *See, e.g., Aspex Eyewear, Inc. v. Elite Optik, Inc.*, No. 98-CV-2996, 2002 WL 1751381, at *34-35 (N.D. Tex. Apr. 4, 2002) (Fitzwater, J.) (in inequitable conduct case, permitting expert to testify concerning "the implications" of the patent's prosecution history because "[s]uch factual or mixed testimony has the potential to assist the trier of fact in understanding what happened when and who made certain statements and at what point"); *Ring Plus, Inc. v. Cingular, Witness LLC*, 637 F. Supp. 2d 423, 430 (E.D. Tex. 2009).  GE's rebuttal expert, Professor Janicke, has given expert deposition testimony in at least two inequitable conduct cases and has read the transcripts of other experts testifying on inequitable conduct "many times".  MHI App. 37 (Dep. Tr. 146).

not skilled in the art, explained that putting together the many pieces of this circumstantial evidence in an inequitable conduct case may be a complicated process with many "bricks" in the "inequitable wall."  MHI App. 27 (Dep. Tr. 106-108).  This analysis is much like Professor Carrier's who says his testimony is intended to "connect the dots" with an array of conduct showing a likelihood of improper conduct.

Further, Professor Carrier's expert opinion meets all of Rule 702's requirements for admissibility.  Professor Carrier's report analyzes GE's patent blocking behavior step-by-step, over the course of his forty-eight page, extensively-sourced report.  (GE App. 1-49).  Professor Carrier is able to integrate and unify these discrete pieces of evidence into a single unified theory of anti-competitive behavior.  He gives precisely the explanation that is needed to understand why the multiple excerpts are part of a common theme.  His report is well-sourced.  There is no reason to exclude his opinions at trial.

First, Professor Carrier's report and testimony are "based upon sufficient facts or data."   Fed. R. Evid. 702.  He reviewed countless documents including, among others, patent blocking scholarship, pleadings in this case, press releases, deposition transcripts and related exhibits, expert reports, and a large number of GE's documents produced by GE in this case.  MHI App. 75-83.  Professor Carrier has spent over 250 hours reviewing documents and drafting his expert report – more than five times the amount of time spent by GE's rebuttal expert.  MHI App. 1 (Dep. Tr. 2:15-17).  Professor Carrier, with the benefit of his specialized knowledge accumulated over 20 years regarding business practices in seeking patents, reviewed these documents and carefully applied them to the facts of this case to formulate his expert opinions.

Second, Professor Carrier's report and testimony are the "product of reliable principles and methods." Fed. R. Evid. 702. Here, with the benefit of his 20 years of academic studies, Professor Carrier reviewed the patent blocking literature and record evidence, all of which are cited throughout his report. Professor Carrier also relied upon more recent studies addressing GE's patent blocking strategies. *See* Carrier Report ¶91 (GE App. 29-30). As Professor Carrier explained, "[t]he concept of patent blocking that I have used in this report is completely consistent with the practices of patent scholars today, all across academia." MHI App. 19 (Dep. Tr. 74:22-25). GE generally does not challenge the reliability of these sources, and GE's rebuttal expert largely relied upon the same sources. Thus, Professor Carrier turned to reliable principles and sources.

Third, Professor Carrier "applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. As set forth in his expert report, Professor Carrier analyzed the patent blocking literature and applied them to the facts of this case. His report cites internal GE documents showing:

- GE employees acknowledging that its goal was to ███████████ ██████ (Report ¶¶ 115,119, 121) (GE App. 38, 39, 41).

- GE systematically monitored its competitors' intellectual property and closely reviewed competitors' portfolios to find further its offensive blocking strategy. (Report ¶¶108-39) (GE App. 35-45).

- GE specifically sought patents on technology that was already in use by competitors. (Report ¶¶ 109-39) (GE App. 35-45).

- GE sought to ████████████████████████████████████. (Report ¶¶ 121-26) (GE App. 41-42).

- GE had a policy to ████████████████████, with minimal emphasis on patent quality. (Report ¶¶ 127-32) (GE App. 43-43).

11

Professor Carrier gives detailed illustrations for each of these observations. For example, he shows that GE's patents were designed to block competitors' existing technology by discussing ████████████████████████████████ ████████████ *See* Carrier Report ¶ 115 (GE App. 38). ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ *See id.*

This is not the first time these dots have been connected. In 1977, David Noble discussed how the "individual policies of GE and AT&T were carefully designed to gain and prolong monopolies vital to their industry." David F. Noble, AMERICA BY DESIGN 93 (1977). "Toward this end, they employed such methods as incomplete disclosure of information in patent applications, . . . the outright suppression or delayed introduction of patented apparatus, the compulsory assignment of employee patents to the company, and the deliberate production of auxiliary patents." *Id.* (footnote omitted). Thus, Professor Carrier's opinion has historical roots. Professor Carrier is entitled to offer a similar opinion based on his analysis of the documents revealed in this case.

With his specialized educational training and over 20 years of professional experience, there is little doubt that Professor Carrier's review of the patent blocking literature, application of those principles to the facts of this case, and his expert opinion that GE Wind's patent blocking strategy makes it more likely that GE Wind intended to

12

deceive the patent office, is the type of "technical or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  Accordingly, the Court should allow Professor Carrier to testify at trial.

### D.    GE's Disagreements With Predicate Facts in Professor Carrier's Report Are Without Merit

GE argues that Professor Carrier's opinions are "belied by the evidentiary record" (GE Motion 8-9), but these are appropriate points for cross examination – not excluding for his testimony.  *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir.2002) ("while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits."); *Micro Chemical*, 317 F.3d at 1392 ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Joovy LLC v. Target*, No. 06-cv-616F, 2012 WL 1006695, at *1 (N.D. Tex. Mar. 17, 2010) ("the court's gatekeeping function is not a substitute for the adversary system"); *Wlliams v. Guadalupe County Texas*, No. SA-04-CA-1058-RF, 2006 WL 17677690, at *3 (W.D. Tex. 2006) (same); *Total Clean LLC v. Ondeo Naleo Co.*, 2003 WL 25676464 (W.D. Tex. 2003) (same).[5]

---

[5] *See also Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1998) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility . . . ."); *Sercu v. Lab. Corp. of Am.*, 3:09-CV-0619-LRH-RAM, 2011 WL 181402, at *2 (D. Nev. Jan. 15, 2011) ("[A] court should not strike expert testimony under *Daubert* simply because the parties dispute the expert's ultimate conclusions ... Furthermore, [arguments involving factual disputes

GE complains that Professor Carrier reviewed only select pieces of the record and is therefore biased.  As he explained in his deposition, Professor Carrier did not review "every single one of the millions of documents produced in this case" but "enough documents that that I had a full sense and was 100 percent comfortable that the report that I wrote was fully supported by the documents that I reviewed, like any other expert would to in a situation like this."  MHI App. 14 (Dep. Tr. 55-56).  Further, Professor Carrier repeatedly offered in his deposition to look at documents that could "potentially change the conclusions that I reach in this report."  MHI App. 14 (Dep. Tr. 56); *see also* MHI App. 13 (Dep. Tr. 49).  GE's counsel showed him no such documents.  Despite this, GE cherry-picks at Professor Carrier's findings, citing to a few select paragraphs in his report but ignoring others.  None of GE's arguments reveal any fatal flaw in Professor Carrier's report.

### 1.    Bonuses Provided to Employees

GE criticizes Professor Carrier's reliance on bonuses given to GE Wind employees who obtain patents before the PTO.  GE Motion 6 (Doc. 607).  Here, GE misses the point.  Professor Carrier relied upon both the financial incentives for filing them ***and*** the adverse personnel consequences for those who did not – i.e., the threat of termination.  GE's motion does not address the adverse-consequences piece of his analysis.  As Professor Carrier explained, filing for patents in general was a factor in engineers' evaluations.  (GE App. 45 ¶ 133).  And GE worked in a "forced ranking"

---

between the parties] go to the weight that should be afforded to the expert testimony and not the admissibility of the evidence.").

14

system where the managers divide employees into three groups – every year, the top 20%

get rewards, the middle 70% keep their jobs, and the lowest 10% are fired.  *See id.* at

¶ 135; *see also* MHI App. 60-61 (Dep. Tr. 140-41).  The "forced ranking" system is a

controversial workforce management tool that is largely unique to GE.  ███████████

█████████████████ when the '705 patent application was filed.  *See* MHI App. 61

(Dep. Tr. 141).  As GE rebuttal expert acknowledged, the threat of being fired could

provide a motive for committing fraud on the PTO.  *See* MHI App. 29 (Dep. Tr. 114).

## 2.    GE Engaged in Patent Blocking

GE argues that "Professor Carrier's foundational premise – that the '705 patent is

part of a scheme by GE to acquire 'blocking' patents – is unreliable because it is based on

cherry-picked excerpts from, and in several instances inaccurate representations of, the

record."  GE Motion 7 (Doc. 607).  GE's arguments are not persuasive.

For example, GE disputes whether the '705 patent claims are so broad that they

cover every practical method to meet the U.S. requirements (FERC Order No. 661A).

*See* GE Motion 8 (Doc. 607).  This is a factual issue to be determined at trial, not through

a motion to strike.  In the inequitable conduct phase of the case, the patent claims are

construed under the lens of the broadest reasonable construction.  (MHI App. 4-5).

Professor Carrier's point was that GE had designed its patent strategy around the newly

promulgated standard – a point that GE does not deny.

GE claims that the Professor Carrier "failed to consider clear contra-indicators of

so-called patent blocking" such as evidence that "the inventors worked hard to innovate a

solution" to the ride-through problem.  GE Motion 9 (Doc. 607).  Again, these challenges

go to the weight of his testimony, not admissibility.  Professor Carrier considered this point in his deposition and rejected it:  "Someone could, for example, spend a lot of time and work really hard . . . but if there's prior art on point, then that is still a bar to patentability."  MHI App. 55 (Dep. Tr. 117:16-20).

GE contends that Professor Carrier "ignores evidence that ███████████ ██████████████████████████████████████"  GE Motion 10 (Doc. 607). Professor Carrier actually considered GE's ████████████████████████████ ██████████████████████████████████– and thereby were aware of the prior art.  (GE App. 38 ¶ 114).

GE contests Professor Carrier's opinion as whether its strategies successfully pushed Mitsubishi out of the U.S. market.  GE Motion 9-10 (Doc. 607).  GE points to two MHI 2.4 MW "sales" in 2011 on projects in which GE could not bid.  GE points to no other new sales since 2008.  These sales totaled 150 wind turbines – less than 3% of the sales in the U.S. in 2011.

In sum, none of the "facts" raised by GE show that Professor Carrier is "mischaracterizing" the record or that he has an incomplete view of the relevant evidence.  To the contrary, his thoughtful counterpoints to each and every item raised by GE further demonstrate the breadth and soundness of his conclusions, proving no grounds supporting a motion to strike.

### 3.    GE Was More Likely To Know About Prior Art

GE objects to Professor Carrier's opinion that employees who are designing a patent strategy to block competitors in the marketplace are more likely to know about the

16

prior art practiced by those competitors.  Nevertheless, GE concedes that its practice of "diligent monitoring and review" of competitors' intellectual property increased the likelihood that it knew about prior art in the field.  GE Motion 10-11 (Doc. 607).  Given this admission, it is unclear why GE moves to strike this point.  Clearly, it is proper as one of the dots that Professor Carrier is connecting to reach his opinion.[6]

At most, GE contends that Professor Carrier should not opine on the materiality of prior art to the '705 Patent because he is not an expert on electrical engineering.  *See* GE Motion 10-11 (Doc. 607).  Professor Carrier does not purport to offer expertise on materiality or technical issues concerning the claims in the '705 patent.  *See* MHI App. 40 (Dep. Tr. 15:9-17).  He made clear in his report and at his deposition that he relied on the conclusions of Professor Harley, a qualified technical expert, for any assumptions about materiality.  *See* Carrier Report ¶ 142 n.165 (GE App. 47); *see also* MHI App. 40, 48-49, 58 (Dep. Tr. 14, 60-64, 211).  This should obviate any of GE's concerns.  GE's rebuttal expert reached his contrary conclusions without opining on materiality.

### 4.    Competitive Harm Is Helpful In Understanding Motive

GE complains that his report includes opinions on irrelevant matters.  *See* GE Motion to Strike at 5-6 (Doc. 607).  Incredibly, according to GE, Professor Carrier's

---

[6] In fact, the only provision of Professor Carrier's report that GE specifically says should be stricken on this basis does not address the state of prior art in this case at all. GE Motion 11.  GE points to paragraph 81 of the Report, which reads: "[P]atent blocking makes it more likely that companies obtain patents not to protect inventions they have created but to cover technologies that rivals already developed."  (GE App. 27 ¶ 81).  In this section, Professor Carrier is discussing the effects of patent blocking generally – not the prior art in this case.  Moreover, his conclusion is entirely consistent GE's own concessions on this issue.

opinions on "the effect of any so-called patent blocking strategy" – harm to competitors

and U.S. consumers – is irrelevant to inequitable conduct. *See id.*

Competitive harm is addressed in a total of six paragraphs in Professor Carrier's

report (¶38-43). It is helpful background to understand GE Wind's motivation. It shows

that GE Wind was not just patenting to "protect its investment in research," but had a

strong corporate motive and that substantively involved individuals knew the competitors

were practicing this technology in the industry. The inverse of competitive harm is

preservation of a monopoly for one company and that supplies the motive. Motive is

relevant to inequitable conduct. As GE's rebuttal witness acknowledged, circumstantial

evidence for proving intent to deceive includes evidence that makes the proposition more

likely to be true. MHI App. 28 (Dep. Tr. 111:3-7).

The stakes are high in this case not only for the parties but also for the American

consumer. It is Mitsubishi's contention that GE motive and plan has been to take an

"invention" long practiced in Europe and re-formulate it into a method patent tied to a

new U.S. regulatory standard that effectively stifles competition. If GE prevails, the U.S.

wind power industry – now well behind Europe – and most particularly the consumer will

suffer. GE's rebuttal expert recognized a patent that provides actual market dominance is

one that calls for close scrutiny. *See* MHI App. 14-15 (Dep. Tr. 55-57). Professor

Janicke apparently recognizes that where the patent process will provide the path to

industry dominance, then the process needs to be closely reviewed. *See id.* In this case,

there will be considerable evidence that the patent in question does in fact pose the real

hazard of market dominance.

18

CONCLUSION

Mitsubishi respectfully requests that the Court deny GE's motion to strike the

expert report and anticipated testimony of Professor Carrier (Doc. 607).

Respectfully submitted,

By:  /s/  Lane Fletcher
Vic H. Henry
TBA No. 09484250
vhhenry@hoaf.com
Lane Fletcher
TBA No. 07139300
lanefletcher@hoaf.com
**HENRY ODDO AUSTIN & FLETCHER**
**a Professional Corporation**
1700 Pacific Avenue, Suite 2700
Dallas, Texas 75201
Telephone:  (214) 658-1900
Facsimile:  (214) 658-1919

Roger D. Taylor
**FINNEGAN, HENDERSON, FARABOW,**
**GARRETT & DUNNER, L.L.P.**
3500 SunTrust Plaza 303 Peachtree Street, N.E.
Atlanta, GA 30308-3263
Phone:  (404) 653-6400
Facsimile:  (404) 653-6444

Filiberto Agusti
Charles G. Cole
Steven Barber
Alice E. Loughran
Seth A. Watkins
**STEPTOE & JOHNSON LLP**
1330 Connecticut Ave., NW
Washington, DC 20036
Phone:  (202) 429-3000
Facsimile:  (202) 429-3902

Dated:  June 25, 2012

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served via the Court's ECF system on all known counsel of record in accordance with the Federal Rules of Civil Procedure on this 25th day of June, 2012.

By:   /s/  Alice Loughran
       Alice Loughran